UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

United States of America,          )
                                   )
                Plaintiff,         )
                                   )
        vs.                        )      File No. 3:21-mj-521
                                   )               3:22-cr-005
Nicholas Derosier,                 )
                                   )
                Defendant.         )

TRANSCRIPT OF DIGITAL RECORDING OF
DETENTION HEARING

Taken at
United States Courthouse
Fargo, North Dakota
January 4 and 6, 2022

BEFORE THE HONORABLE ALICE R. SENECHAL
-- UNITED STATES DISTRICT COURT MAGISTRATE JUDGE --

<u>APPEARANCES</u>

        MS. JENNIFER K. PUHL
        U.S. Attorney's Office
        655 First Avenue North, Suite 250
        Fargo, North Dakota 58102


                                        FOR THE UNITED STATES



                        - - - - - - - - - -



        MR. CHRISTOPHER P. BELLMORE
        Federal Public Defender's Office
        Federal Square
        112 Roberts Street North, Suite 200
        Fargo, North Dakota 58102


                                        FOR THE DEFENDANT



                        - - - - - - - - - -



        Certificate of Transcriptionist – Page 44



                        - - - - - - - - - -


2

1          (The above-entitled matter came before the Court, The

2     Honorable Alice R. Senechal, United States District Court

3     Magistrate Judge, presiding, commencing at 3:00 p.m., Tuesday,

4     January 4, 2022, in the United States Courthouse, Fargo, North

5     Dakota.  The following proceedings were had and made of record

6     by digital recording in open court with the defendant present.)

7                        - - - - - - - - - - -

8          THE COURT:  Today is January 4, 2022.  It is just

9     past 3:00 p.m.  We're here in Case Number 3:21-mj-521, *United*

10    *States of America versus Nicholas Morgan-Derosier*.  Jennifer

11    Puhl is here representing the United States.  Mr. Derosier is

12    present and represented by Chris Bellmore from the Federal

13    Public Defender's Office, and Rachel Wallock from the pretrial

14    services office is also present.

15         This is a hearing on a motion for detention pending

16    trial.  Mr. Derosier had requested an indefinite continuance of

17    the hearing at the time of his initial appearance and has now

18    requested that hearing, so that's why we're in the courtroom

19    this afternoon.

20         I have the pretrial services report.  Ms. Wallock, do

21    you have anything to add to that written report?

22         MS. WALLOCK:  No, Your Honor.

23         THE COURT:  Counsel, have you both received the

24    report and had enough time to consider it?

25         MS. PUHL:  May I remove my mask, Your Honor?

3

1          THE COURT:  Yes.

2          MS. PUHL:  Yes, I have reviewed this report, and I've

3     had time to consider it.  Thank you.

4          THE COURT:  Mr. Bellmore?

5          MR. BELLMORE:  Yes, I have.

6          THE COURT:  Okay.  Ms. Puhl, you may proceed.

7          MS. PUHL:  Thank you.  May I remain seated, Your

8     Honor?

9          THE COURT:  Yes, and please pull the microphone

10    closer so --

11         MS. PUHL:  Certainly.

12         THE COURT:  -- it picks it up.

13         MS. PUHL:  Your Honor, the United States is

14    requesting detention in this matter.  The defendant,

15    Mr. Derosier, is a prolific collector and distributor of child

16    pornography and a longtime hands-on offender of young boys.

17         Because this case involves minor victims, there is a

18    presumption of detention; that is, there is a presumption that

19    there are no conditions that will reasonably assure the

20    defendant's appearance as required or assure the safety of the

21    community in this case, so this is a over -- a presumption that

22    the defendant must overcome, and I would submit he simply

23    cannot do so in this case based upon the history and

24    circumstances of this defendant, the weight of the evidence and

25    his criminal history.

1          First, I want to address the defendant's living
2     situation.  He submits in the pretrial services report that he
3     owns a condo with his partner, Riley Berg, who is now, I'm
4     told, just turned 21 years of age.  That condo is not owned by
5     the defendant.  In fact, the -- it would appear that the condo
6     is, in fact, owned by an individual named Michael Biel.
7          Michael Biel is a 66-year-old man who owns a NAPA
8     Auto Parts store in Carrington, North Dakota, among other NAPA
9     Auto Parts stores throughout the Midwest, including one in
10    Thief River Falls.
11         Mr. Biel met the defendant ten years ago online,
12    after which he hired the defendant to work for him at the Thief
13    River Falls NAPA Auto Parts store.  Thereafter the defendant
14    was charged and convicted of stealing from that NAPA Auto Parts
15    store, and that's reflected on page 4 of the pretrial services
16    report, so the -- that NAPA store -- NAPA Auto Parts store in
17    particular, Mr. Biel is the victim of that offense.
18         This is the condo that the defendant is residing in.
19    It is owned by Mr. Biel, so when I saw this, I asked the agents
20    to reach out to Mr. Biel today to find out about ownership of
21    this condo.  And Mr. Biel tells law enforcement that it --
22    there was a contract for deed and that Mr. Derosier has made
23    one payment, and that payment was in September of this year.
24    He has made no other payments, and he is taking legal action to
25    get that condo returned to him, Your Honor.

1          I also learned today that the condo association has

2    put a $15,000 lien on this condo because Mr. Derosier has not

3    paid condo dues, has not paid special assessment, and did not

4    undergo a background check, which apparently is required by the

5    condo association, so that calls into question whether, in

6    fact, this condo is available for him to return to.

7          Also important about Mr. Biel is that Mr. Biel bonded

8    the defendant out of state custody after he was charged in

9    Grand Forks County with the child pornography offenses.

10   Because this was obviously very strange to us - he's a victim

11   of the offense in 2012, 2015, and then later bonds him out -

12   law enforcement interviewed him.  Quite perplexing.  Doesn't

13   say much at that point.  Says that he has a soft place in his

14   heart for Mr. Derosier.

15         As we later learned, as I just -- as set forth in the

16   presentence investigation report (sic), the investigation

17   revealed that he -- Mr. Derosier then moves into this condo

18   that's owned by Mr. Biel.  And law enforcement executed a

19   search warrant at that condo on October 31, 2021, and this was

20   one of many search warrants that have been executed in this

21   case.

22         They interview Mr. Biel for a second time, and he

23   admits to being in a relationship with the defendant at that

24   point or having a relationship.  And he also shares text

25   conversations between Mister -- Mr. Derosier and himself,

1  during which time Mr. Derosier is sending him naked pictures of

2  his current partner, who I believe at the time was either 19 or

3  20 years of age.

4          In addition, the defendant had text message

5  conversations with a 77-year-old man from Grand Forks on

6  August 23, 2021, after his bond was revoked in state court.  So

7  his bond is revoked in state court, and he's detained for a

8  short period of time, and he has text messages with this

9  77-year-old man from Grand Forks.

10          And during those text conversations the man is asking

11 or telling the defendant, Mr. Derosier, that he wants him to

12 bring Riley over to his house to give him a massage.  So this

13 defendant, Your Honor, continues, I believe, I would submit, to

14 exploit individuals, in particular this young man, Mr. Riley.

15          Now, he does not consider himself a victim, no

16 question, but I think what we're seeing, of course, is

17 exploitation.  At the time of the defendant's arrest, law

18 enforcement asked Mr. Riley whether he was aware that the

19 defendant was serving him up to a seven -- or a 77-year-old

20 man, and Mr. Riley said no, Your Honor.

21          THE COURT:  Mr. Berg?

22          MS. PUHL:  Mr. Berg.  I'm sorry.  Yes.  Thank you.

23          So I mention all of that again for two reasons,

24 because I'm -- it calls into question this place that the

25 defendant has identified that he can return to.  I would submit

7

1    at best it's questionable.  And, of course, his relationship

2    with Mr. Riley is, of course, I think of concern here.

3            In addition, Your Honor -- and I'm going to be

4    relying on the affidavit that supports the Complaint.  The

5    United States -- well, before I get to that, let me also talk

6    about the defendant's criminal history that's reflected on page

7    3.  The defendant has a 2006 charge for criminal sexual conduct

8    in the second degree out of Anoka County.  The victim of that

9    offense is a family member of the defendant.

10           The -- there's another family member, the defendant's

11   sister, who is claiming or who has alleged that the defendant

12   sexually abused her when she was in elementary school and

13   middle school.  And she tells us that this victim of this

14   offense recanted because there was pressure put on them by the

15   family, and there was -- or not pressure, perhaps, but there

16   was a promise made to these young girls that the defendant

17   would buy them a car, and, in fact, the victim recanted.

18           But today the victim, who's in court, and she told me

19   that I can -- can refer to her as the defendant's sister, is

20   claiming that she was sexually abused by this defendant when

21   she was in elementary school and middle school.

22           Now, relative to the facts of this case, the weight

23   of the evidence is very strong.  There's child -- thousands of

24   images and videos of child pornography depicting mostly boys

25   that were recovered from numerous devices from the defendant's

8

1   residence in Grand Forks, including on his person and in a safe

2   that was located in his bedroom.

3          Now, relative to the phone, there's an HTC cell phone

4   that was recovered from the safe that was found in his bedroom

5   in his Grand Forks residence.  Special Agent Smith has

6   conducted a forensic examination of that phone, and there's

7   child pornography.  And I'm not going to talk about that child

8   pornography because it's detailed, I think, in the affidavit

9   that supports the Complaint, the numbers and then some of the

10  images.

11         But in addition to the child pornography, on an HTC

12  cell phone, law enforcement recovered -- or excuse me.  Special

13  Agent Smith identified 20 to 21 victims, individuals that

14  he's -- that are suspected victims of this defendant,

15  individuals that this defendant has engaged in sexual activity

16  with when these victims were underage, and this goes back to

17  2011.

18         As I sit here right now, I can't recall if four -- I

19  think five of those victims have since been interviewed.  It's

20  taking time because, of course, they don't have the same phone

21  numbers, it's -- they've since moved, they're now adults, but

22  five of those victims have been recently interviewed in the

23  last six to nine months by HSI agents.

24         Those victims -- with the exception of one, those

25  victims have -- have revealed that they sent -- either sent

sexually graphic images to the defendant, or at least three of them told law enforcement that the defendant engaged in sexual activity with them when they were underage. And again, we have a lot of work to be done here, but as I said, Special Agent Smith has identified 20 to 21 victims just from this phone alone, Your Honor.

There are also conversations that were recovered from this HT (sic) cell phone between the defendant and James McHaney. As is detailed in some of the search warrant affidavits, James McHaney is an individual that was convicted of child pornography offenses out of the District of Columbia.

After he was released from BOP custody, he moves to Minnesota, moves to the metro area, and his supervision is transferred, and again, this is detailed in search warrant affidavits. That supervision is revoked recently. It's revoked -- was revoked twice, most recently in June. I think it was June of this summer. And he cooperates as a part of that. And he sits down with the Minnesota Internet Crimes Against Children Task Force, and he tells them a whole lot of information about a whole lot of people.

Now, again, this is independent of our investigation, what's happening in North Dakota, but it gets forwarded to the North Dakota ICAC Task Force because there's information in that report which implicates Mr. Derosier. And it's consistent with what one of the victims who has been interviewed told law

1  enforcement, that he had sex with the defendant when he was a

2  minor and he had sex with Mr. McHaney.  Mr. McHaney introduced

3  the defendant to this minor.

4       Mr. McHaney -- Mr. McHaney is interviewed recently by

5  HSI, and what does he say?  He says that they met roughly ten

6  years ago, and he says that he engaged in sexual activity with

7  underage males with Mr. Derosier on several occasions.

8       And he says that Mr. Derosier told him at a

9  restaurant in Minneapolis -- he's very specific about which

10  restaurant, Sabo's (ph) in downtown Minneapolis.  He told him

11  that he was having sex with his nephew, one of his nephews, and

12  that he was recording it, so that came from Mr. McHaney.

13       And again, this is Mr. McHaney.  The first report was

14  independent of our investigation, and law enforcement goes down

15  and interviews him, and it's consistent with what the forensics

16  are showing, that he's having conversations with young -- about

17  young males with Mr. McHaney.

18       And, of course, the one victim who has been

19  interviewed -- one of the five victims who has been interviewed

20  said, "Yes, I had sex with Mr. Derosier when I was underage,

21  and Mr. McHaney, that they sexually assaulted me."  And again,

22  that's from one phone.

23       Multiple other devices that were recovered from --

24  from this defendant.  Most recently law enforcement gained

25  access to the cell phone that was recovered from the

11

1   defendant's person.  The search warrant was executed in
2   September of 2020.  The search warrant (sic) that was recovered
3   from his person was not -- law enforcement was not able to gain
4   access to it, and they sent it off to Cellebrite.  Cellebrite,
5   after over a year, gained access to it, provided it to law
6   enforcement.

7           And Special Agent Smith has begun to go through that
8   lengthy process.  It's about a -- I think about probably a
9   50-page report, just a summary report of that one device.  And
10  some of the conversations that the defendant is having with
11  other like-minded individuals, individuals that are sexually
12  interested in prepubescent-aged boys, are detailed in the
13  affidavit that supports the Complaint, and he is claiming that
14  he is sexually assaulting his two prepubescent-aged nephews.

15          We also know that he is sending pictures of his
16  nephews, sexually-suggestive pictures and seemingly innocent
17  pictures of his nephews.  And in some cases he's getting child
18  pornography in exchange as a result of sending those pictures,
19  Your Honor.  And, again, some of those conversations -- I think
20  two, perhaps three of those conversations, very short snippets
21  of them are detailed in the affidavit, but it is -- it is a
22  very small portion of what's at issue here, Your Honor.

23          There are all kinds of other conversations that the
24  defendant is having with like-minded individuals where he's
25  representing that the defendant -- or that he is engaged --

1   that he is sexually abusing these nephews.  Sometimes he

2   represents that he's the father of these children, but if

3   there's -- but to not be mistaken, he's sending pictures of the

4   nephews, so we know it's the nephew and not some other child.

5   And in other cases he's representing that he is the uncle, and

6   he's very specific about what kinds of sexual activity that

7   he's engaging in with these kids.

8          Also of import here, Your Honor, is the fact that

9   we -- the law enforcement here in North Dakota received yet

10  another tip from law enforcement in Minnesota.  That was

11  independent of the investigation happening here, and that too

12  is detailed in, I think, every search warrant affidavit that's

13  been presented to this Court in this case.

14         And at issue in that case was a man, Jonathan -- or,

15  excuse me, a man who reported to the Eagan Police Department

16  that he met an individual online who was later identified as

17  Justin Langen, who has since been charged with child

18  pornography offenses in state court in Minnesota.  He said he

19  met this individual and that he -- that this individual sent

20  him child pornography.  So he receives this child pornography

21  that's very disturbing.  He walks into the Eagan Police

22  Department and hands it over.

23         And again, this is -- again, I'm going to say this

24  again, it's set forth in the search warrant affidavits.  This

25  then led to a search warrant of Mr. Langen's residence, and

1    they seized media, including a telephone.  The forensic

2    examination of that telephone revealed text conversations and

3    Grindr conversations between Mr. Derosier and Justin Langen.

4    Now, they weren't able to recover child pornography, but you

5    can infer that child pornography was traded based upon what is

6    being said in these conversations.

7           And he also provided him a picture of Mr. Derosier

8    and his younger nephew, and they talk about having boy fun

9    together.  He talks -- they're talking about sexual -- they're

10   talking about sexual interest in prepubescent-age boys, and he

11   sends an image of he and his younger nephew, who he represents

12   is five years of age.  It's the younger of the two nephews.

13   His sister has two boys.  This is the younger of the two

14   nephews.  So again, that's independent of what's going on in

15   North Dakota.  And again, that -- that image of the defendant

16   and the defendant's nephew shows up on Mr. Langen's cell phone

17   in Minnesota, Your Honor.

18          And, of course, as I said, again, there's all that

19   other media which reveals all the other child pornography.  In

20   total there -- I think there are five cyber tips in this case,

21   Your Honor, that were ultimately resolved back to the

22   defendant.  Some of these cyber tips were, I think, as -- date

23   back many years, but Special Agent Smith has been -- has since

24   been able to attribute them to this defendant.

25          What's of interest in this case, Your Honor, I think

                                    14

1    one of the first cyber tips that came to North Dakota I believe

2    was in January or February of 2019, and it was shortly after

3    the defendant's business partner was killed.  And he said that

4    the cyber tip came back to Team Lawn, and he made a

5    representation to the Grand Forks Police Department or law

6    enforcement that his devices had been stolen.  Devices had been

7    stolen, and, unfortunately, it was dropped at that point, so it

8    was never -- law enforcement never sought through.

9           Fast-forward many months, there's a search warrant at

10   the defendant's residence for the -- for his engaging in

11   fraudulent activities relative to his Team Lawn business, and

12   it was during that search warrant in September of 2020 that

13   they located child pornography, Your Honor.  But what's of

14   interest is the devices weren't stolen.  All of those devices

15   were there.  He lied to law enforcement then.  He continues to

16   lie to law enforcement and continues, I think, to misrepresent

17   to this Court what's going on with his living situation.

18          In the end, Your Honor, the defendant poses a very

19   real, a very serious and a very imminent threat to the safety

20   of the community, in particular children.  And again, some of

21   this activity or the activity I believe -- the activity

22   relative to Riley Berg is all happening after he's been charged

23   in Grand Forks County, Your Honor.

24          And I'm asking this Court to rely on the affidavit

25   that supports the Complaint, the affidavit -- the search

1   warrant affidavits, as well as the information that I have

2   proffered about the many suspected victims that were recovered

3   from the HTC cell phone, some of which have been -- some of

4   those victims have been interviewed by law enforcement, so

5   again, a serial offender of children.

6          So given the weight of the evidence and, I would

7   submit, the somewhat weak ties to this community, I also would

8   submit that the defendant poses a risk of flight in this case.

9   As I said, he's got that history of dishonesty, whether it be

10  his theft conviction, his deceiving others relative to his Team

11  Lawn business, and then again, those representations made to

12  this Court.  In light of this -- all of this, Your Honor, the

13  United States submits that the defendant simply cannot overcome

14  the presumption of detention here.

15         THE COURT:  You made several references to affidavits

16  supporting search warrant applications.

17         MS. PUHL:  Yep.

18         THE COURT:  Have those been provided to Mr. Bellmore?

19         MS. PUHL:  They have not, no.  I can certainly

20  provide them.  I have them all right here, but they will be

21  provided to him after he's indicted, along with the other

22  evidence.

23         THE COURT:  Mr. Bellmore.

24         MR. BELLMORE:  Yes, Your Honor.  I don't know when

25  that -- I don't know when that's going to be, and that's the

1  problem here.  The government unloads all of these allegations,

2  all of these accusations for information mostly that is not

3  charged in the Complaint, involving conduct that's taken place

4  out of district, which I am -- I do not have to review in

5  preparation of this hearing, was not given a heads-up about it,

6  that there's -- that adds specific information was going to be

7  provided at the hearing.

8          And I don't have any of that information through

9  discovery because the government has charged this through

10 Complaint, and they're not going to provide discovery until

11 he's indicted.  And when's he going to be indicted?  There's no

12 timeline on that.  It's whenever the government wants to do it,

13 I suppose.  And so what the government has essentially done

14 here is, seeing the end of the state case, filed a Complaint

15 and affidavit based on a partial version of their

16 investigation, to use it to have Mr. Derosier arrested.

17         I have gone through -- this case was -- the state

18 version of this case was charged out quite a while ago.  It was

19 dismissed recently, on December 30th.  I had taken a look at

20 the docket in that case, and it looked like the State of North

21 Dakota was playing tricks on Mr. Derosier's bond.  He was

22 bonded out.  He posted a $25,000 bond, and there was no

23 substantive issues with him while he was released.

24         For example, I noticed that the government had

25 indicated that if Mr. Derosier appeared for his videoconference

17

1   hearing which took place over the internet, that they were

2   going to move to revoke his bond because he would've had to

3   access the internet, knowing that the Court had scheduled the

4   hearing for a video teleconference.  Fortunately, that didn't

5   happen.

6       But Mr. Derosier has been out.  He has been bonded in

7   this -- in that case and had been doing what he needs to do.

8   He wasn't -- there wasn't any legitimate revocation.  He was

9   arrested at his home on the warrant in this case.  Officers

10  knew where to -- found him.  He was where he was supposed to

11  be, which is the residence that we are asking for his release

12  to, the condo that the government mentioned, so he has a solid

13  release plan.

14      I guess going back to the presumption here, of

15  course, the Court knows the presumption is rebuttable.  We bear

16  the burden of producing a release plan, and this is a

17  rock-solid release plan.  Mr. Derosier has a place where he can

18  go.  He has a roommate, his significant other, his partner,

19  Mr. Berg, who pretrial services has contacted, has verified all

20  of the information.

21      The government indicates that Mr. Derosier was

22  playing a fast one with the status of this condo.  He was not.

23  I was present for the bond interview.  He said it was a

24  contract for deed.  That is actually described in the financial

25  section of the Bond Report, so he wasn't trying to mislead.  He

18

1  wasn't misleading pretrial services.  That is a place that he
2  has.
3        Whether he's behind on payments is one thing, but
4  he's certainly not misrepresenting that he has a place.  And
5  that place, Your Honor, is not too far away from the
6  courthouse.  It's not too far away from where his pretrial
7  services officer would be, within walking distance, and
8  Mr. Derosier does not drive.
9        What I'm proposing, Your Honor, is his release on
10 conditions that he be supervised, that he be supervised with
11 the condition that he undergo location monitoring and that he
12 be confined to his home, home confinement conditions.  Those
13 are conditions of release that I believe we have -- that we are
14 producing through the Bond Report and through my comments this
15 afternoon that overcome that burden.
16        Again, I don't have the burden of persuasion in this
17 case with respect to his release.  That's the government.  I
18 have a limited burden of producing conditions that would
19 overcome the presumption that there are no options available.
20 There are options available.  He has a place to go.  He has a
21 condominium.  There are conditions on -- restrictions that can
22 be placed upon him by the Court that would alleviate concerns
23 of nonappearance and danger -- danger to the community.
24        The Bond Report indicates that there's criminal
25 history entries, relatively few convictions.  The government

19

1  mentioned the Thief River Falls theft case that was ten days
2  jail that was stayed for one year.

3       There are failure to appear entries in those cases.
4  Starting with the ones that are upfront in bold on page 3, both
5  of those are out of Minnesota, one in Stevens County for a
6  driving case, one in Sterns County for a fraudulent check case,
7  a bad check case.  Those cases were opened in 2020.
8  Mr. Derosier traveled to Minnesota to attend those proceedings,
9  go to the courthouse to address those.  He was told that the
10 courthouse was shut down because of COVID and to pay attention,
11 there'd be a new date.

12      It's unclear to me whether or not he was mailed the
13 new date, whether it was mailed to the wrong address.  Early on
14 Mr. Derosier had been checking to see what the status of that
15 was, and after several months kind of took his eye off of it.
16 And these dates were set and -- and missed.

17      At that point he was dealing with the North Dakota
18 cases, where he had a bond condition where he could not leave
19 the state of North Dakota, so he couldn't easily get to
20 Minnesota to take care of those and to deal with those, because
21 those appear to be active, Your Honor.

22      I would have -- request an additional condition of
23 release that he resolve those within a reasonable time, such as
24 45 days, and if he were to be released, that he resolve those
25 warrants within 45 days.  Those are -- again, taking a look at

1   the nature of those charges, appear to be not -- not serious

2   and should be easily resolved if he's given the opportunity on

3   release.

4          Your Honor, going -- going to the Complaint, a lot of

5   the -- the charges that are actually -- were brought forth in

6   the Complaint, only one of them carries a mandatory minimum

7   case -- sentence - excuse me - of five years.  The nature of

8   the offenses as charged are not overly serious.

9          The affidavit that provides some information around

10  them is -- is another thing, Your Honor.  I would just point

11  that some of the information that's provided in there is

12  unclear.  It's not with certainty that Mr. Derosier is the one

13  who is engaging in these communications.

14         And, two, the government's concern about nephews -

15  I'm basing this on the affidavit because this is, frankly, the

16  only substantive information on the government's evidence I

17  have at this point - indicates that neither -- neither of those

18  boys disclosed any sexual abuse when they were forensically

19  interviewed, interviewed by a professional trained to interview

20  children, and that there was no information disclosed.

21         So, Your Honor, I even -- even with the allegations

22  of contraband being found on electronic devices, I still

23  believe that there are conditions.  Again, it was a condition

24  on the state bond that he was able to abide by, was that he not

25  have a smartphone, that it have easy access to the internet.

1    It wouldn't be necessary.

2            The Bond Report indicates that Mr. Berg, as most

3    people -- almost every -- every person in free society has a

4    laptop, a phone or some access to the internet that -- for

5    daily life, but that would be separate from Mr. Derosier.  He

6    would not have access to that.

7            And again, Mr. Berg has agreed to serve as a

8    third-party custodian.  I have been in contact with him as

9    well, and he verified the same, understood what was going on,

10   understood that -- there was a willingness to report any issues

11   of noncompliance, made that understanding -- made it -- made it

12   clear that he understood what was going on.  And I would say

13   that I'm unaware of any concern that he had regarding what the

14   government suspects is some issue with that -- with that

15   relationship.  He seemed willing to help and willing to

16   understand what would -- the expectations would be.

17           What's not in the Bond Report is that we, during the

18   interview, invited pretrial services to contact a state

19   probation officer.  We provided a name, indicated this officer

20   was stationed out of Fargo who had information based on his

21   supervision of Mr. Derosier and to see, you know, what

22   Mr. Derosier had been doing, had he been compliant.  I would

23   say he has been.

24           And it doesn't appear as though pretrial services has

25   even attempted to contact this officer.  I believe it's Officer

1   Lund in Fargo who would have very important and relevant

2   information as to whether or not Mr. Derosier is supervisable.

3   I believe that he is amenable to supervision.  And again, we

4   are proposing -- we have proposed to pretrial services that it

5   be home confinement.

6        And again, the Bond Report indicates that one strike

7   against release is that he has no verifiable employment, which

8   at this time I'm not going to dispute.  At the same time, if

9   he's subject to home confinement condition, there's not that

10  additional concern about the individual being out at work, not

11  being at home for a certain amount of time, that he is going to

12  be at home, confined there nearly around the clock.  Unless

13  there's some legal probation or medical appointment, he would

14  be confined to -- to his home.

15       And again, the proximity to the courthouse, proximity

16  to pretrial services office show that there are alternatives to

17  incarceration in this case.

18       This is -- again, the allegations that are out there

19  I -- I feel as though it puts us at a significant disadvantage

20  being unaware of those.  As the government was making their

21  argument, I had looked at the docket.  I didn't see that there

22  were any filed affidavits beyond what's in the Complaint in

23  this case.  So not only I have not been given those, I don't

24  know if I could've found them independently on my own.

25       And so when the Court considers the weight of the

1   evidence, I'd ask the Court to consider the fact that the

2   defense in this case hasn't provided any information to

3   discuss, to review what the government has proffered today.

4   That's a factor the Court has to consider, but would just ask

5   the weight of the evidence and the weight to apply that factor

6   I think should be limited under these circumstances and

7   confined primarily to what's contained in the affidavit.  That

8   does allege some serious conduct, Your Honor, but it's not

9   conduct so serious that he's -- he's a danger to the community.

10       These allegations, again, not only took place out of

11  the district, but timeline of them does not appear to be

12  recent.  The allegations, even the conversations that were

13  depicted in the affidavit are over two years old, and the state

14  case has been going on for quite some time.  Typically when

15  somebody, in my experience, has been arrested and charged in

16  federal court by a Complaint, there was some immediate conduct

17  that was alleged to have occurred.  This is -- this is not the

18  case.  The information confined to the Complaint is quite old.

19  Both -- both -- all three charges - excuse me - were alleged to

20  have occurred in 2020.

21       And so, you know, with that, Your Honor, I believe

22  that, again, there are -- there are conditions, that any

23  presumption has been overcome by the release plan, that he be

24  placed on home confinement at his residence under the

25  supervision of pretrial services, as well as a third-party

24

1   custodian in Mr. Berg, and that those conditions alleviate any

2   concerns addressed in the Bond Report regarding risk of

3   nonappearance and risk of flight.

4           I'd just add too, as far as the failure to appears

5   are concerned, most of those didn't result in an arrest.  Most

6   of those resulted in learning that there's a warrant and taking

7   care of it.  A lot of those failure to appear entries come with

8   a subsequent entry that says warrant quashed.

9           He takes the cases seriously, but he's also -- these

10  are cases where he's out on bond and he's appearing by summons

11  and receiving legal documents in the mail, and so he could've

12  been better about staying on top of court hearings, but it's

13  not as though he was absconding.  I believe that there's a

14  difference in these cases, missing court versus absconding.

15          In federal court this case is by far, if you take a

16  look at his record, the most serious case that he's going to

17  have to confront, whatever form that takes, whenever he's

18  indicted.  We expect that this would be by and far the most

19  serious case that he will be confronting, and the case --

20  excuse me.  The court hearings and the proceedings would be

21  limited in federal court as opposed to just check-ins regularly

22  in state court, and so I don't believe that the failure to

23  appears truly reflect his risk of nonappearance.

24          And again, his -- his time that he's been supervised

25  in the state show that he -- he is amenable to supervision.

1  The facts and circumstances leading to his arrest, where he was
2  found at his home, also indicate that he is not a risk of
3  flight, that he's -- this was -- law enforcement knew where he
4  was.  Pretrial services are going to -- is going to know where
5  he is, and then based on that, Your Honor, we're asking for his
6  release under the conditions as I have proposed this afternoon.
7          THE COURT:  Mr. Bellmore, the only information that
8  you have received is the Complaint and affidavit, is that
9  correct?
10         MR. BELLMORE:  Yes.  That's Document 1-1.
11         THE COURT:  Okay.  Ms. Puhl, I do have some concern
12  about proffering evidence that's not available to the defense.
13         MS. PUHL:  I'm -- as I said, Your Honor, the search
14  warrant affidavits are available right now if he wants to
15  review them, and I'm certainly willing to provide those for
16  that purpose.
17         But I do want to address a couple of things that --
18  that has been said, and first, I take issue with the fact that
19  this isn't a serious crime.  I think there are few cases, few
20  charges that are more serious.  This involves the graphic
21  sexual abuse of prepubescent-aged boys.  There's not one,
22  there's not two, there's not a hundred, there's thousands of
23  young boys who are sexually abused.  And each one of those
24  videos, each one of those images represents a separate and
25  distinct victim that is being sexually abused, and this

26

1  defendant is distributing them to individuals who also have a

2  sexual interest in children.

3        Now, in order to get those images, he's also provided

4  images of his two nephews, Your Honor, in exchange for some of

5  the child pornography.

6        Now, defendant says that much of what we have in here

7  is old.  A couple things that the defendant is not keeping in

8  mind is that the search warrant was executed in September

9  of 2020.  That's when the phone was recovered.  Now I'm

10  referring specifically to the phone that was seized from his

11  person.  We didn't get access to that phone until October of

12  2021.  That's two-and-a-half months ago.  That information, I

13  suspect, wasn't available to Grand Forks.  That's -- the phone

14  -- that phone is where much of this information comes.

15        And he's having conversations in 2020, up until the

16  point that phone is taken from him, and he's -- in those

17  conversations he's trading images of his nephew with other

18  like-minded individuals, trading child pornography, Your Honor.

19        So, yes, some of this is old -- older, but I think

20  when you -- when you take -- when you look at it in the context

21  of what's going on, when law enforcement gained access to that

22  particular cell phone, it makes sense, Your Honor.

23        Also, we selected conversations in -- or the officer

24  -- the agent selected conversations with other individuals that

25  predated the travel of his two nephews from Minneapolis to

1    North Dakota, because those conversations, he's -- he's
2    representing that he's engaging in sexual activity with these
3    nephews, so they become important because it -- it reveals what
4    his intent is when he picks them up.

5    According to his mother, picks them up without her
6    permission and brings them over to North Dakota and takes
7    pictures of them, sexually suggestive pictures of them, so
8    those conversations were selected because it reflects what his
9    mindset is when he's picking up those children and bringing
10   them to North Dakota.

11   But, again, there are other conversations that
12   continue into 2020, near the point in time of when the
13   telephone -- rather, the cell phone was seized from the
14   defendant.

15   His being a hands-on offender, that's information
16   that's not -- that's not -- that is the only information that
17   I'm proffering that's not set forth in any sort of affidavit, I
18   believe, and that comes from, as I say, the HTC cell phone.

19   This alternative release option is a dangerous
20   alternative because much of what the defendant did, he can do
21   in his own home.  He's sitting on his telephone or behind his
22   many devices, reaching out to children, adolescent-age
23   children, trading child pornography with other like-minded
24   individuals, Your Honor.  All of that's happening in his home
25   and, therefore, I think it would be a dangerous alternative,

28

1   and I don't think anything he has submitted overcomes, again,

2   that presumption of detention, Your Honor.

3           THE COURT:  Thank you.

4           MR. BELLMORE:  Your Honor, can I make one comment?

5           THE COURT:  Let me say first, Mr. Bellmore, I'm

6   inclined to continue the hearing to allow you to review the

7   search warrant affidavit and continue it to another day if

8   that's what you choose.  But if you want to go ahead and tell

9   me what you want to tell me now, go ahead, Mr. Bellmore.

10          MR. BELLMORE:  Well, just -- just to clarify, Your

11  Honor, what is charged in here is serious, but compared to what

12  the government was proffering, there's a difference, hands-on

13  sexual abuse.  And certainly I wouldn't disagree that child

14  pornography depicts abuse.  At the same time is -- the media

15  files does not mean the possessor or the distributor or even

16  the receiver is the one who abused the child, as depicted in

17  the -- in the image, and there -- and I -- there's a

18  distinction there.

19          So these are serious, but compared to, again, what

20  the statutory penalty ranges are, I -- I wanted to characterize

21  that as being minor as compared to what the government --

22  conduct the government was -- was proffering.

23          But if I have one moment, Your Honor?

24          THE COURT:  Sure.

25          MR. BELLMORE:  Your Honor, if -- yeah, I would agree

29

1    that and ask that we continue this proceeding so that I might

2    be able to review more information, review that with

3    Mr. Derosier before the Court makes a decision.

4              THE COURT:  And how long a continuance would you

5    request, Mr. Bellmore?

6              MR. BELLMORE:  I think by the end of the week, Your

7    Honor, would be enough time if I'm given the affidavits soon.

8    I'm generally available this week.

9              THE COURT:  Okay.  I think I would have time later

10   Thursday afternoon or later Friday afternoon.  And by "later,"

11   I'm thinking 3 o'clock or later on both days.  Ms. Puhl?

12             MS. PUHL:  I may be out of town Friday, so my

13   preference would be Thursday, Your Honor.

14             MR. BELLMORE:  I think that would be my preference

15   too, Your Honor.

16             THE COURT:  Okay.  Let's plan for a continuance of

17   the hearing.  To be safe, I'll say 3:30 on Thursday,

18   January 6th.  And in the meantime, Ms. Puhl, you will

19   provide --

20             MS. PUHL:  Yep.

21             THE COURT:  -- the search warrant affidavits to

22   Mr. Bellmore.

23             MS. PUHL:  Yes.

24             THE COURT:  So, Mr. Derosier, I'm not going to decide

25   the detention question today.  We'll plan to have another

1    hearing after your attorney has a chance to look at those

2    search warrant affidavits.  And then we'll be back here, and

3    I'll make a decision at that time.

4              THE DEFENDANT:  Okay.

5              THE COURT:  Do you understand that?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  All right.  Ms. Puhl, anything else

8    today?

9              MS. PUHL:  Nothing further, Your Honor.

10             THE COURT:  Mr. Bellmore, anything else today?

11             MR. BELLMORE:  Nothing further, Your Honor.

12             THE COURT:  Thank you, all.  We're adjourned.

13             (A recess was taken from 3:43 p.m., Tuesday,

14   January 4, 2022, to 3:30 p.m., Thursday, January 6, 2022.)

15                     - - - - - - - - - -

16

17

18

19

20

21

22

23

24

25

1          (The above-entitled matter came before the Court, The

2    Honorable Alice R. Senechal, United States District Court

3    Magistrate Judge, presiding, commencing at 3:30 p.m., Thursday,

4    January 6, 2022, in the United States Courthouse, Fargo, North

5    Dakota.  The following proceedings were had and made of record

6    by digital recording in open court with the defendant present.)

7                      - - - - - - - - - - -

8          THE COURT:  Today is January 6, 2022.  It is

9    3:30 p.m.  This is a hearing in Case Number 3:21-mj-521, *United*

10   *States of America versus Nicholas Morgan-Derosier*.  Jennifer

11   Puhl is here representing the United States.  Mr. Derosier is

12   present and represented by Chris Bellmore from the Federal

13   Public Defender's Office.  Meghan Nelson from the pretrial

14   services is also here in the courtroom.

15         And we do have a couple of people who are present

16   telephonically.  I granted that request.  I just mention that,

17   and I will say to the two of you, if you have any difficulty

18   hearing at any point, please let us know so that we can attempt

19   to remedy that.

20         This is a continuation of a detention hearing.  I

21   continued it to allow the defense some time to review search

22   warrant affidavits to which the United States had referred in

23   its proffer of evidence, and the United States has provided

24   those to me at my request as well.

25         So I think, Mr. Bellmore, I will allow you to go

                                   32

1  first this afternoon, and we can go from there.

2      MR. BELLMORE:  Okay.  Thank you, Your Honor.  I would

3  incorporate the arguments that I'd made at the initial

4  detention -- detention hearing into my arguments this

5  afternoon.  I thank the Court for allowing us the opportunity

6  to pause the proceeding to review the search warrant

7  affidavits, as well as thank the government for providing those

8  in a -- in a timely matter (sic).  We have reviewed those, and

9  based -- based on that review, my position is unchanged, at

10  least with respect to the weight of the evidence.

11      These warrants were obtained.  I tracked the nature

12  of the investigation, and essentially seek, as search warrants

13  do, permission to seize and investigate certain items,

14  including e-mail addresses, phones, cars and premises.  The

15  weight of the evidence here would be the fruits of those that

16  were provided, and I don't believe that that's exactly what is

17  detailed in those search warrant affidavits.  Again, it's

18  showing where the investigation is headed.

19      I think the information yet is still limited and

20  would ask the Court to rely on the weight of evidence based on

21  the probable cause affidavit in this case to charge

22  Mr. Derosier via the Complaint and the three charges that are

23  listed in there.

24      And also note too that the weight of -- the

25  government's argument is relying heavily on, if not exclusively

33

1   on the weight of the evidence here.  The evidence here is an

2   ongoing investigation, Your Honor.  I'm not going to litigate

3   every fact or allegation.  I still can't do that, and I still

4   don't think that's necessary for a detention hearing.  Several

5   Courts have found that the weight of the evidence as a factor

6   is the least important of which.  Too heavily relying on that

7   factor overshadows the presumption of innocence.

8         And I think all the other factors indicate here,

9   despite serious allegations, that there are alternatives to

10   incarceration.  Again, that is the release plan that we have

11   set forward at the first hearing, that he has a condominium

12   nearby the courthouse, nearby pretrial services office.

13         The government tried to raise some information that

14   that may not be an option for him going forward.  We would

15   dispute that.  That was based on the landlord relationship with

16   Mr. Derosier and Mr. Derosier's significant other.

17         They mentioned that they've fallen behind on

18   payments.  My understanding is those payments are up to date,

19   that there may've been a prior working relationship there, but

20   that the contract is still good.  There's no intention to try

21   to evict or initiate some legal proceedings to void the

22   contract for deed, that that remains a housing option for him.

23   That's a housing option.

24         Again, the proximity - I think it's significant - to

25   pretrial services office, where we -- he would live with his

34

1   significant other, who has told pretrial services that he would

2   serve as a third-party custodian, understanding what those

3   obligations would be.

4        Not only that, I had offered as a condition that

5   Mr. Derosier be placed on home confinement conditions.  That

6   would prohibit him from leaving his home unless he had

7   permission under limited circumstances by a pretrial services

8   officer.  And that would be monitored through geographic

9   technology, location monitoring where pretrial services would

10  know exactly where he's at.

11       The question of employment is one that's often --

12  often relevant.  If someone is out and working, that that is a

13  factor that is in their favor.  Certainly in this day and age

14  and with Mr. Derosier's education and -- and work history, he'd

15  be able to find employment.  At this moment in time he was

16  between formal jobs.  But in this case, if there's concerns

17  about his whereabouts, not working at the present time I think

18  is something that is in his favor.

19       He'd be able to maintain the premises.  Mr. Berg,

20  Riley Berg, the third-party custodian, is able to work and --

21  and pay for living expenses, and that would keep Mr. Derosier

22  at home at more hours during the day.  There wouldn't be any

23  concerns about to and from work and -- and the whereabouts.  He

24  would be home more often, so I think that -- that employment is

25  a -- is a neutral factor.  It kind of cuts both ways.  If the

1    Court is concerned about employment, Mr. Derosier can be

2    gainfully employed.

3            One thing too of note -- I'm not sure if I mentioned

4    it at first, but Mr. Derosier is undergoing a construction case

5    that's out of Grand Forks.  That is a case that's not related

6    to this.  That has not been dismissed.  And there's also a

7    civil case with regard to the business.

8            Now, in the construction criminal case he has

9    appointed counsel.  He's entitled to that.  In the civil case

10   he is not.  He's essentially defending that case on his own,

11   which is next to impossible when he's incarcerated, and I think

12   that is a factor that's relevant as well.

13           More relevant is that this was a state case.  This

14   was a state case that was dismissed on December 30th.  He was

15   out on bond during that case.  He was required to follow

16   conditions and be where he needed to be, and he did so.  There

17   was not a revocation of that bond.  So when he had an

18   opportunity to run from that case, he didn't, and he would not

19   run from this case.

20           Again, when I address the failure to appears -- and

21   the failure to appears are not a situation where he was

22   absconding from law enforcement or avoiding cases.  They were

23   miscommunications, which is unfortunate.  And not

24   insignificant -- not irrelevant, but I think insignificant in

25   the grand scheme of things is, though, he would check in with

1   court and get those matters taken care of.

2           And again, in this federal case those obligations to

3   check into court for hearings that is notified by mail is not

4   going to be an option.  He would have direct communications

5   with a pretrial services officer and, again, have location

6   monitoring, and he would be accountable that way, Your Honor.

7           So I think that the proposed conditions here address

8   all of the concerns raised by the government, raised by the

9   pretrial services office, that those risks are mitigated by

10  home confinement at his own residence that's nearby the

11  courthouse and the pretrial services office, especially

12  considering his -- the way he had stuck around for his state

13  case, again, something that he had denied, something that he is

14  going to defend, and something he's going to do here.  He has

15  no interest in running from this case, demonstrated by his

16  behavior during the state case, and again, that -- that

17  mitigates against any -- any risk of nonappearance.

18          So, Your Honor, I'm asking again that Mr. Derosier be

19  released on pretrial release pending trial in this case.

20          THE COURT:  Thank you.  Ms. Puhl.

21          MS. PUHL:  Your Honor, the defendant ignores the --

22  I'm sorry.  Closer?

23          THE COURT:  Closer, yes.

24          MS. PUHL:  Your Honor, the defendant has said nothing

25  about the presumption of detention in this case, which he has

37

1   not because he cannot overcome.  He is a hands-on offender of
2   children, children who have been identified by Special Agent
3   Smith, and some of whom have been interviewed and confirm that
4   they did, in fact, engage in sexual activity, some intercourse,
5   some oral sex with this defendant or with the defendant and
6   James McHaney; Mr. McHaney, if you recall, who is in BOP
7   custody as -- today.

8           Now, I proffered all of this on Tuesday, and I
9   realize the defendant didn't have the discovery, but it's no
10  matter because the Bail Reform Act is very, very clear that the
11  parties, including the defendant, can proceed by proffer even
12  in the face when they haven't had the discovery yet, Your
13  Honor.  Now, it's up to Her Honor to determine how much weight
14  to give, but it's very clear that the parties can proceed by
15  proffer, and it's designed to do that at this -- at this stage.

16          Now, our case is not limited to the weight of the
17  evidence, our recommendation or -- but, rather, it's based on
18  the nature and circumstances of the offense charged, perhaps
19  most significantly, the history and characteristics of this
20  person, his mental condition, his family ties, his lack of
21  employment, and I'll talk about that in a moment.

22          But again, that -- the weight of the evidence is
23  something that the United States did, in fact, rely on, but
24  that's limited to the Complaint.  That's the child pornography.
25  What's charged here is the child pornography charges and his

1  traveling in interstate commerce with the intent to engage in

2  sexual activity with these two children, so that's very strong.

3  But I mention all this other stuff, the fact that

4  he's a hands-on offender, not a charged offense; the fact that

5  he's communicating with numerous individuals who share a sexual

6  interest in prepubescent-aged children.  These are individuals,

7  Your Honor, that the defendant has shared images of his nephew

8  with.  These are individuals he's expressed a sexual interest

9  in children with, in particular his nephews, his prepubescent-

10  aged nephews.

11  Some of those conversations, again, are set forth in

12  the Complaint affidavit, and they are earlier in time because,

13  as I said, they predate the travel when he went and picked up

14  his nephews in the metro area in Minnesota and brought them to

15  North Dakota.  But as I proffered, there are other

16  conversations where he represents that he's sexually interested

17  in his nephews and -- and/or engaging in sexual activity with

18  them.

19  After that travel takes place, he takes sexually

20  suggestive images of the older nephew.  The nephew now is 11.

21  I think at the time he would've been nine or ten.

22  In addition, the defendant possessed thousands of

23  files of child pornography, video files, image files that

24  depict the graphic sexual abuse of prepubescent-aged boys.

25  Now, I would submit that this information is sufficient in and

1   of itself to conclude that the defendant poses a serious risk

2   of danger to the community, but, nonetheless, we have -- or but

3   in addition we have all this other stuff that, again, I either

4   proffered or am relying on the affidavits.

5          So in the end, I mean, we're not just looking at the

6   weight of the evidence, we're looking at the nature and

7   circumstances of the offense conduct and the defendant's

8   character and his history, including his criminal history,

9   including allegations that he was running sham businesses,

10  accepting payment for services and never performing those

11  services, not paying his employees.

12         In addition to all that, there are these concerns

13  about the proposed residence.  As I said, as I proffered, that

14  the owner of the condo told HSI on Tuesday morning, after I

15  received and read the P -- the presentence investigation

16  report (sic), that there was a contract for deed.  The

17  defendant has made one payment on it, one payment, that's it,

18  and that he is -- he is taking steps to get the property back.

19         Now, the defendant says otherwise, but he hasn't

20  offered any foundation for that, so I assume it's his

21  statement, the statement of an individual who's -- who's a sham

22  artist, Your Honor.  The owner says this.

23         In addition, we have the condo -- the association --

24  or the president of the condo association that says he hasn't

25  paid his condo dues, his special assessments.  All that would

1  confirm what Mr. Biel has said about the -- about his failure
2  to pay -- to make any payments on the condo, so it looks like
3  this defendant is not going to have a place to return to.

4  And he has no job, and that's -- that's problematic
5  for somebody who is such a prolific collector and trader of
6  child pornography.  He's at -- these are all things he can do
7  at home, so at home with no job is concerning.  It's perilous.
8  And he's living with a young man who he's offered up to other
9  men, Your Honor, and again, I proffered that as well.

10  And, finally, there are the defendant -- there are
11  these warrants that have been issued for his failure to appear.
12  I know he has explanations for them, but in the end they are
13  warrants for him.  He did fail to appear.

14  So collectively the defendant is not a good candidate
15  for release even aside from the presumption of detention, but,
16  of course, we have that presumption of detention that he has
17  not overcome.  He has not overcome the fact that he's a
18  hands-on offender, that he's communicating with people that
19  have a like interest in prepubescent-aged boys, that he's
20  sharing images of his nephews with these individuals, and in
21  return receiving child pornography, that he's taken images --
22  sexually suggestive images of these boys.

23  So in the end, Your Honor, the defendant's suggestion
24  for release is -- as I said, it's reckless and perilous.

25  THE COURT:  Thank you.  Mr. Bellmore.

41

1    MR. BELLMORE:  Your Honor, I'm just going to object
2 to the government's characterization of the rebuttable
3 presumption.  The government indicated we had failed to rebut
4 the government's allegations and arguments.  The presumption is
5 that there are no conditions available.  That is a presumption
6 that is overcome by us bearing the burden of production.  I
7 have produced a release plan that overcomes them, that is
8 enough to overcome the rebuttable presumption, and then that
9 puts the burden of persuasion ultimately on the government.
10    THE COURT:  Thank you.  Anything else that either
11 counsel wants to put on the record?
12    MS. PUHL:  Nothing further, Your Honor.  Thank you.
13    MR. BELLMORE:  No, Your Honor.
14    THE COURT:  All right.  Mr. Derosier, I'm going to
15 grant the motion for detention, so you will stay in custody at
16 this time.  There is a presumption because of the nature of the
17 charge against you.  There is a presumption for detention.  As
18 Mr. Bellmore just pointed out, there has been some rebuttal of
19 that presumption by presenting a release plan, but I still
20 consider the presumption even though that release plan has been
21 presented.
22    There is, of course, some question about the
23 availability of the condo as a residence.  That's something I
24 consider.  I consider the information that the United States
25 has proffered as to the circumstances surrounding the offense.

42

1  I have considered the information in the affidavits supporting

2  the Complaint and the information in the affidavits supporting

3  the applications for search warrants.

4          I have considered the criminal history information

5  that is a part of the pretrial services report, including the

6  nature of the charges pending against you concerning the

7  construction business, because there is a serious allegation of

8  deception in connection with that.

9          So in summary, having considered all of the factors

10  set out in 18 USC 3142(g), I find that the government has met

11  the burden to prove that there is no condition or combination

12  of conditions that would reasonably assure community safety and

13  reasonably assure appearance at future proceedings.  There will

14  be a written order to that effect issued shortly.

15          Ms. Puhl, was there anything else needing attention?

16          MS. PUHL:  Nothing further, Your Honor.

17          THE COURT:  Mr. Bellmore?

18          MR. BELLMORE:  Nothing further, Your Honor.

19          THE COURT:  And I'll just ask for confirmation.

20  There's been a waiver of the preliminary hearing, is that

21  correct?  The clerk is telling me yes.

22          MR. BELLMORE:  Yes, Your Honor.

23          THE COURT:  Okay.  Thank you, all.  We're adjourned.

24          (Proceedings concluded at 3:48 p.m., the same day.)

- - - - - - - - - -

43

<u>CERTIFICATE</u>

State of North Dakota    )

                         ) ss

County of Burleigh       )


      I, Sandra E. Ehrmantraut, do hereby certify that the foregoing and attached typewritten pages contain an accurate transcription, to the best of my ability, of said digital recording made at the time and place herein indicated.

      Dated:  March 8, 2022


                /s/ Sandra E. Ehrmantraut