UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA


United States of America,          )
                                   )
              Plaintiff,           )
                                   )
       vs.                         )      File No. 3:22-cr-5
                                   )
Nicholas James Morgan-Derosier,    )
                                   )
              Defendant.           )


REDACTED TRANSCRIPT OF SUPPRESSION HEARING
VOLUME I
Pages 1-194


Taken at
United States Courthouse
Fargo, North Dakota
May 3, 2023


BEFORE THE HONORABLE ALICE R. SENECHAL
-- UNITED STATES DISTRICT COURT MAGISTRATE JUDGE --


Sandra E. Ehrmantraut, CRR
U.S. District Court Reporter
sandie_ehrmantraut@ndd.uscourts.gov
Proceedings Recorded by Mechanical Stenography
Transcript Produced by Computer-Aided Transcription

APPEARANCES

MS. JENNIFER K. PUHL
U.S. Attorney's Office
655 First Avenue North, Suite 250
Fargo, North Dakota 58102

        AND

MR. CHARLES D. SCHMITZ
Department of Justice
1301 New York Avenue N.W., Suite 1100
Washington, DC 20005

                               FOR THE UNITED STATES

- - - - - - - - - -

    MR. CHRISTOPHER P. BELLMORE
    MS. ANNE M. CARTER
    Federal Public Defender's Office
    Federal Square
    112 Roberts Street North, Suite 200
    Fargo, North Dakota 58102

                               FOR THE DEFENDANT

- - - - - - - - - -

GOVERNMENT WITNESS

                                 Page No.

David Buzzo
   Direct Examination by Ms. Puhl           10
   Cross-Examination by Mr. Bellmore     122

- - - - - - - - - -

1          (The above-entitled matter came before the Court, The

2     Honorable Alice R. Senechal, United States District Court

3     Magistrate Judge, presiding, commencing at 9:00 a.m.,

4     Wednesday, May 3, 2023, in the United States Courthouse, Fargo,

5     North Dakota.  The following proceedings were had and made of

6     record in open court with the defendant present.)

7                    - - - - - - - - - - -

8          THE COURT:  Today is May 3rd, 2023.  It is 9:00 a.m.

9     We're here for Case Number 3:22-cr-5.  That is *United States of*

09:01  10    *America versus Nicholas James Morgan-Derosier*.  Jennifer Puhl

11    is here representing the United States.  And, Ms. Puhl, who is

12    with you this morning, please?

13         MS. PUHL:  Your Honor, my co-counsel, Charles

14    Schmitz, and he is with main Justice, the Child Exploitation,

09:01  15    Obscenity Section.

16         THE COURT:  Good morning, Mr. Schmitz.

17         MR. SCHMITZ:  Good morning, Your Honor.

18         THE COURT:  And Agent Casetta from HSI?

19         MS. PUHL:  Yes.  I'm sorry.  Yes, he's the designated

09:01  20    case agent, and Ms. Meyer, our paralegal.

21         THE COURT:  Thank you.  Mr. Derosier is present and

22    represented by Chris Bellmore and Anne Carter from the Federal

23    Public Defender's Office.

24         There is a Motion to Suppress Evidence that's been

09:02  25    filed, and we're here this morning to consider that motion.

3

1    First let's talk about a few logistical matters.  The United

2    States has brought in a screen.  Mr. Bellmore, is the position

3    of that acceptable to you, and are your electronics working

4    acceptably?

09:02    5            MR. BELLMORE:  Yes, Your Honor.  It's our intention

6    -- yes to the positioning of the device.  We are planning on

7    going forward with displaying evidence and information through

8    our laptop onto the screens and not using the government's

9    larger screen, if that's acceptable to the Court.

09:02    10           THE COURT:  I think so.  We'll figure that out for

11   sure when we get to it.

12           MR. BELLMORE:  And, Your Honor, we have tested it,

13   and it appears to be in working order.

14           THE COURT:  Okay.  Thank you.  Then I, of course,

09:03    15   have reviewed the briefs.  There were four briefs filed.  There

16   were a number of attachments to those briefs, and I see a

17   notebook of exhibits.  And just glancing through, I'm not sure

18   that those exhibits in the notebook duplicate those that were

19   submitted with the briefs, so what is counsel's intention as

09:03    20   far as the attachments that were submitted with the briefs

21   being considered exhibits for today's hearing?

22           MS. PUHL:  I don't recall -- as I stand here, Your

23   Honor, I'm not certain which exhibits, if any, that we did

24   attach to our response motions.  Nevertheless, we intend to

09:04    25   submit a number of exhibits today here in court, so we will be

4

1    submitting everything anew.

2              THE COURT:  Okay.  Mr. Bellmore?

3              MR. BELLMORE:  Your Honor, that was not defense's

4    intention.  We have several exhibits, as the Court noted, that

5    have been submitted with the briefs.  Our intention was to add

6    some additional exhibits for the Court, but not to duplicate

7    those.  That's our position.

8              THE COURT:  Okay.  Well, we'll sort that out as we

9    progress.

10             Right now this is the only thing on my schedule for

11   today and tomorrow aside from a noon meeting today.  Counsel,

12   can you give me some idea of the number of witnesses and the

13   time expectations that you have in mind?

14             MS. PUHL:  Your Honor, we intend to call three

15   witnesses.  And we were notified yesterday afternoon that the

16   defense intends to call a forensic examiner, and depending on

17   that testimony, I expect that we will call a rebuttal witness.

18   In fact, I think it's quite likely, so if that's the case, I

19   expect that we will be going until -- at least until tomorrow.

20             THE COURT:  Okay.

21             MS. PUHL:  But I expect we'll be done by tomorrow --

22   tomorrow morning sometime.

23             THE COURT:  Mr. Bellmore?

24             MR. BELLMORE:  Your Honor, I'm not exactly sure how

25   the witnesses overlap.  We have three officers who we have

5

09:04
09:04
09:04
09:05
09:05

1    subpoenaed to testify today, as well as Mr. Meinke, as Ms. Puhl

2    had indicated.  I do believe that this will probably take most

3    of the day, so hopefully that total is five witnesses, just so

4    the Court's aware.  And, you know, we'll try to be as efficient

09:05    5    as possible, but, you know, there's --

6              THE COURT:  Sure.

7              MR. BELLMORE:  We need to be thorough here, and I do

8    expect there will be some -- plenty of exhibits that'll take a

9    little bit of time as well.

09:05    10             THE COURT:  Okay.  And is there any request for

11   sequestration of witnesses?

12             MR. BELLMORE:  Your Honor, I would with the exception

13   of -- I would ask that the fact witnesses be sequestered.  The

14   government has a case agent.  As I mentioned, we have Mr.

09:06    15   Meinke here.  I think it would be appropriate for him to remain

16   in the courtroom, as I believe is typical practice here for a

17   defense expert.

18             THE COURT:  Ms. Puhl?

19             MS. PUHL:  I just want to be clear.  I have no

09:06    20   objection to Mr. Meinke being in the courtroom for the forensic

21   examiners.  I would object to him being in the courtroom for

22   the remainder of the testimony.

23             THE COURT:  And as to sequestration of other

24   witnesses, Ms. Puhl, is there any objection?

09:06    25             MS. PUHL:  No, Your Honor.

6

1                    THE COURT:  Mr. Bellmore?

2                    MR. BELLMORE:  Your Honor, Mr. Meinke's testimony, I

3          expect, will center around what the officers will testify to as

4          far as what they searched, what they seized, and how they

09:06   5          processed and evaluated electronic evidence, which is right in

6          Mr. Meinke's wheelhouse, so I do think it would be appropriate

7          for him to be present in the courtroom at that time.

8                    THE COURT:  Anything else, Ms. Puhl?

9                    MS. PUHL:  Again, I have no objection to him being

09:07  10          present in the courtroom for Detective Freeman's testimony.  I

11          would object to the -- his presence in the courtroom for the

12          remainder of the testimony.  And I expect that we, likewise,

13          will have a forensic examiner to witness the testimony of Mr.

14          Meinke, as is typical.

09:07  15                    THE COURT:  Okay.  Well, we'll sequester the fact

16          witnesses other than Mr. Meinke completely.  And, Mr. Bellmore,

17          how about if we sequester Mr. Meinke at this time, but if

18          during the course of questioning of other witnesses there's a

19          perceived need for him to be present, you could raise that at

09:07  20          that time?

21                    MR. BELLMORE:  Your Honor, yes, it is -- it is our

22          position that Mr. Meinke should be allowed to be here

23          throughout the entire proceeding.  If the Court wants to limit

24          that, as the government indicated, to Ms. Freeman -- if the

09:08  25          Court is aware, that she's mentioned throughout the briefing.

7

1   She's the one who handled the electronic devices, and I would

2   agree that that would be most relevant for Mr. Meinke to

3   observe.  So with that, if that -- that clarification, as long

4   as Mr. Meinke is allowed to be here for Ms. Freeman, that's

09:08   5   acceptable.  I have no other objection.

6            THE COURT:  Okay.  That seems like a reasonable

7   request.  And, Mr. Bellmore, please give me his full name and

8   spell it.

9            MR. BELLMORE:  Yes, Your Honor.  That is Daniel

09:08   10   Meinke, D-A-N-I-E-L, M-E-I-N-K-E, middle initial R.

11            THE COURT:  Thank you.  Mr. Morgan-Derosier, I want

12   to be sure that you understand the process that we're going to

13   be following here today.  You, of course, filed the motion

14   asking for suppression of the evidence.  Judge Welte will be

09:09   15   making the decision on that motion.  He has assigned me to

16   conduct this hearing today and to prepare a written report and

17   recommendation for him.

18            In that report and recommendation, I will outline the

19   evidence that is presented today.  All of the evidence will, of

09:09   20   course, be available to Judge Welte, and I will make

21   recommendations as to the legal questions that are presented.

22            After I file that report and recommendation, both

23   sides will have a chance to file objections to it.  Your

24   attorneys can object.  The government's attorney can object.

09:09   25            I do not know when my report and recommendation will

8

1  be filed.  I would expect it would be at least a few weeks from

2  now, but it is certainly dependent on whether there is to be a

3  transcript prepared of this hearing and whether the attorneys

4  ask for post-hearing briefing, so we'll talk about that at the

09:10   5  end of the hearing.  Do you have any questions about what I've

6  said?

7          THE DEFENDANT:  No, that's everything that I

8  understood, so --

9          THE COURT:  All right.  Good.  Counsel, do you wish

09:10   10  to make opening statements?

11          MS. PUHL:  No, Your Honor.  I think we can proceed

12  immediately to testimony.

13          THE COURT:  Mr. Bellmore?

14          MR. BELLMORE:  I agree, Your Honor.

09:10   15          THE COURT:  Okay.  Please proceed.

16          MS. PUHL:  United States calls, well, David Buzzo.

17          THE COURT:  Good morning.  Please come forward, take

18  an oath.

19          THE CLERK:  Raise your right hand.

09:11   20                       DAVID BUZZO,

21  having been first duly sworn, was examined and testified as

22  follows:

23          MS. PUHL:  Your Honor, in the interest of time, may I

24  give him all the exhibits that we intend to offer through the

09:11   25  witness so I'm not going back and forth?

9

1          THE COURT:  Certainly.

2                    <u>DIRECT EXAMINATION</u>

3     <u>BY MS. PUHL</u>:

4     **Q.**   Good morning, Detective.

09:12  5     **A.**   Morning, ma'am.

6     **Q.**   Could you please introduce yourself?

7     **A.**   My name is David Buzzo.

8     **Q.**   And spell your name, please, for the record.

9     **A.**   D-A-V-I-D, B-U-Z-Z-O.

09:12  10    **Q.**   And how are you employed, Detective Buzzo?

11    **A.**   I'm currently employed with the Department of the Air

12    Force, Inspector General's Office of Special Investigations.

13    **Q.**   Just very briefly, what are your duties with the Air Force

14    Base?

09:12  15    **A.**   For the Department of the Air Force I'm a criminal

16    indexing investigations specialist for OSI.

17    **Q.**   What does that mean?

18    **A.**   So, generally speaking, I'm a program manager, and I

19    handle all the administrative issues in -- within our federal

09:13  20    law enforcement when it comes to case work preparation,

21    preparation for court trial, evidence, handling, disposition

22    and discovery.

23    **Q.**   And how long have you been employed with the Air Force

24    Base -- at the Air Force Base?

09:13  25    **A.**   Just -- just over two years, ma'am.

                              10

1  Q.   And prior to working at the Air Force Base, where were you

2  employed?

3  A.   With the City of Grand Forks, Grand Forks Police

4  Department.

09:13   5  Q.   How long were you employed with the Grand Forks Police

6  Department?

7  A.   Twelve years total, ma'am.

8  Q.   How were you employed?

9  A.   As a police officer for the entire time.  The last five

09:13   10  years I was a detective in the Criminal Investigations Bureau.

11  Q.   Okay.  So at all times you were a sworn police officer.

12  A.   That's correct.

13  Q.   Were you assigned to a specific division at the police

14  department during the time that you were a detective?

09:14   15  A.   I was.  I was a financial crimes investigator.

16  Q.   Okay.  Is that part of the Investigative Division?

17  A.   Yes, ma'am.

18  Q.   And what training and experience did you obtain prior to

19  joining the investigations section of the Grand Forks Police

09:14   20  Department?

21  A.   So in June of 2002 I enlisted in the United States Air

22  Force, went to basic training.  Upon graduation from basic

23  training I attended the security force -- the Air Force

24  security forces law enforcement academy -- I'm sorry, the

09:14   25  security forces academy at Lackland Air Force Base.

1          I was then assigned to Grand Forks Air Force Base,

2    where I continued my training and gained experience for the

3    next six years in various positions, eventually moving up to

4    the noncommissioned officer in charge of police services.

09:15    5    Following my enlistment in the Air Force I attended the -- or I

6    was hired by the City of Grand Forks.

7          In 2008 I attended the North Dakota state police

8    academy in Bismarck, where I became licensed as a police

9    officer in the state.  For the following subsequent years I

09:15   10   accrued over 2,000 hours of training in general police studies,

11   as well as specific to financial crimes.  Some of that training

12   was specific to financial crimes.

13   **Q.**   So were you assigned to work specifically financial

14   crimes, is that right?

09:15   15   **A.**   Mostly, yes, ma'am.

16   **Q.**   And what types of crimes would that include?

17   **A.**   Instances of fraud, fraud involving elders, embezzlements,

18   thefts, bank fraud, bad checks, forgeries, counterfeiting and

19   the like.

09:16   20   **Q.**   Detective Buzzo -- and I'm going to call you Detective

21   Buzzo because you were formerly a detective, right?  And you

22   were a detective during the time that this case was

23   investigated, is that right?

24   **A.**   That's right.

09:16   25   **Q.**   Okay.  So are you familiar with an investigation with the

12

1  defendant -- involving the defendant, Mr. Derosier?

2  A.   Yes, ma'am, I am.

3  Q.   And how are you familiar with him?

4  A.   I investigated Mr. Derosier for a variety of things,

5  involving construction fraud, contracting without a license,

6  forgery, and violation of a judicial order.

7  Q.   And how did that investigation begin, Detective Buzzo?

8  A.   It began when I reviewed a previously submitted report

9  from December of 2019, and just followed up with that, and it

10 snowballed into what we have today.

11 Q.   So you testified you reviewed a December 2019 report.

12 What was the nature of that report?

13 A.   So in December of 2019, December 26th of 2019, a Grand

14 Forks resident, Dawn Peterson, reported that a check that was

15 dated November 11th of 2018 had been cashed against her

16 account.  She had -- she had written out the check, but it was

17 dated November of 2018.  The check showed up as cashed on her

18 account over a year later.  When she reviewed this debit, this

19 check that had debited her account, she noticed that the date

20 had been changed and her initials were placed next to the date.

21 She never did any of that.

22 Q.   So how did this report involve the defendant, if at all?

23 Do you recall who the check was paid out to?

24 A.   Yes, ma'am.  It was -- Team Lawn is who the check was

25 written to.  And Ms. Peterson had -- Ms. Dawn Peterson had done

13

1    business with that company back in 2018.

2    **Q.**   And before we go any further, what is Team Lawn?

3    **A.**   It's a -- at the time it was a landscaping and contracting

4    business in the city of Grand Forks.

09:18    5    **Q.**   And do you recall who owned Team Lawn?

6    **A.**   My understanding is that another Grand Forks resident by

7    the name of Robert Coons owned the business, and eventually a

8    second individual, Mr. Derosier, took over the company upon

9    Mr. Coons being killed.

09:19    10   **Q.**   Okay.  And at the time that this Grand Forks citizen

11   reported this fraudulent check, who owned Team Lawn?

12   **A.**   At the time of the report, ma'am, is that --

13   **Q.**   That's right.

14   **A.**   Mr. Derosier.

09:19    15   **Q.**   And that's because Mr. Coons had passed away by that time,

16   is that right?

17   **A.**   Yes, ma'am.  He died in February of -- February of 2019.

18   **Q.**   And this report was in December of 2019, is that right?

19   **A.**   December 26th of 2019.

09:19    20   **Q.**   Now, to whom did Ms. Peterson make the report, make the

21   complaint?

22   **A.**   That would've been Officer Samson.  He's assigned to the

23   Uniform Patrol Bureau for the City of Grand Forks.

24   **Q.**   And when, if at all, did you learn about that report?

09:20    25   **A.**   So the day that Officer Sampson took the report, he had

14

1   contacted me and -- because I'm the financial crimes

2   investigator for the P.D. or for the police department, he --

3   he had questions.  He was confused as to what -- what the

4   offense actually would be, whether it would be a theft or a

09:20   5   forgery or both or counterfeiting.  We discussed the issues,

6   and he'd completed his report from there.

7   **Q.**   Okay.  And that was on what date, do you recall?

8   **A.**   The day he took the report, so it would've been the 26th,

9   I believe.

09:21   10  **Q.**   Of December 2019?

11  **A.**   Yes, ma'am, December 26th of 2019.

12  **Q.**   And was that matter later assigned to you?

13  **A.**   Yes, it was.

14  **Q.**   And how did that happen?

09:21   15  **A.**   The process at the police department to assign cases to an

16  investigator -- I'll use the term "bottleneck."  All the

17  reports that are taken by patrol officers, that standard patrol

18  officer usually initiates a criminal complaint.  That -- all of

19  those reports are then reviewed by the Criminal Investigations

09:21   20  Bureau commander, who then makes a determination of whether or

21  not a report is assigned to an investigator or whether it -- or

22  assigned to another officer or if it stays with the originating

23  officer.

24  **Q.**   So in this case it was assigned to you, as you said,

09:21   25  right?

15

1    **A.**    Yes, ma'am.

2    **Q.**    And after it was assigned to you, did you immediately pick

3    it up and begin investigating it?

4    **A.**    No, ma'am, I did not.

09:22    5    **Q.**    Why not?

6    **A.**    I would've reviewed it as a matter of procedure just

7    because it showed up in my queue, but the dollar value of the

8    check, of the case involved and my caseload at the time, it

9    just -- it was not a priority --

09:22    10    **Q.**    Okay.

11    **A.**    -- at the time.

12    **Q.**    So it sat for a while, is that right?

13    **A.**    Yes, ma'am.

14    **Q.**    Okay.  And directing your attention to August 12, 2020,

09:22    15    what happened on that day?

16    **A.**    So I began -- I was in the process of going through all of

17    my -- call it a backlog of reports, and I began reviewing

18    those, and I came across this report from Dawn Peterson, and I

19    reviewed it.  In the narrative of the report it mentions that

09:23    20    she had reported the issue to the North Dakota Attorney

21    General's Consumer Protection and Antitrust Division, so I

22    called -- I called the Attorney General's Office to see if

23    anything had been done or what -- what they had done on their

24    end.

09:23    25    **Q.**    So just to clarify, Ms. Peterson walked into the police

16

1    department on December 26, 2019, and made this complaint about

2    a forged check involving Team Lawn, is that right?

3    A.   I don't know if she walked in or if Officer Sampson went

4    to her location, but she did report it on -- in December, yes.

09:23   5    Q.   And that complaint was then assigned to you, is that

6    right?

7    A.   That's right.

8    Q.   And then roughly eight minutes -- eight months later, then

9    you pick it up and begin investigating it, on August 12, 2020,

09:23   10   is that right?

11   A.   Yes, ma'am.

12   Q.   Okay.  So it sat for about eight months.

13   A.   Yes, ma'am.

14   Q.   Okay.  And what's the first thing you did?  I think you

09:24   15   said -- am I correct that you pulled the report, is that right?

16   A.   Yes, ma'am.

17   Q.   Okay.  Now, drawing your -- or directing your attention to

18   Exhibit Number 1 that's right in front of you, is that the

19   patrol officer's report?

09:24   20   A.   Yes, ma'am, it is.

21   Q.   Okay.  And looking also at 1-A, is that the -- is that the

22   forged check that was attached to the officer's report?

23   A.   It is a copy of the check that was attached to the

24   officer's report.

09:24   25   Q.   Okay.  And you would've reviewed both the report and the

17

1    forged check on August 12, 2020, is that right?

2    A.   Yes, ma'am.

3              MS. PUHL:  United States introduce -- moves to

4    introduce Exhibits 1 and 1-A, Your Honor.

09:25
5              THE COURT:  Mr. Bellmore?

6              MR. BELLMORE:  No objection, Your Honor.

7              THE COURT:  Exhibits 1 and 1-A are received.

8    Q.   (MS. PUHL CONTINUING)  Now, what did you learn after

9    reading and reviewing the patrol officer's report?  And I think

09:25
10   you may have mentioned this earlier.

11   A.   That Ms. Dawn Peterson had reported it to the Attorney

12   General's Office, the anti -- Consumer Protection and Antitrust

13   Division of the Attorney General's Office.

14   Q.   So what did you do next?

09:25
15   A.   I called that office and spoke with Investigator Chris

16   Schroeder.

17   Q.   And what did you learn?

18   A.   I -- I learned from Investigator Schroeder that Mr.

19   Derosier and Team Lawn, Vaughn Construction and some other

09:26
20   business names were affiliated with a complaint that the

21   Attorney General's Office had processed, investigated and

22   filed, which led to an Order of Injunction to where Mr.

23   Derosier and the companies were prohibited from doing business

24   in the state of North Dakota.

09:26
25   Q.   And did you also learn that other complaints had been

18

1   lodged in this -- against Mr. Derosier?

2   **A.**   Yes, ma'am, I did.

3   **Q.**   And that's what led to the Order of Injunction, is that

4   right, according to Mr. Schroeder?

09:26   5   **A.**   Yes, ma'am.

6   **Q.**   So this is the first time that you hear about the Order of

7   Injunction, is that right?

8   **A.**   That's correct, ma'am.

9   **Q.**   Did Mr. Schroeder also tell you about a tipster that

09:26   10   called in to the Consumer Protection office?

11   **A.**   He did, ma'am.

12   **Q.**   And what was that about?

13   **A.**   He told me about an individual who -- by the name of Jack

14   Hirst is how -- was the name that was provided, and this

09:27   15   individual reported that Mr. Derosier was doing business in

16   violation of the injunction, and the Attorney General's Office

17   was aware of that, and he provided the information for Jack

18   Hirst to me.

19   **Q.**   And after you had this conversation with the investigator,

09:27   20   did you pull the Order of Injunction?

21   **A.**   I did, ma'am.

22   **Q.**   And you read it?

23   **A.**   I did.

24   **Q.**   Okay.  And how did you understand it?

09:27   25   **A.**   My interpretation of the Order of Injunction is that Mr.

1  Derosier, along with the companies listed on the injunction,

2  are prohibited from doing business in the state of North Dakota

3  until further order of the Court.

4  **Q.**   And is that Order of Injunction marked as Exhibit 2 that,

09:28  5  again, is in front of you?

6  **A.**   Yes, ma'am, it is.

7         MS. PUHL:  United States moves to introduce Exhibit

8  Number 2, Your Honor.

9         THE COURT:  Mr. Bellmore?

09:28  10         MR. BELLMORE:  Your Honor, I do recognize what's been

11  marked and offered as Government's Exhibit 2 as a document that

12  has been submitted in the briefing, so I have no objection to

13  this.  In fact, it was our Exhibit Number 1.  I would just at

14  this time like to ask the Court how we're going to proceed with

09:28  15  overlapped exhibits.

16         THE COURT:  How about if we deal with offers coming

17  from the government and use the number system that the

18  government has employed, and then if there are other exhibits

19  that were attached to the brief that the government does not

09:29  20  offer, we can deal with them?  Does that make sense?

21         MR. BELLMORE:  Yes, Your Honor.  And I have no

22  objection to the exhibit that's been offered by the government

23  here presently.

24         THE COURT:  Exhibit 2 is received.

09:29  25  **Q.**   (MS. PUHL CONTINUING)  Directing your attention to

20

1    Government's Exhibit Number 3, Detective Buzzo, do you

2    recognize that exhibit?

3    **A.**    Yes, ma'am, I do.

4    **Q.**    And what is that?

09:29    5    **A.**    It's an e-mail I received on the next day, on August 13th,

6    from Investigator Chris Schroeder at the AG's Office providing

7    contact information for Jack Hirst, as well as stating that he

8    was unable to contact him and what Hirst had stated to him or

9    stated in his tip to the AG's Office.

09:30    10   **Q.**    So this exhibit, it was received by you from the

11   Investigator Schroeder, is that right?

12   **A.**    That's correct.

13   **Q.**    On August 13, 2020, right?

14   **A.**    That's correct.

09:30    15   **Q.**    And it appears the same today as it did when you received

16   it, is that right?

17   **A.**    That's right.

18            MS. PUHL:  The U.S. moves to introduce Exhibit

19   Number 3, Your Honor.

09:30    20            THE COURT:  Mr. Bellmore?

21            MR. BELLMORE:  I have no objection, Your Honor.

22            THE COURT:  Exhibit 3 is received.

23   **Q.**    (MS. PUHL CONTINUING)  And if you could, Detective Buzzo,

24   please read Exhibit Number 3, please.

09:30    25   **A.**    Out loud?

21

1  **Q.**   Yes, please.

2  **A.**   "Detective Buzzo:  This is pursuant to our conversation

3  from earlier regarding Nicholas Derosier, dba Team Lawn.  As we

4  discussed, we recently received information from an individual

09:31  5  who identified himself as Jack Hirst, 320-760-9412, that

6  indicates Derosier may be continuing to operate in violation of

7  the October 15th, 2019, order.

8       "Hirst indicated that he has worked on multiple

9  landscaping jobs in North Dakota as an employee of Derosier

09:31  10  that he estimated to be valued over $4,000.  I have been

11  unsuccessful in obtaining a written statement from Hirst.  Feel

12  free to contact him if you need his information.  Please let me

13  know if you need anything else."  And then it's Chris

14  Schroeder, Investigator, and his signature block by e-mail.

09:31  15  **Q.**   And according to the investigator, Jack Hirst reported

16  that the defendant was working on projects that were over

17  $4,000, right?

18  **A.**   That's correct.

19  **Q.**   And what is the significance of that amount?

09:31  20  **A.**   4,000 -- I'm sorry.  $4,000 is the trigger mechanism for

21  the state requirement of a contracting license for the State of

22  North Dakota, so the value of the job needs to be $4,000 or

23  greater to trigger the licensing requirement for the state.

24  **Q.**   So if an individual is engaging in contracts for under

09:32  25  $4,000, there's no requirement that he be -- he or she be

1   licensed, is that right?

2   **A.**   Contracting work, yes.

3   **Q.**   Okay.  So after you received this e-mail, did you attempt

4   to contact Mr. Hirst?

09:32   5   **A.**   I did, ma'am.

6   **Q.**   And what happened?

7   **A.**   I couldn't get ahold of him, if the number didn't work or

8   it -- I just could not get ahold of him.  I tried.

9   **Q.**   Did your investigation continue, nonetheless?

09:32   10   **A.**   Yes, ma'am, it did.

11   **Q.**   If you recall, what did you do next?

12   **A.**   So I continued looking into the businesses, Team Lawn and

13   Mr. Derosier.  I just used Google, a simple open-source

14   searching, as well as our own records management system within

09:33   15   the police department, other records that had been -- other

16   reports and -- but specifically on the internet I found job

17   postings for a business related to Mr. Derosier.

18   **Q.**   And are those job -- are those job postings set forth in

19   Exhibit Number 4?

09:33   20   **A.**   Yes, ma'am, they are.

21   **Q.**   And you recognize these?

22   **A.**   Yes, ma'am, I do.

23   **Q.**   As the same job postings that you located during your

24   investigation?

09:33   25   **A.**   Yes, ma'am.

1          MS. PUHL:  The United States offers Exhibit Number 4,

2     Your Honor.

3          THE COURT:  Mr. Bellmore?

4          MR. BELLMORE:  No objection, Your Honor.

09:33   5          THE COURT:  Just a minute, please, Ms. Bellmore --

6     Ms. Puhl.  So Exhibit 4 is received.

7          MS. PUHL:  Yes, and there are only a few exhibits

8     that I -- that I think that we intend to show on the screen,

9     Your Honor, because they're in front of you as well.

09:34   10    Q.   (MS. PUHL CONTINUING)  So looking at Exhibit Number 4, can

11    you summarize what information is found in that exhibit?

12    A.   Yes, ma'am.  So there's two job postings.  One is from a

13    site or application called Job Terro.  If you look at the

14    top-left corner, there's a print date of 8/13 of '20 and then

09:35   15    the header of Landscape Crew Member, Grand Forks, Job Terro,

16    dated 7/28 of 2020.

17         The rest of the posting lists Garden & Patio

18    Headquarters and Derosier Outdoor as the company, they're

19    looking -- what they're looking for, along with the job

09:35   20    responsibilities and the requirements.  And then near the

21    bottom is, "Please call to schedule an interview," with the

22    name of "Nick" and a phone number of 218-399-2222.

23    Q.   So this is an advertisement soliciting workers for a

24    landscaping job, is that right?

09:35   25    A.   That's correct, ma'am.

1  **Q.**  And that landscaping job is with Garden & Patio

2  Headquarters and Derosier Outdoor, is that right?

3  **A.**  That's correct.

4  **Q.**  And there's a contact information of Nick with a specific

09:35   5  number, as you said, is that right?

6  **A.**  That's right.

7  **Q.**  Okay.  Now, during your investigation did you also

8  determine where Mr. Derosier was operating his business out of?

9  **A.**  Yes, ma'am, I did.

09:36   10  **Q.**  And where was that?

11  **A.**  So around the same time of this, of finding the job

12  postings and searching our police department records,

13  management database, I realized that Mr. Derosier had been in

14  a -- in an incident involving Mr. Coons in February of '19, so

09:36   15  I wanted to find the investigator that handled that case and --

16  **Q.**  And that incident was Mr. Coons having been killed in an

17  accident, is that right?

18  **A.**  Yes, ma'am, he was killed.

19  **Q.**  Okay.  I'm sorry.  I interrupted you.

09:36   20  **A.**  I lost my train of thought.

21  **Q.**  You were telling us how you determined where Mr. Derosier

22  was operating the business out of.

23  **A.**  Yes, ma'am.  So I'd sought out the investigator that

24  handled that case, who was Detective Todd Riedinger.  I just

09:37   25  happened across Detective Freeman at the time.  Her office is

1    kitty-corner to where mine is at, and I told Detective Freeman

2    about Team Lawn and this case that was beginning to look like

3    an issue, and she -- she recognized the name "Team Lawn" from a

4    previous investigation involving a cyber tip in that case.

09:37   5    They had chased down an address for Team Lawn through the post

6    office, and the address came back to XXXXXXXXXXXXXXXXXXXXX in

7    Grand Forks.

8    Q.    And she shared that information with you, is that right?

9    A.    Yes.

09:37   10   Q.    Did she share anything -- any other information with you

11   at that time?

12   A.    From what I recall, it was about a cyber tip, and it -- it

13   was nothing.  They weren't able to move forward with it.

14   Q.    Directing your attention to August 24, 2020, do you recall

09:38   15   what, if anything, happened on that day relative to this

16   investigation?

17   A.    August --

18   Q.    -- 24th, 2020.

19   A.    Oh, August 24th.  So I received a call from Rebecca

09:38   20   Peterson, another resident of Grand Forks, who was referred to

21   me by the Attorney General's Office, Consumer Protection and

22   Antitrust Division, and she reported that Mr. Derosier was

23   doing business on the south end of Grand Forks.

24   Q.    And did she tell you what type of business he was doing in

09:39   25   the south end of Grand Forks?

26

1   **A.**   Yes, ma'am.   It was landscaping.   It appeared it be a

2   landscaping job and in a condo area down there off of Cherry

3   Street.

4   **Q.**   So she gave you a description of the general area where

09:39   5   this condo development was located, is that right?

6   **A.**   That's correct, ma'am.

7   **Q.**   And what did you do after you had this conversation with

8   her?

9   **A.**   So after hanging up with Ms. Peter -- with Ms. Rebecca

09:39   10   Peterson, I drove to the area that she described.   I could

11   picture it in my head.   It was High Plains Court area, and I'm

12   very familiar with the city, so I just drove down there to

13   check it out, see what I could see, and happened to cross some

14   equipment and trailers and a worksite or two.

09:39   15   **Q.**   You drove to this condo development that was described to

16   you by the complainant, right?

17   **A.**   That's correct.

18   **Q.**   And you discovered what specifically?

19   **A.**   So on the street, as I pull onto High Plains, there was a

09:40   20   trailer with plants and brick and some other materials on it.

21   And then on the opposite side of the street to that there was

22   piles of dirt, some brick or blocks on the ground.   You could

23   see off down a driveway parking area that there was a worksite

24   there.   I believe there was a wheelbarrow out or some equipment

09:40   25   up near that job site.

27

1        As you continued around the court to XXXXXXXXXXXXXX,

2   you could -- I could see that there was a new fence, what

3   appeared to be new landscaping, and then a brand-new wooden

4   vertical post at 614.  The other job site was at XXXXXXXXX

09:41   5   XXXXXXXXXXXX.

6   Q.   Did you later learn who these condos belonged to?

7   A.   I did.

8   Q.   Who was that?

9   A.   So XXXXXXXXXXXXXXX Court belonged to Ruth Ann Halvorson,

09:41   10   and XXXXXXXXXXXXXXXXXXXXXX belonged to Raymond Holmberg.

11  Q.   So you concluded that this was a landscaping and

12  construction job site, is that correct?

13  A.   That's correct.

14  Q.   Did you witness employees at this -- at this job site?

09:41   15  A.   There was nobody around, ma'am.

16  Q.   But you did observe a vehicle, is that right?

17  A.   That's correct.

18  Q.   And what type of vehicle specifically?

19  A.   So, well, there was a trailer, but there was no -- no

09:41   20  vehicle there at the time.

21  Q.   And what was on the trailer?

22  A.   Block and plants, potted plants and what -- just it -- it

23  appeared to be associated with the landscaping project going

24  on.

09:42   25  Q.   What did you do next?

28

1    A.    So I ran the license plate just to find out who it

2    belonged to, and it belonged to Team Lawn, Inc., was the name

3    on the registration.

4    Q.    And is that vehicle registration set forth in Exhibit

09:42    5    Number 5?

6    A.    Yes, ma'am.

7    Q.    So upon running the license plate of that trailer, this is

8    what you received, is that correct?

9    A.    That's correct.

09:42    10    Q.    And as you testified, it indicates that the vehicle is

11    registered to?

12    A.    Team Lawn, Inc.

13         MS. PUHL:  Okay.  United States moves to introduce

14    Exhibit Number 5, Your Honor.

09:42    15         THE COURT:  Mr. Bellmore?

16         MR. BELLMORE:  No objection, Your Honor.

17         THE COURT:  Exhibit 5 is received.

18    Q.    (MS. PUHL CONTINUING)  What did you do next?

19    A.    So I had taken some photos of the area, and then I called

09:43    20    the building and zoning administrator for the City of Grand

21    Forks, Bev Collings.

22    Q.    And looking at Exhibits 6-A, B, C, D, E, F, G, H, I and J,

23    are those photos that you took of the job site on August 24,

24    2020?

09:43    25    A.    Yes, ma'am, it is.

1          MS. PUHL:  United States offers Exhibits 6-A through
2    6-J, Your Honor.
3          THE COURT:  Mr. Bellmore?
4          MR. BELLMORE:  May I have one moment, Your Honor?
09:44   5    May I have one moment, Your Honor?
6          THE COURT:  Certainly.
7          MR. BELLMORE:  I have no objection, Your Honor.
8          THE COURT:  Exhibits 6-A through J are received.
9    **Q.**  (MS. PUHL CONTINUING)  So beginning very -- very quickly,
09:44   10   if you could just go through what you're seeing on these
11   exhibits, beginning with 6-A.
12   **A.**   6-A would've been XXXXXXXXXXXXXXXXXXXXX, Ruth Ann
13   Halvorson's address.  There's a vertical post.  It appears to
14   be new wood construction, unpainted.
09:44   15          6-B is also at XXXX -- well, 6-B, C, and D are the
16   continuation of that work at XXXXXXXXXXXXXXXXXXXXX mentioned,
17   and it's a newer-looking fence, as well as newer-looking
18   landscaping around there.
19          6-E was a pickup with a ladder rack on the back.  I
09:45   20   wasn't sure if it was affiliated with Team Lawn at the time.  I
21   couldn't read the license plate.  I took a picture of it.  It
22   was at an adjacent address.
23          6-F, 6-G and 6-H, 6-I are all a view from the road
24   at -- looking back towards Ray Holmberg's address at XXXXXXXXX
09:45   25   XXXXXXXXXXXXX.  You could see there's some skid loader

1    attachment up there, along with wheelbarrow and what appears to
2    be an active worksite.
3         6-G is -- there's a pile of dirt there, and you can
4    see the construction site in the background.
5         6-H has piles -- pallets of bricks, what appears to
6    be landscaping bricks, along with -- I think it's a skid steer
7    bucket in the background.
8         6-I is a continuation of the previous photograph, to
9    the side of there, with more brick, another -- and another skid
10   steer forklift attachment underneath the bricks.
11        6-J is a picture of that trailer with the items on
12   it, dirt or block and other tools or equipment.
13   Q.   So is it fair to say that this was a very active job site?
14   A.   Yes, ma'am.
15   Q.   After you took these photos, you testified that you
16   contacted the city inspector's office, is that right?
17   A.   That's correct, ma'am.
18   Q.   For what purpose?
19   A.   To find out if there were any permits issued for these job
20   sites.
21   Q.   And what did you learn?
22   A.   From Administrator Collings I learned that there were no
23   permits issued, and her office was aware of the work at XXXX
24   XXXXXXXXXXX, however, and she provided me with the name of Ruth
25   Ann Halvorson.

31

1  **Q.**   And Ruth Ann Halvorson is the owner of one of the two

2  properties that you took photographs at, is that correct?

3  **A.**   That's correct.

4  **Q.**   And did you eventually call Ms. Halvorson?

09:47
5  **A.**   I did.

6  **Q.**   And what happened?  What'd you learn?

7  **A.**   I learned from Ruth Ann Halvorson that Team Lawn or Mr.

8  Derosier, Nick Derosier, was doing work for her at several of

9  her properties.  And she knew of five total properties just off

09:47
10  the top of her head where -- where he was doing work actively

11  or had recently done work related to landscaping or contracting

12  work.

13  **Q.**   And these properties were located in Grand Forks County?

14  **A.**   Yes, ma'am.

09:48
15  **Q.**   Directing your attention to the next day, what happened?

16  **A.**   So the following day I returned to High Plains Court to

17  see if there were -- if anybody was present, working at those

18  addresses.  And I observed at XXXXXXXXXXXXXXX, the residence of

19  Ray Holmberg, that there were people working there.

09:48
20  **Q.**   So you returned to the condo development the following

21  day, is that right?

22  **A.**   Yep.

23  **Q.**   Okay.  And what did you observe?

24  **A.**   So there were three people there in a red pickup, red Ford

09:48
25  F-150 there.

1  Q.   Did you identify those three individuals?

2  A.   I did.

3  Q.   And who were they?

4  A.   Blake Thorson, Shawn Halvorson, and Christyan Logan.

5  Q.   And these were employees of Mr. Derosier, is that right?

6  A.   That's correct, ma'am.

7  Q.   And did you interview them?

8  A.   I did.

9  Q.   And tell me about that inter -- or tell the magistrate
10 judge about that interview, please.

11 A.   So I -- I approached the three as they were working there.
12 We -- we just talked.  I asked them about business they were
13 conducting there, and they had told me that they were being
14 paid -- that they were working for Mr. Derosier, doing the
15 contracting work, the landscaping project there, as well as
16 they were being paid by Mr. Derosier and his company.  And they
17 had been working there for varying degrees of time, but just a
18 couple weeks at that point.

19 Q.   And did you ask to see any proof of anything during that
20 interview?

21 A.   I did.  I asked them if they had any -- how they're being
22 paid, whether taxes were being taken out, those types of
23 questions, and if they had a pay stub, or anything.  Christyan
24 Logan stated that he could provide me with a photo of his -- of
25 a pay stub.

33

1   **Q.**   And did he do that?

2   **A.**   He did.

3   **Q.**   And directing your attention to Exhibit Number 7, is that

4   the pay stub that he showed you?

09:50   5   **A.**   Yes, ma'am, it is.

6   **Q.**   And just to be clear, did he show you the physical pay

7   stub or a picture of the pay stub?

8   **A.**   No, it was a photo that was taken at his request.

9   **Q.**   Okay.

09:50   10   **A.**   So he called somebody.  They took a picture of it, and

11   then he took a snapshot and texted it to me.

12   **Q.**   Okay.

13   **A.**   That's how I ended up with this copy.

14   **Q.**   Because this is the pay stub that you received from

09:50   15   Mr. Logan on August 25th, 2020.

16   **A.**   That's correct.

17        MS. PUHL:  United States offers Exhibit Number 7,

18   Your Honor.

19        THE COURT:  Mr. Bellmore?

09:51   20        MR. BELLMORE:  May I have a moment, Your Honor?

21        THE COURT:  Certainly.

22        MR. BELLMORE:  Your Honor, I would object to

23   Exhibit 7 based on the foundation that was laid and the actual

24   depiction in the photo.  It appears as though it's a photograph

09:52   25   of a document that is not complete.  It is cut off.  We cannot

34

1    see the entire page, so I will object to Exhibit Number 7.

2          THE COURT:  Ms. Puhl?

3          MS. PUHL:  Your Honor, this is a suppression hearing.

4    The same Rules of Evidence do not apply, but, nonetheless, this

09:52   5    is a document that was received by Detective Buzzo during the

6    investigation, and it was information that was relevant for

7    purposes of his obtaining a search warrant for the defendant's

8    place of -- place of residence, his person.  It's a QuickBooks

9    pay stub.  We'll talk about that fact and why it was important.

09:52   10          THE COURT:  The objection is overruled, and Exhibit 7

11    is received for purposes of this hearing.

12    Q.   (MS. PUHL CONTINUING)  So looking at Exhibit Number 7, you

13    testified that it was a pay stub that you received from

14    Mr. Logan, is that right?

09:53   15    A.   That's correct.

16    Q.   And that he sent to you.

17    A.   That's correct.

18    Q.   Okay.  And what did you recognize this pay stub as, if

19    anything?

09:53   20    A.   That the layout and the template is a standard QuickBooks

21    payroll template.

22    Q.   And how do you know that, Detective Buzzo?

23    A.   I've seen it dozens, if not more, times.  I have training

24    related to QuickBooks and Intuit software and experience in

09:53   25    using it as well.

1   **Q.**   And you are a detective that investigates specifically

2   financial fraud during this time, is that right?

3   **A.**   That is correct.

4   **Q.**   And during those many investigations involving financial

09:53   5   fraud, you came across QuickBooks pay stubs, is that right?

6   **A.**   Many times, ma'am.

7   **Q.**   And this is consistent with, as you said, QuickBooks pay

8   stub, is that right?

9   **A.**   That is correct.

09:53   10  **Q.**   Okay.  Now, did you continue to talk to these three

11  employees at the worksite after you received this pay stub?

12  **A.**   Yes, ma'am, I did.

13  **Q.**   Okay.  And did others join the job site at any point?

14  **A.**   Yes, ma'am.

09:54   15  **Q.**   And who was that, if anybody?

16  **A.**   So the first to show up after I began talking to the three

17  was Nicholas Beeche.  Mr. Beeche just rolled up into the

18  worksite, and we -- I chatted with him.  He said he had been

19  working with or for Mr. Derosier for about seven months, and

09:54   20  generally that's what he confirmed.

21  **Q.**   Were there other employees that showed up as well?

22  **A.**   Mr. Derosier arrived because one of the three, whether it

23  was Christyan Logan or whoever it was there, I had asked --

24  asked them to call Mr. Derosier and asked -- have him come to

09:55   25  the job site.  And he, if I remember correctly, was coming from

36

1    Menards or one of the big box stores there, and he eventually

2    drove up to the area and approached the job site.

3    **Q.**   And when he approached the job site, did the employees,

4    the workers, did they stay at the job site or did they leave?

5    **A.**   No, they left, ma'am.

6    **Q.**   And so then you interviewed or spoke to Mr. Derosier, is

7    that right?

8    **A.**   That's right, ma'am.

9    **Q.**   Do you see Mr. Derosier in the courtroom today?

10   **A.**   I do, ma'am.

11   **Q.**   And could you identify him for the record, please?

12   **A.**   He's at the end of the table over here, ma'am, at the

13   defendant's table.

14          MS. PUHL:  Okay.  Let the record reflect that

15   Detective Buzzo has identified Mr. Derosier, Your Honor.

16          THE COURT:  He has.  Detective Buzzo, you mentioned

17   Mr. Beeche?

18          THE WITNESS:  Yes, ma'am.

19          THE COURT:  How is that spelled, please?

20          THE WITNESS:  I believe it's B-E-E-C-H-E.

21          THE COURT:  Thank you.  Sorry for interrupting.

22   Please proceed.

23   **Q.**   (MS. PUHL CONTINUING)  So you testified that you had a

24   interview with Mr. Derosier at this time, is that right?

25   **A.**   That's correct, ma'am.

37

1   **Q.**   Do you have Exhibit Number 73 in front of you?

2   **A.**   73?

3   **Q.**   Is it a CD?

4   **A.**   Yes, ma'am, I do.

09:56   5   **Q.**   And do you recognize that exhibit?

6   **A.**   I do.

7   **Q.**   And what is it?

8   **A.**   It is a recording of my interview with Mr. Derosier from

9   August 25th of 2020.

09:56   10   **Q.**   And you've listened to that recording?

11   **A.**   I did.

12   **Q.**   And does it accurately record the conversation as you

13   recall it on that day?

14   **A.**   Yes.

09:57   15   **Q.**   And how long is this interview?

16   **A.**   Just under an hour, 50 minutes, or so.

17        MS. PUHL:  United States offers Exhibit Number 73,

18   Your Honor.

19        THE COURT:  Mr. Bellmore?

09:57   20        MR. BELLMORE:  No objection, Your Honor.

21        THE COURT:  Exhibit 73 is received.

22        MS. PUHL:  And in the interest of time, we don't

23   intend to play that interview, but rather I'll have Detective

24   Buzzo summarize that interview, Your Honor.

09:57   25        THE COURT:  And have we received the CD, itself?

38

1          MS. PUHL:  United States offers 73, so it'll be --

2          THE COURT:  Oh, it's right there.

3          MS. PUHL:  Yes.

4          THE COURT:  Okay.

09:57    5          MS. PUHL:  Sorry.

6          THE COURT:  Thank you.  Exhibit 73 is received.

7   **Q.**   (MS. PUHL CONTINUING)  If you would, please, could you

8   summarize what Mr. Derosier told you during that interview on

9   August 25, 2019?

09:57   10   **A.**   He told me a lot that day, ma'am.  He said the whole case

11  against him with the Attorney General's Office was a farce, he

12  hadn't been properly served, he was -- his license -- or the

13  business he was operating was -- I believe he said GPHQ, LLC,

14  and that was a licensed business in the state, and then his

09:58   15  phone number, other things.  I mean, he confirmed that he was

16  doing business not only in the city, but in the state of North

17  Dakota.

18  **Q.**   Okay.  So I think I referred to the interview happening on

19  August 25, 2019.  That was incorrect, right?  It was August 25,

09:58   20  2020.

21  **A.**   Did I say '19?

22  **Q.**   I did.

23  **A.**   Oh, no, it's August 25th of 20 -- 2020.

24  **Q.**   My mistake.  Thank you.  And you said that the defendant

09:59   25  told you that this new business was licensed, is that right?

39

1    A.   That's correct.

2    Q.   And upon hearing that, did you make a call?

3    A.   I did.  So there was another detective with me at the

4    time, so he hung out with Mr. Derosier.  I stepped away and

09:59    5    called the Attorney General's Office and spoke with Director

6    Parrell Grossman, who's the director of the Consumer Protection

7    and Antitrust Division.  I told him what Mr. Derosier had told

8    me, he was licensed, good to -- good to go in the state.

9         So Director Grossman called the Secretary of State

09:59    10   and confirmed that GPHQ -- not only GPHQ, but Mr. Derosier was

11   not licensed to do business.

12   Q.   So if you could, just explain how this conversation

13   happened.  You called Detective (sic) Grossman, and then he, in

14   turn, called the Secretary of State.  You were all three on the

10:00    15   line, or --

16   A.   No, it was -- it was Director Grossman, not detective, but

17   the director called the Secretary of State.  I could hear it on

18   like speakerphone.  They weren't -- we weren't connected on

19   like a three-way call.  I could hear the speakerphone.  He was

10:00    20   addressing the Secretary of State, told him what the issue was.

21   Within a short period of time the answer came, no, no good, not

22   good.  We ended the call at that point.  I went back to speak

23   with Mr. Derosier.

24   Q.   And that was in direct -- what you learned from Detective

10:00    25   (sic) Grossman, who, in turn, learned it from the Secretary of

40

1   State was in direct contradiction to what Mr. Derosier told you

2   about the licensing, is that right?

3   **A.**   That's right.

4   **Q.**   And you also said that during this interview he told you

10:01   5   about his cell phone number, is that right?

6   **A.**   That's right.

7   **Q.**   Okay.  And what did he tell you about that number?

8   **A.**   It was 218-399-2222.

9   **Q.**   And he said that was his phone number, is that right?

10:01   10   **A.**   That's right.

11   **Q.**   And this is the same phone number that was set forth in

12   those advertisements that you previously testified to, is that

13   right?

14   **A.**   That's right.

10:01   15   **Q.**   After you were done speaking with Mr. Derosier, what did

16   you do next?

17   **A.**   So after I was done speaking with Mr. Derosier, we left.

18   I began driving away and heading back to the office at that

19   point.

10:01   20   **Q.**   And when you returned to the office, did you call another

21   employee of Mr. Derosier's?

22   **A.**   Yes.

23   **Q.**   And who was that?

24   **A.**   So in my conversation with Blake Logan -- I'm sorry,

10:02   25   Blake, Christyan, and Shawn, I had -- they had mentioned other

41

1    employees that worked for Mr. Derosier.  One name that came up

2    was Jack Hirst.

3    Q.   And was that name familiar with you?

4    A.   It certainly was.

10:02   5    Q.   Why was that?

6    A.   Because it was the name associated with the tip to the

7    Attorney General's Office that Mr. Derosier was continuing to

8    do work in the state.  To this point I hadn't been able to

9    contact Jack Hirst.  I had searched for his name.  It wasn't

10:02  10    coming up, and I didn't -- I couldn't confirm that Mr. Hirst

11    was a real person until this point, so it was -- that name

12    struck out of those interviews, so that's when I -- why I went

13    back to the office and tried to get ahold of Jack Hirst.

14    Q.   And did you get ahold of him?

10:03  15    A.   I did.

16    Q.   And can you tell the magistrate judge about that

17    conversation?

18    A.   So Mr. Hirst confirmed not only that he was working or had

19    worked for Mr. Derosier, but the job sites, and the names --

10:03  20    and/or the names that he provided for the job sites where he

21    worked was consistent with what Ruth Ann Halvorson had -- had

22    told me when I had initially spoke with her.

23    Q.   Did he claim that he was owed money by Mr. Derosier?

24    A.   Yes, ma'am.  He -- he claimed that he's -- he wasn't paid

10:03  25    for -- I believe it was $2,000 worth of work that he -- he had

1    done for Mr. Derosier.

2  **Q.**   And continuing on that same day, did you receive a

3  voicemail message from yet another employee of Mr. Derosier?

4  **A.**   I did.

10:04   5  **Q.**   And who was that?

6  **A.**   Nicholas Beeche called.  He left me -- I was already gone

7  from the office, so I received it the next day, but he called

8  and he said he had evidence related to Mr. Derosier.

9  **Q.**   And you weren't able to get ahold of him?

10:04   10  **A.**   I was not.

11  **Q.**   Did you eventually set up a more formal interview with

12  Mr. Fox or with an Andrew?  Let me step back.  Who is Andrew

13  Fox?

14  **A.**   Andrew Fox is another employee that was identified, and

10:04   15  he -- he actually filed a small claims action against Mr.

16  Derosier for unpaid labor, labor that he was owed by Mr.

17  Derosier for work that he had conducted.

18  **Q.**   And how did you learn about that?

19  **A.**   I believe it came from my interview with the three at the

10:05   20  worksite, but it could've been -- I guess I don't recall

21  specifically how I came across Andrew Fox's name.

22  **Q.**   But you -- nonetheless, you came across his name during

23  the investigation, and you reached out to him, is that right?

24  **A.**   That's right.

10:05   25  **Q.**   Okay.  And you reached out to him by telephone at first,

43

1    is that right?

2    A.    That's correct.

3    Q.    Okay.  And during that telephone conversation, what did he

4    tell you?

10:05    5    A.    That he confirmed that he had worked for Mr. Derosier.

6    Q.    Did he also confirm that he filed a small claims case

7    against Mr. Derosier, as you learned about?

8    A.    Yes, ma'am.

9    Q.    Did he tell you when he started working for Mr. Derosier?

10:05   10    A.    Yes, he did, ma'am.  I can't recall a specific date right

11    now.

12    Q.    Okay.  Was it for a long period of time or a short period

13    of time?

14    A.    It wasn't a short period of time, for sure, several

10:06   15    months --

16    Q.    Okay.

17    A.    -- to a year.

18    Q.    And did you eventually set up a more formal interview with

19    him?

10:06   20    A.    I did, ma'am.  It was the following week.

21    Q.    And do you recall the date of that interview, if you -- if

22    you can?

23    A.    I'd have to review my report to -- for the specific date,

24    ma'am.

10:06   25    Q.    But it was sometime -- it was about a week following your

44

1    initial contact with him on August 28, 2020, is that right?

2    A.   That's correct, ma'am, September -- September 4th rings a

3    bell, but I'd have to look at my report to be sure.

4    Q.   Okay.  Sometime in September, is that right?

10:06    5    A.   That's correct.

6    Q.   So where did this interview occur?

7    A.   At his residence in Grand Forks.

8    Q.   And you drove to that residence?

9    A.   That's correct, ma'am.

10:07    10    Q.   And what happened during that interview?

11    A.   I was provided with several documents from Mr. Fox, a

12    check and pay stub, a response from the Department of Labor.

13    There were text messages from Mr. Derosier, as well as some

14    audio recordings of Mr. Derosier and Andrew Fox engaging in

10:07    15    conversation.

16    Q.   And were many of these documents documents that he filed

17    as part of his small claims case?

18    A.   There was a check and a pay stub and a letter, response

19    from Mr. Derosier, yes.

10:07    20    Q.   Was Mr. Fox familiar with GPHQ?

21    A.   He was not.  He had -- he saw it on the check, but he

22    didn't know what that was.

23    Q.   Okay.  And did Mr. Fox tell you where Mr. Derosier

24    operated his business out of?

10:08    25    A.   Yes, ma'am.

45

1   **Q.**   And where was that?

2   **A.**   XXXXXXXXXXXXXXXXXXXXX.

3   **Q.**   And what did he identify that address as?

4   **A.**   It's where Mr. Coons lived.  Nick Derosier lived and

10:08    5   worked out of there, ran his business out of that residence,

6   and that's where he conducted the administrative aspects of the

7   business.

8   **Q.**   So at some point did he tell you that Mr. Coons died?

9   **A.**   Yes, ma'am.

10:08   10   **Q.**   Okay.  And then Mr. Derosier was continuing to reside out

11   of there and operate the business out of there, is that right?

12   **A.**   That's correct.

13   **Q.**   Okay.  And did he tell you about whether there are any

14   electronic devices inside that residence?

10:09   15   **A.**   Yes, ma'am.

16   **Q.**   What did he say about that?

17   **A.**   He said there were -- there were two computers in the main

18   floor, and he had observed Mr. Derosier using QuickBooks on one

19   of the computers.

10:09   20   **Q.**   And did he identify which computer that Mr. Derosier used

21   the QuickBooks program on?

22   **A.**   I believe it was the left computer.

23   **Q.**   Okay.  And did you ask Mr. Fox whether he was aware of the

24   Order of Injunction that precluded Mr. Derosier from doing

10:09   25   business?

46

1   **A.**   I did.

2   **Q.**   And what was his response?

3   **A.**   He was aware of it, and when -- when the Order of

4   Injunction became public, Mr. Derosier had addressed it with

10:09   5   him and/or the other employees that he had received an

6   extension to continue work to finish projects.

7   **Q.**   And to the best of your knowledge, did Mr. Derosier, in

8   fact, receive an extension to complete these projects?

9   **A.**   No, ma'am.

10:10   10   **Q.**   Looking at Exhibit 8, could you identify that, 8 and -- 8

11   and 9, please?

12   **A.**   Eight and nine?  Exhibit 8 is some of the information I

13   received from Mr. Fox, a copy of the check and pay stub, along

14   with notes from him regarding times worked, work times, times

10:11   15   and dates that he conducted work.  Exhibit 9 is a payroll

16   printout, payroll stub for Mr. Fox.

17   **Q.**   And both of these documents you received from Mr. Fox, is

18   that right?

19   **A.**   That's correct.

10:11   20   **Q.**   And you received those during the time that you

21   interviewed him, is that right?

22   **A.**   That's correct.

23   **Q.**   Okay.  And looking specifically at the check set forth in

24   Exhibit 8, what is the date of that check?

10:11   25   **A.**   10/31 of 2019.

47

1  **Q.**   And why would that be relevant?

2  **A.**   The date of the injunction would have been 10/15 of 2019.

3  **Q.**   Okay.

4  **A.**   So --

10:12  5  **Q.**   Go ahead.  I'm sorry.

6  **A.**   The date -- the payroll -- the pay period is 10/4 of '19

7  through 10/17 of '19.

8  **Q.**   Okay.  And this, again, is a check written on the GPHQ

9  account and paid to Andrew Fox, is that right?

10:12  10  **A.**   That's correct.

11  **Q.**   And is there anything significant about the bottom of the

12  pay stub?

13  **A.**   Yes, ma'am.

14  **Q.**   And what is that?

10:12  15  **A.**   There's a clear marking on the bottom-right corner of

16  that.  It says, "Powered by Intuit Payroll."

17  **Q.**   And why is that significant?

18  **A.**   The Intuit company is a parent company for QuickBooks, for

19  the QuickBooks software.

10:13  20  **Q.**   And the documentation behind Number 8, that was a work

21  log, is that right, that Mr. Fox provided to you?

22  **A.**   That's correct.

23  **Q.**   That recorded the dates that he worked for Mr. Derosier,

24  is that correct?

10:13  25  **A.**   That's correct.

48

1  Q.   And this includes a period of time before and after the

2  date of the injunction, is that correct?

3  A.   That's correct.

4  Q.   But, nonetheless, at all relevant dates the defendant was

10:13  5  not licensed to do business, is that right?

6  A.   That's correct.

7       MS. PUHL:  United States offers Exhibit 8.

8       THE COURT:  Mr. Bellmore?

9       MR. BELLMORE:  No objection, Your Honor.

10:13  10       THE COURT:  Exhibit 8 is received.

11  Q.   (MS. PUHL CONTINUING)  Looking at Exhibit 9, could you

12  please identify that?

13  A.   It is a pay stub for a pay period between 10/18 of '19 and

14  11/7 of '19, with a date of November -- it says pay date,

10:14  15  November 15, 2019, for Andrew Fox.

16  Q.   And are there some notes on this pay stub?

17  A.   Yes.

18  Q.   And according to Mr. Fox, who made those notes?

19  A.   Mr. Derosier did.

10:14  20  Q.   And this was a pay stub that Mr. Fox provided to you

21  during that interview, is that right?

22  A.   That's correct.

23  Q.   And, again, is this also a QuickBooks document?

24  A.   It is, ma'am.

10:14  25  Q.   And how do you know that?

1   A.   Because on the bottom-right corner it says, "Powered by

2   Intuit Payroll."

3           MS. PUHL:  United States offers Exhibit Number 9.

4           THE COURT:  Mr. Bellmore?

10:14    5           MR. BELLMORE:  No objection, Your Honor.

6           THE COURT:  Exhibit 9 is received.

7   Q.   (MS. PUHL CONTINUING)  And looking very quickly at

8   Exhibit 10, could you please identify that?

9   A.   These are the messages between Andrew Fox and Nick

10:15   10   Derosier that were provided by Mr. Fox to me, screenshots.

11   Q.   And when you say "messages," are you -- what type of

12   messages are you referring to?

13   A.   Text messages.

14   Q.   And were these text messages that occurred between

10:15   15   November 4th -- or November 1, 2019, through December 12, 2019?

16   A.   They begin on November 1st, and they end on December 10th.

17   Q.   Of 2019, right?

18   A.   Yes, ma'am.

19   Q.   Okay.  And, again, do these text messages reflect when

10:16   20   Mr. Fox worked for Mr. Derosier?

21   A.   That's correct.

22           MS. PUHL:  United States offers Exhibit Number 10,

23   Your Honor.

24           THE COURT:  Mr. Bellmore?

10:16   25           MR. BELLMORE:  No objection, Your Honor.

1          THE COURT:  Exhibit 10 is received.

2    Q.   (MS. PUHL CONTINUING)  Finally, during this interview of

3    Mr. Fox, did you learn about a letter that Mr. Derosier wrote

4    to the North Dakota Department of Labor and Human Rights?

10:16     5    A.   Yes, I did.

6    Q.   And according to Mr. Fox, why was this letter important?

7    A.   The -- from what I recall, Mr. Fox in the -- in the letter

8    -- I'm sorry.  Mr. Derosier in the letter confirms that he was

9    doing business in the state and that Mr. Fox was working for

10:17     10   him, and --

11   Q.   So to be clear, during -- during this interview you

12   learned about a complaint that Mr. Fox made about Mr. Derosier

13   to the Department of Labor and Human Rights, is that right?

14   A.   That's correct.

10:17     15   Q.   Okay.  And according to Mr. Fox, this letter was in

16   response to that complaint, is that right?

17   A.   That's correct.

18   Q.   And that letter is marked as Government's Exhibit

19   Number 11, is that right?

10:17     20   A.   That's correct.

21   Q.   And what is the date of that letter?

22   A.   It's dated November 22, 2019.

23   Q.   And as you testified to, in this letter the defendant

24   acknowledges that Mr. Fox was employed for him -- employed by

10:18     25   him during the period of time that was subsequent to the Order

1    of Injunction, is that right?

2    **A.**    Yes, ma'am.

3              MS. PUHL:  United States offers Exhibit Number 11,

4    Your Honor.

10:18   5              THE COURT:  Mr. Bellmore?

6              MR. BELLMORE:  No objection, Your Honor.

7              THE COURT:  Exhibit 11 is received.

8    **Q.**    (MS. PUHL CONTINUING)  Looking at page 2 of Exhibit

9    Number 11, Detective Buzzo --

10:18   10   **A.**    Yes, ma'am.

11   **Q.**    -- what period of time does Derosier admit that Mr. Fox

12   worked for him?

13   **A.**    So there's two periods of time.  The first one is 10/4 of

14   '19 through 10/17 of '19.  And the second one is 10/18 of '19

10:18   15   through 11/7 of '19.

16   **Q.**    And in this letter does Mr. Fox -- does Mr. Derosier

17   indicate why, if at all, he did not pay Mr. Fox?

18   **A.**    Yes.

19   **Q.**    And why was that?

10:19   20   **A.**    In the letter, the second-to-last paragraph, he states

21   that he disputes what Mr. Fox has provided to the Labor

22   Department, he's dissatisfied with his employment, he breached

23   a contract, the company was filing for Chapter 11 bankruptcy,

24   and that he also keeps timecard records recorded from all

10:19   25   employee time records and records kept by manager time and job

52

1    tracking.

2    **Q.**   So he provided a number of reasons why he didn't pay --

3    pay him, is that right?

4    **A.**   That's correct.

10:20    5    **Q.**   And that included him being insubordinate, is that right?

6    **A.**   That's right.

7    **Q.**   And damages to his company, is that right?

8    **A.**   That's right.

9    **Q.**   During your investigation did you obtain a search warrant

10:20    10    for any of the bank accounts that were used by any of Mr.

11    Derosier's businesses?

12    **A.**   I did.

13    **Q.**   And when did that occur?

14    **A.**   I'd have to review my report to be positive.

10:20    15    **Q.**   Okay.  Would it have been before you obtained the search

16    warrant?

17    **A.**   Yes, ma'am.

18    **Q.**   And when I say "search warrant," I'm referring to the

19    search warrant of Mr. Derosier's residence, is that right?

10:20    20    **A.**   Yes, before the search warrant of the residence, ma'am.

21    **Q.**   Okay.  So sometime in September of 2020?

22    **A.**   It was the same day I met with -- September 10th.  It was

23    the same date I met with Ruth Ann Halvorson, was when I served

24    it on United Valley Bank.

10:21    25    **Q.**   And what specifically was the subject of that search

53

1  warrant?

2  **A.**   The bank account documents, deposits, withdrawals, checks,

3  copies of checks.

4  **Q.**   And for which account specifically, do you recall?

10:21  5  **A.**   The Team Lawn account that was identified on the back

6  of --

7  **Q.**   And what --

8  **A.**   -- Ms. Peterson's cashed check, I believe.

9  **Q.**   And what business -- or, excuse me.  What crimes were you

10:21  10  investigating?

11  **A.**   So construction fraud, contracting without a license, and

12  forgery, and violation of judicial order.

13  **Q.**   And did you receive a response from United Valley Bank?

14  **A.**   I did, ma'am.

10:22  15  **Q.**   And do you recall when?

16  **A.**   I don't recall the exact date.

17  **Q.**   Okay.  If you reviewed your report, would that refresh

18  your memory?

19  **A.**   Yes, ma'am, it would.

10:22  20        MS. PUHL:  Your Honor, if I may?

21        THE COURT:  Yes.

22  **Q.**   (MS. PUHL CONTINUING)  I'm handing you a copy of your

23  report in this matter to refresh your memory.  Do you recognize

24  this report?

10:22  25  **A.**   I do, ma'am.

54

1   Q.   And will it help you recall when you received a response

2   from the bank?

3   A.   Yes.

4   Q.   Okay.  If you could review it, please.

10:22   5   A.   It would've been September 14, 2020, at 10:30 hours.

6   Q.   Okay.  So reading your report, that -- or reading this

7   report refreshed your memory, right?

8   A.   That's correct, ma'am.

9   Q.   And as you said, it was September 14, 2020.

10:23   10   A.   That's correct.

11   Q.   '20?

12   A.   2020.

13   Q.   2020.

14        THE COURT:  Ms. Puhl, when it's convenient, let's

10:24   15   take a break.

16        MS. PUHL:  I think if -- with your permission, I'll

17   just conclude this line of questioning?

18        THE COURT:  Sure.

19   Q.   (MS. PUHL CONTINUING)  And what did you learn as a result

10:24   20   of the records that you received from United Valley Bank?

21   A.   From review of those records, ma'am, it was apparent that

22   there was most likely business being conducted.  There were

23   checks being written to a local excavation company that also

24   sells dirt or other items, rock and various things that would

10:24   25   be used for landscaping; brick -- a local brick company, Hebron

55

1   Brick.  They sell patio block.  They sell everything brick, as

2   their name would suggest.  It shows money -- or a check being

3   written to another account for GPHQ, you know, money coming to

4   and money leaving, chasing money.

10:25   5   **Q.**   Okay.  So the money that was being deposited into that

6   bank account, that was money that you would like to believe

7   that was received by customers, is that right?

8   **A.**   Received from?

9   **Q.**   From.

10:25   10   **A.**   Yes.

11   **Q.**   Yes, and that is due to the fact that you reviewed

12   notations on some of those checks, is that right?

13   **A.**   That's correct.

14   **Q.**   And do you recall what some of those notations indicated?

10:25   15   **A.**   Yes.  So some of the checks that were deposited into the

16   account said "paid in full."

17   **Q.**   And you also indicated that there were checks that were

18   being written on the account as well, is that right?

19   **A.**   That's correct.

10:25   20   **Q.**   Okay.  And looking at Exhibit 12, what is that?

21   **A.**   This is a printout of -- there's four checks debited from

22   the account.  There's -- Strata Corporation is the first check.

23   The second check is written to Hebron Brick.  The third check

24   is written to GPHQ, LLC.  And the third check is written to Rum

10:26   25   River.  It's a company in Minnesota.  These are all dated

56

1    between May -- May of 2020 and August of 2020.

2    **Q.**    And why were those dates important?

3    **A.**    No business is supposed to be conducted after the order of

4    the injunction, which was 10/15 of 2019.

10:27    5    **Q.**    And you also said that these were businesses that are

6    associated with landscaping, is that right?

7    **A.**    Yes.   The third check is written to the business, from the

8    business, but Checks 1, 2 and 4 are all companies that would

9    certainly be in the landscaping business purview.

10:27    10    MS. PUHL:   United States offers Exhibit Number 12,

11    Your Honor.

12    THE COURT:   Mr. Bellmore?

13    MR. BELLMORE:   No objection, Your Honor.

14    THE COURT:   Exhibit 12 is received.

10:27    15    MS. PUHL:   And now would be a good time to take a

16    break, Your Honor.

17    THE COURT:   All right.

18    MS. PUHL:   Thank you.

19    THE COURT:   Let's plan to reconvene at 10:45.   Thank

10:27    20    you, all.

21    (A recess was taken from 10:27 a.m. to 10:45 a.m.,

22    the same day.)

23    THE COURT:   Please continue with your questioning of

24    Detective Buzzo.

10:45    25    MS. PUHL:   Thank you, Your Honor.

1   **Q.**   (MS. PUHL CONTINUING)   Before we broke, Detective Buzzo,

2   you were testifying about your search of the United -- United

3   Valley Bank records for the Tim -- Team Lawn business account,

4   is that right?

10:46   5   **A.**   That's correct.

6   **Q.**   And after you conducted a review of that business account,

7   what happened next --

8   **A.**   I --

9   **Q.**   -- during your investigation?

10:46   10   **A.**   I interviewed Ruth Ann Halvorson.

11   **Q.**   And if you could remind the magistrate judge, who is Ruth

12   Ann Halvorson?

13   **A.**   Ms. Ruth Ann Halvorson is a citizen -- citizen of Grand

14   Forks who owns 614 -- XXXXXXXXXXXXXXXXXXXXX in Grand Forks,

10:46   15   where the work had been conducted by Mr. Derosier.

16   **Q.**   And she also previously reported to you that Mr. Derosier

17   was working at a number of other job sites in the Grand Forks

18   area, is that right?

19   **A.**   That's correct, ma'am.

10:46   20   **Q.**   And do you recall when you interviewed her?

21   **A.**   It would've been September -- September 10, 2020.

22   **Q.**   Okay.  And what, if anything, did she say during that

23   interview?

24   **A.**   Ms. Halvorson provided invoices -- or estimates for

10:47   25   several jobs that she had been provided, that she asked for

1    from Mr. Derosier.  She provided several invoices that she had

2    paid for work conducted by Mr. Derosier, as well as e-mails

3    with the condo association down there in High Plains Court for

4    work and other related topics.

10:47    5    Q.    And these invoices and statements were for the year --

6    were from the year 2019, is that right?

7    A.    I believe -- I'd have to check on the dates to be

8    positive.  There were 2020, for sure.  I'd have to look to

9    refresh my memory.

10:48    10   Q.    Okay.  And would that be in your report?

11   A.    It would, ma'am.

12   Q.    Okay.  So if I handed you a copy of your report, would

13   that refresh your memory?

14   A.    Yes, ma'am.

10:48    15   Q.    For the record, I'm handing you a copy of Mr. Derosier --

16   or Detective Buzzo's report.  Did that refresh your memory?

17   A.    Yes, ma'am.

18   Q.    Okay.  And so what did Ms. Halvorson provide you?

19   A.    The 2019 and 2020 invoices, ma'am.

10:48    20   Q.    For Team Lawn and Landscape, is that correct?

21   A.    That's correct.

22   Q.    Did you conduct any other interviews?

23   A.    I did.

24   Q.    Who else did you interview?

10:48    25   A.    So the following day, on September 11th, I interviewed a

1    Grand Forks County resident, Robbin Rendahl.  She lives in

2    rural Thompson, is where her address is located at.

3    Q.    And what, if anything, did she say?

4    A.    Mr. Derosier has been doing work for her, quite a large

5    series of projects totaling about $50,000, or so, of work.  She

6    walked me through the property, and we discussed her business

7    with Mr. Derosier.  She had provided to him with -- a down

8    payment, about 50 percent, and then work was -- there were

9    still landscaping projects being conducted on her property.

10   Q.    Had that work been completed?

11   A.    Not entirely, ma'am.

12   Q.    Okay.  But yet she had paid for it, is that right?

13   A.    That's correct.

14   Q.    Okay.  So at this point your investigation is revealing

15   that the defendant is engaging in business that was subsequent

16   to the Order of Injunction, is that right?

17   A.    That's correct.

18   Q.    Also engaging in a business without a contractor license,

19   is that right?

20   A.    That's correct.

21   Q.    And, finally, receiving payment for jobs that he did not

22   complete work on, is that right?

23   A.    That's correct, and that's construction fraud under the

24   North Dakota statute, Century Code.

25   Q.    So based upon your investigation up to this point, what

1    did you do next?

2    A.    I drafted an affidavit of probable cause for a search

3    warrant, Mr. Derosier's residence, computers for business

4    records, computers and other associated storage devices.

10:50    5    Q.    And when did you seek to obtain that warrant?

6    A.    September 14th.

7    Q.    Of?

8    A.    Of 2020.

9    Q.    And what were you investigating specifically?

10:51    10    A.    Violations of judicial order, construction fraud,

11    contracting without a license, forgery up to that point.

12    Q.    And you drafted a number of documents as part of this

13    search warrant request, is that right?

14    A.    That's correct.

10:51    15    Q.    Okay.  And are those documents set forth at Exhibit 13?

16    A.    Yes, ma'am.

17    Q.    And if you would, could you please identify those

18    documents?

19    A.    On Exhibit 13 -- you want to go by Bates stamps or just --

10:52    20    Q.    That would be fine.

21    A.    Okay.  705 -- a Bates 705 is the search warrant.  706 is

22    Exhibit A to the search warrant, and it continues to 707.  And

23    then Bates 708 through 719 are -- or is the affidavit of

24    probable cause.  Bates 720 is Search Warrant Exhibit 1, and

10:53    25    Bates 721 is Search Warrant Exhibit 2.

61

1   **Q.**   So to be clear, you drafted the search warrant, Exhibit A,

2   and the affidavit, is that right?

3   **A.**   Everything in -- yeah, everything there --

4   **Q.**   Okay.

10:53  5   **A.**   -- between -- I didn't draft the exhibits, but --

6   **Q.**   You didn't draft -- you did not draft the exhibits to the

7   affidavit, is that right?

8   **A.**   That's correct.

9   **Q.**   Okay.  And those are exhibits that you refer to in your

10:53  10   affidavit, right?

11   **A.**   That's correct.

12   **Q.**   And that you received during your investigation of Mr.

13   Derosier, is that correct?

14   **A.**   Correct.

10:53  15   **Q.**   Okay.  So after you drafted the search warrant affidavit,

16   did you submit it to anyone for review?

17   **A.**   Yes, ma'am.

18   **Q.**   And who did you submit it to?

19   **A.**   The Grand Forks County assistant state's attorney, Megan

10:54  20   Essig.

21   **Q.**   Okay.  And did she approve of your seeking a search

22   warrant after she reviewed it?

23   **A.**   Yes, ma'am.

24   **Q.**   Did she make any changes to it?

10:54  25   **A.**   I don't believe so.

1   Q.   Okay.  And how did you submit the documents that are

2   marked as Exhibit 13?

3   A.   So Grand Forks County was on an all E or electronic search

4   warrant system.  We had switched over to that sometime previous

10:54   5   to this, and we -- Grand Forks County, now the entire state,

6   are to submit search warrants electronically through the state

7   portal for ND Courts.

8   Q.   Okay.  And there's a template that's used for that, is

9   that right?

10:54   10   A.   That's correct.

11   Q.   And we'll talk about that in a moment, is that correct?

12   A.   Yes.

13   Q.   Okay.  So all of these documents that are marked as

14   Exhibit 13, were they all submitted to the state court judge as

10:54   15   a bundle?

16   A.   That's -- yes, ma'am.

17   Q.   Okay.  And do you recall who you submitted them to?

18   A.   It was Judge Lolita Hartl Romanick of Grand Forks District

19   Court.

10:55   20   Q.   And did she sign the search warrant after reviewing those

21   documents?

22   A.   Yes, ma'am, she did.

23   Q.   But she didn't make any changes to them?

24   A.   No, ma'am.

10:55   25        MS. PUHL:  The United States moves to introduce the

63

1    search warrant packet marked as Exhibit 13, Your Honor.

2              THE COURT:  Mr. Bellmore?

3              MR. BELLMORE:  No objection, Your Honor.

4              THE COURT:  Exhibit 13 is received.

10:55   5    **Q.**  (MS. PUHL CONTINUING)  So looking at the face of the

6    search warrant, Detective Buzzo, do you recognize today that it

7    includes a typo?

8    **A.**    Yes, ma'am.

9    **Q.**    And what is that?

10:56  10   **A.**    So the face of the search warrant as it reads would

11   authorize the search of Nicholas Derosier at XXXXXXXXXXXXXXXX

12   XXXXX --

13   **Q.**    So --

14   **A.**    -- Grand Forks.

10:56  15   **Q.**    I'm sorry.

16   **A.**    Go ahead.

17   **Q.**    So it authorizes specifically a search of Derosier's

18   person, is that correct?

19   **A.**    Yes.

10:56  20   **Q.**    And that person, according to the search warrant, is

21   located at his residential address, is that correct?

22   **A.**    That's correct.

23   **Q.**    Okay.  Was that your intent?

24   **A.**    No.

10:56  25   **Q.**    What was your intent?

1   A.    My intent was to search the residence for the items listed

2   in Exhibit A, those items; search and seize Mr. Derosier's cell

3   phone, and search him if his phone wasn't located during the

4   course of the search of the residence.

10:57   5   Q.    So to be clear, it was your intent to obtain authorization

6   to search both the residence and Mr. Derosier's person, is that

7   right?

8   A.    That's right.

9   Q.    Okay.  And did you understand the warrant to authorize you

10:57   10   to do both?

11   A.    Yes.

12   Q.    Now, according to the face of the warrant, you indicate

13   that there will be -- that you expect to find certain property

14   on the defendant's person, is that right?

10:57   15   A.    Yes.

16   Q.    And if you would, could you identify that, please, looking

17   at the face of the search warrant, Bates 705?

18   A.    Yes.  It states, "Evidence or property, namely, computers,

19   cell phones, other electronic communication devices, electronic

10:57   20   storage devices such as the computer's hard drive, removal --

21   removable media such as CDs, DVDs, or portable USB drives, as

22   listed in Exhibit A, described with particularity in the

23   attached and incorporated exhibit."

24   Q.    And when you refer to Exhibit A, that includes -- that

10:58   25   includes a laundry list of devices, is that correct?

65

1   A.   That is correct.

2   Q.   And are any of these -- are these devices that you would

3   typically find on someone's person or in someone's home?

4   A.   In their home, ma'am.

10:58   5   Q.   And, again, you testified that you provided all of this to

6   the assistant state's attorney, is that right?

7   A.   That's correct.

8   Q.   And she didn't catch the error, is that right?

9   A.   That's correct.

10:58   10   Q.   And nor did the judge, is that right?

11   A.   That's correct.

12   Q.   And you would agree that the affidavit is clearly written

13   to read that you are requesting permission to search the

14   residence and the person, is that right?

10:59   15   A.   That is correct.

16        MS. PUHL:  And if I could, Your Honor, at this time

17   I'd like to publish the search warrant affidavit.

18        THE COURT:  Certainly.

19        MS. PUHL:  I'd like to publish Bates 718, page 11 of

10:59   20   the search warrant affidavit, paragraph 22.

21   Q.   (MS. PUHL CONTINUING)  Could you read paragraph 22,

22   Detective Buzzo?

23   A.   Yes, ma'am.  "Your affiant believes probable cause exists

24   that Nicholas J. Derosier, a/k/a Nicholas Morgan-Derosier, has

10:59   25   committed the crimes of violation of a judicial order and

1   contractor license required and construction fraud, and

2   evidence of those crimes are contained within the computers and

3   other electronic communication devices within XXXXXXXXXXXXXXXX

4   XXXXX and Derosier's cellular telephone.

11:00   5       "Your affiant requests a search warrant be issued

6   authorizing your affiant to search for and seize the computers

7   and other electronic communication devices, electronic storage

8   devices such as the computer's hard drive, removable media such

9   as CDs, DVDs, or portable flash USB drives and the like.

11:00   10      "Additionally, your affiant requests the search

11   warrant to allow him to search Derosier's person and seize his

12   cell phone if it is not found during the search of the

13   residence.

14      "Additionally, your affiant requests the search

11:00   15   warrant to authorize a forensic search" -- I'm sorry.  I made a

16   mistake.  I'll start over.  "Additionally, your affiant

17   requests the search warrant to authorize a search and forensic

18   examination of all seized computers, electronic communication

19   and storage devices found and seized under this warrant and

11:01   20   Search Warrant Exhibit A."

21   **Q.**   So this affidavit is clearly written to support a search

22   of the house, in addition to Derosier -- Derosier's person, is

23   that right?

24   **A.**   That's correct.

11:01   25   **Q.**   And you specifically request permission to search

1    electronic devices found in the residence, is that right?

2    A.    That's correct.

3    Q.    Now moving to Exhibit A, do you identify the crimes that

4    you are specifically investigating?

11:01    5    A.    Yes, ma'am.

6    Q.    Okay.  Looking at Exhibit 706, Bates 706, and where do you

7    identify that, Special Agent -- or Detective Buzzo?

8    A.    Paragraph 1.

9    Q.    And if you would, could you please read that paragraph?

11:01    10    A.    "By forensic or other means of examination:  Files

11    containing evidence of the crimes of contractor license

12    required, construction fraud, and violation of a judicial order

13    in any form wherever they may be stored."

14    Q.    Now, is there a place on the search warrant when you are

11:02    15    completing the E warrant to identify the crimes under

16    investigation?

17    A.    No, ma'am.

18    Q.    Okay.  And could you please tell the magistrate judge

19    how -- looking specifically at Bates 706, how that search

11:02    20    warrant is created?

21    A.    Bates 70 --

22    Q.    705.  I'm sorry.  Right.  Can you tell how -- could you

23    please tell the magistrate judge how that search warrant is

24    created?

11:03    25    A.    Yes, ma'am.  Using the ND Courts E warrant system you --

68

1  once you log in, you fill out the specific blocks.  And the

2  vast majority of the actual warrant as you see it, you see it

3  once it's signed or at least when the -- when I used the

4  system, the first time you would see the warrant as this

11:03  5  (indicating), as Bates 705, is once it's signed by the judge,

6  so everything is handled within the system.

7       You enter addresses.  You enter names.  The blocks

8  are "or this, or that."  And then you attach your Exhibit A,

9  your affidavit of probable cause, and then any exhibits to the

11:04  10  affidavit of probable cause and submit it to the judge through

11  this portal.  And then once it's signed, this is auto-populated

12  based off of the information you put into that system.

13  Q.   So you start with an electronic template, is that right?

14  A.   That's correct.

11:04  15  Q.   And then you populate certain boxes in that template, is

16  that right?

17  A.   Yes.

18  Q.   And after you populate those boxes on that template, do

19  you have an opportunity to review the document before it's

11:04  20  submitted to the judge?

21  A.   Not -- not this document.

22  Q.   Right.  Did you create an exhibit which demonstrates how

23  this document is created?

24  A.   Yes, ma'am.

11:04  25  Q.   I'm handing you Court Exhibit A.  Do you recognize that

1   document or recognize -- recognize that exhibit?

2   **A.**   Yes, ma'am.

3   **Q.**   Okay.  And what is it?

4   **A.**   It's the demonstration of the North Dakota Courts E

11:05   5   warrant system.

6   **Q.**   And did you create this exhibit with the assistance of

7   another officer?

8   **A.**   Yes, ma'am.

9   **Q.**   And who was that?

11:05   10   **A.**   Detective Freeman --

11   **Q.**   And --

12   **A.**   -- because I don't have login information.  I can't log

13   into it anymore since I'm not a police department officer.

14   **Q.**   So you worked with Detective Freeman to just show an

11:05   15   example of this template, is that right?

16   **A.**   That's correct.

17          MS. PUHL:  Okay.  The United States offers Court

18   Exhibit A, Your Honor, for demonstrative purposes.

19          THE COURT:  Mr. Bellmore?

11:05   20          MR. BELLMORE:  Your Honor, I have a question of the

21   witness, if I may, for foundational purposes.

22          THE COURT:  Sure.  Why don't you move a little closer

23   to the microphone.

24          MR. BELLMORE:  Detective Buzzo, when was this disk

11:06   25   created?

1      THE WITNESS:  I'm not sure when this disk was

2   created, sir, but we reviewed it yesterday at the U.S.

3   Attorney's Office here.

4      MR. BELLMORE:  Was it created before or after the

11:06   5   search warrant that we're talking about right now?

6      THE WITNESS:  It was created after.

7      MR. BELLMORE:  Was it created after there were

8   federal charges against Mr. Morgan-Derosier?

9      THE WITNESS:  Yes.

11:06   10      MR. BELLMORE:  Was it created after Mr.

11   Morgan-Derosier filed a Motion to Suppress in this case?

12      THE WITNESS:  Yes.

13      MR. BELLMORE:  Okay.  Thank you.  I have no

14   objection.

11:06   15      THE COURT:  Exhibit A is received.

16      MS. PUHL:  Permission to publish A, Your Honor?

17      THE COURT:  Go ahead.

18   Q.   (MS. PUHL CONTINUING)  Okay.  And just briefly, what are

19   we looking at right here (indicating)?

11:06   20   A.   So this is the landing page after you log in.  You can see

21   the previously submitted search warrants for Detective Freeman

22   here.

23   Q.   And if you move forward to the next page?

24   A.   Hit play.  Stop.  So here's the options for the state

11:07   25   search warrants.  Different types of search warrant templates

71

1    pop up for each different type you select.  So in this case you

2    would hit "Other."  Hit play, please.

3    **Q.**    So this is the template that you were referring to, is

4    that right?

11:07    5    **A.**    That's correct.  Hit stop.

6    **Q.**    And this is identical to the template that you would have

7    filled out on September 15th -- 14th, rather, 2020, is that

8    right?

9    **A.**    That's correct.

11:08    10    **Q.**    Okay.  And whose template is this, just to be clear for

11    the record?

12    **A.**    The State of North Dakota Court System is the entity that

13    owns this process.

14    **Q.**    And it's your understanding that this template was created

11:08    15    by the North Dakota Supreme Court, is that right?

16    **A.**    Yes, ma'am.

17    **Q.**    Do you have an option to use a different template when you

18    submit an E warrant?

19    **A.**    Only -- only those options that you see on that landing

11:08    20    page -- or not the landing page, but the type of warrant when

21    you hit "Create New."

22    **Q.**    Okay.  So if you're doing a warrant for a financial fraud,

23    you must use this template when submitting an E warrant, is

24    that right?

11:08    25    **A.**    That's correct.

72

1  Q.   Okay.  Now, if you would, if you could walk us through

2  this template, Detective Buzzo.

3  A.   Yes.  Hit play, please.  So if you can see where the top

4  portion -- you can hit stop.  So this section right here, you

11:09  5  fill out your report number, in district court, whether it's

6  district or municipal court, the county and then which city the

7  warrant is being executed in.

8       The next portion, if you can hit play, is where you

9  enter the other information.  So these are your options when

11:09  10  you're filling out this E warrant application.  You have "on

11  premises or location known as or on the person, within the

12  person of or on or within property described as or presently

13  located."  And hit stop.  Can you go back?  Forward just a

14  little.

11:10  15  Q.   In this instance what boxes did you populate, Detective

16  Buzzo?

17  A.   I believe I -- I entered information in Box 2 and Box --

18  so Box 2 and Box 4, 2 and 4.  That's what I -- from reading the

19  face of the search warrant, I believe that's where I entered

11:10  20  data in.

21  Q.   And by populating Boxes 2 and 4, you believed you were

22  requesting authorization to search both the residence and the

23  defendant's person, is that right?

24  A.   That's correct.

11:10  25  Q.   Okay.  And upon further review, you acknowledge that you

73

1    should have populated Boxes 1 and 2, is that right?

2  **A.**    I think I should've done 1, 2 and 4.

3  **Q.**    Okay.  And the template is not necessarily clear because

4    it provides "or" not "and/or," is that right?

11:11    5  **A.**    That's correct.  You can hit play, please.

6  **Q.**    But, nonetheless, you'd agree --

7  **A.**    Stop.

8  **Q.**    Oh, go.  I'm sorry.

9  **A.**    No, I just didn't want it to go past here.

11:11    10  **Q.**    Nonetheless, as you testified to, your affidavit makes

11    very clear that you were asking authorization to search both

12    the residence and Derosier's person.

13  **A.**    That's correct.

14  **Q.**    All right.  Now, moving below, what do we see here?

11:11    15  **A.**    So the next section, this portion here (indicating), it

16    states, "more particularly described on the attached and

17    incorporated Attachment A," which you check all that apply, "is

18    evidence of a crime, is contraband, fruits of a crime or other

19    items illegally possessed, is property designated for use,

11:12    20    intended for use or used in committing a crime or other."

21         And when you select those boxes, that's where it

22    populates below the first paragraph of the search warrant, "is

23    evidence of a crime; is contraband, fruits of crime or other

24    items illegally possessed."  So I clicked Items 1 and 2, and

11:12    25    that's why those populated where they did.

1   Q.   And there's no box where you would populate the specific

2   crimes being investigated, is that right?

3   A.   That's correct.

4   Q.   In fact, this template contemplates that you will provide

11:12   5   that information as incorporated in Attachment A, is that

6   right?

7   A.   That's what it says right here.

8   Q.   And did you, in fact, provide that information in

9   Attachment A to the search warrant?

11:13   10   A.   Yes, ma'am, I did.

11   Q.   Now going -- continuing on with this document, what else

12   do we see or that's relevant here?

13   A.   So hit play, please.  Stop.  So then the next option are

14   special warrant options.  These are to notice special

11:13   15   circumstances on the search warrant that have to be

16   specifically approved by the judge, as well as nighttime

17   service and no-knock justifications.

18       These items all populate on the very bottom of the

19   warrant, as you see on Exhibit 13, Bates 705, additional facts

11:14   20   sworn and recording left on the magistrate, nighttime service,

21   or no-knock entry authorized --

22   Q.   And --

23   A.   -- which in this case, none of those applied.

24   Q.   Okay.  And if we continue to play a little, that's

11:14   25   reflected in here, right?

75

1    **A.**   Yes.  Hit play, please.  Hit stop.

2    **Q.**   Okay.  What are we seeing here?

3    **A.**   So what you have to do is attach your files into the

4    portal here, so you would attach your Attachment A, your

11:14    5    affidavit of probable cause, and then all your exhibits to your

6    affidavit of probable cause, and they populate in this box down

7    below as icons or attachments, just like any, I guess, typical

8    website where you're loading documents, uploading documents to

9    it, much the same -- if you hit play, please.  So you choose

11:15    10    your files, put them in there.  In this case nothing was

11    selected because we can't go forward.  It's a test, so you hit

12    next.

13         Now, if you stop, because it's Grand Forks County,

14    the policy -- the policy from the state's attorney of Grand

11:15    15    Forks County is that we shall, as law enforcement officers,

16    submit all search warrant applications to be reviewed by the

17    state's attorney's office prior to submission to the Court.  So

18    this puts -- as well as notifying you that it's going to a

19    Grand Forks County judge, right?

11:16    20         So it's Grand Forks -- because at the top you select

21    Grand Forks County, it needs to go to a Grand Forks County

22    judge, not one in Pembina County or Burleigh County, for

23    instance.  So you make sure that -- this puts you on notice

24    it's going to Grand Forks County.  "Is that correct?  Click

11:16    25    okay or cancel," and then you can see the note.  The judges in

76

1   the county have requested all warrants be approved by the

2   state's attorney before submitting to the judge for his or her

3   approval.

4        Hit play, please.  So stop.  In this case there was

11:16   5   no affidavit attached, so the application couldn't move

6   forward.

7   Q.   So a search warrant must be accompanied by an affidavit,

8   is that right?

9   A.   Yes.

11:16  10   Q.   You can't proceed unless you submit an affidavit to the

11   search warrant, is that right?

12   A.   That's correct.

13   Q.   Okay.  And even though the template does not include the

14   words, quote, unquote, "incorporated," you're, in fact,

11:17  15   attaching it and incorporating as part of the warrant, is that

16   right?

17   A.   That's correct.

18   Q.   All right.  Thank you, Detective Buzzo.  So again, after

19   you complete -- you populate those boxes and you send the

11:17  20   search warrant, search warrant affidavit and all the

21   attachments to the judges, you don't have an opportunity to

22   review that search warrant, is that right, before it's

23   submitted to the judge?

24   A.   You have -- so the next page, once you attach -- put all

11:17  25   your attachments in there and hit "next," the next page that

77

1   comes up is all the information you typed in there, in those

2   boxes.  You see that again, and they're grayed out, so you

3   can't make changes to them.

4          And then there's a little radio button at the bottom,

5   has this -- and it effectively asks or makes a statement, hey,

6   you need to -- has the state's attorney signed off on this, yes

7   or no, or if they have, hit here.  And then you can hit "next,"

8   select the judge, procedure there.  Whoever the on-call judge

9   is, call the clerk and notify them.  Call that judge's clerk

10  and say, "I just submitted an E warrant," and you hit "next."

11  Q.   Right.  And after you do that process, you are not

12  provided a copy of the search warrant as it appears on

13  Exhibit 13, Bates 705, before it's submitted to the judge,

14  right?  You don't review it in a narrative form.

15  A.   No, ma'am.

16  Q.   Now, after you submitted this search warrant packet as you

17  described, you said the judge signed it, is that right?

18  A.   That's correct.

19  Q.   Okay.  And then you received it as we see it in Exhibit

20  13, is that right?

21  A.   Yes, ma'am.

22  Q.   Okay.  And you would've reviewed it, is that right?

23  A.   Yes, ma'am.

24  Q.   And did you catch the typo at that time?

25  A.   No.

1  **Q.**   Okay.  So what happened after you obtained the search

2  warrant?

3  **A.**   I began drafting an operations plan and notifying other

4  members of the Criminal Investigations Bureau that we'd be

11:19  5  conducting a search warrant at -- the following day, the

6  following morning, and then that was about it.

7  **Q.**   So you obtained the search warrant on September 14, 2020,

8  and you made plans to execute it on September 15, 2020, is that

9  right?

11:19  10  **A.**   That's correct.

11  **Q.**   Okay.  So you referred to it as an ops plan, is that

12  right?

13  **A.**   Yes, ma'am.

14  **Q.**   Okay.  What is that?

11:19  15  **A.**   So an operations plan is -- can take several forms, but

16  it's a risk-management trigger, right?  Inherently -- it's

17  inherently dangerous situations, so you have to have a plan.

18  **Q.**   Is that required by your police department?

19  **A.**   I believe it's in our written policy or was at the Grand

11:20  20  Forks Police Department at the time, but it was certainly a

21  bureau -- a policy of the Criminal Investigations Bureau.  To

22  conduct a search warrant on a residence, you had to do plan --

23  you had to have a plan.

24        Again, it's a risk-management issue, who -- who's

11:20  25  going to be there, how many -- how many officers do you need?

79

1    Is it a high-risk issue?  What's the criminal nexus here?  Is

2    the SWAT team going to be involved?  Is it near a school?  How

3    do you get people to hospital if things go bad?  All those

4    plans are hashed out, as well as assigning duties.

11:21   5  **Q.**   So is it a briefing of sorts with the people that are

6    going to conduct or execute the search warrant?

7    **A.**   Well, it's a document that's prepared prior to the

8    briefing.

9    **Q.**   Okay.

11:21   10  **A.**   So everybody has it in writing.

11   **Q.**   Okay.  So you completed that ops plan, is that right?

12   **A.**   Yes.

13   **Q.**   Okay.  And then what happened?

14   **A.**   Then the following morning -- I think I actually finished

11:21   15  it the following morning, and then we had a briefing at 9:30.

16   It wasn't long before we approached the residence at

17   10 o'clock.

18   **Q.**   And who attended that briefing?

19   **A.**   All the available members of the Grand Forks P.D.,

11:21   20  Criminal Investigations Bureau, as well as Special Agent

21   Casetta from HSI.

22   **Q.**   And is it typical to include all the available officers

23   and detectives at the police department for an execution of a

24   search warrant?

11:22   25  **A.**   Yes.

80

1   **Q.**   Okay.  And do you recall specifically who from the P.D.

2   attended that briefing and participated in the execution of the

3   search warrant?

4   **A.**   So I believe both Criminal Investigation Bureau

11:22   5   supervisors, but I know one for sure.  Mike Jennings was there.

6   Obviously I was there.  Jen Freeman, Detective Freeman, was

7   there; Steve Conley, Detective Steve Conley; I believe

8   Detective Rob Starr; Detective Caitlin Stromberg.

9   **Q.**   And others you may not be able to call -- recall at this

11:22   10   moment, is that right?

11   **A.**   Yes, ma'am.

12   **Q.**   So why was Detective Freeman invited to participate in

13   this search warrant execution?

14   **A.**   Well, first of all, it's all-hands-on-deck kind of issue,

11:23   15   and then second of all, she's our -- the computer forensics

16   person for the P.D.

17   **Q.**   Is she the only computer forensic examiner, or do you have

18   several?

19   **A.**   She's -- she's it, ma'am.

11:23   20   **Q.**   So does that mean that she does the computer forensics for

21   financial investigations, child exploitation investigations,

22   murder investigations, everything?

23   **A.**   Yes, ma'am, everything.

24   **Q.**   Now, you also said that Special Agent Dan Casetta attended

11:23   25   the briefing, is that right?

81

1  **A.**    That's correct.

2  **Q.**    And who is he?

3  **A.**    Special Agent Casetta is with the Department of Homeland

4  Security Investigations, HSI office.

11:23  5  **Q.**    And he's set seated at counsel table, is that right?

6  **A.**    He is.

7  **Q.**    And did you invite him?

8  **A.**    I did.

9  **Q.**    Okay.  And why did you invite him?

11:23  10  **A.**    I had worked other white-collar cases with Dan, with

11  Special Agent Casetta in the past.  I knew him personally.  He

12  was an officer with the P.D. for a long time, and it's always

13  helpful to have extra manpower there, as well as extra -- extra

14  set of eyes should other issues pop up.

11:24  15  **Q.**    So you were aware that he had experience with white-collar

16  investigations, is that right?

17  **A.**    That's correct.

18  **Q.**    Okay.  And you had experience working with him, right?

19  **A.**    Yep.

11:24  20  **Q.**    Okay.  And he also was a former police officer with the

21  Grand Forks Police Department, is that right?

22  **A.**    That's correct.

23  **Q.**    So he was your former colleague before he went over to

24  HSI, is that right?

11:24  25  **A.**    That's correct.

82

1  **Q.**   Okay.  When did you invite Special Agent Casetta?

2  **A.**   I think he had about 15 -- 10 to 15 minutes to get to the

3  police department when I called him.

4  **Q.**   Okay.  So you obtained the search warrant on the 14th, and

11:24   5  you had the briefing on the 15th, is that right?

6  **A.**   That's right.

7  **Q.**   And you called Special Agent Casetta about 15 minutes

8  before that briefing, is that right?

9  **A.**   At most.

11:25   10  **Q.**   Did you talk to him at any point before that time about

11  this case?

12  **A.**   No, ma'am.

13  **Q.**   Okay.  And what did you tell him when you invited him

14  over?

11:25   15  **A.**   I -- specific words, I don't know exactly what I told him,

16  but general terms, it was, we're doing a search warrant on a --

17  on a business, on a contracting issue.  Do you want to tag

18  along?

19  **Q.**   And is that typical to ask for assistance from a federal

11:25   20  agent on a local investigation?

21  **A.**   We do it.  We have task forces.  We have -- we work

22  together, work together well with other agencies, state, local,

23  federal, other -- other jurisdictions, county.

24  **Q.**   So it's something that the Grand Forks Police Department

11:25   25  -- Police Department routinely does, is that right?

1  **A.**   Yes.

2  **Q.**   Because, as you said, it's all-hands-on-deck, right?

3  **A.**   Yes.

4  **Q.**   So at some point you're looking for extra set of hands to

11:26  5  execute a search warrant, is that right?

6  **A.**   That's correct.

7  **Q.**   And did Special Agent Casetta agree to come over?

8  **A.**   Yes.

9  **Q.**   Okay.  And where did this briefing occur?

11:26  10  **A.**   In the basement classroom of the police department.

11  **Q.**   And what was the purpose of the briefing?

12  **A.**   To go over the operations plan, talk about those

13  risk-management issues, assign duties and talk about our

14  approach to the residence and how we're going to manage the

11:26  15  scene.

16  **Q.**   Did you talk about the search warrant, itself?

17  **A.**   Yes.

18  **Q.**   Did you tell the officers what crimes that you were

19  investigating?

11:26  20  **A.**   Yes.

21  **Q.**   And did you tell them that the search warrant was limited

22  to those crimes that you were investigating?

23  **A.**   Yes.

24  **Q.**   And those crimes as you've now previously -- or testified

11:26  25  to multiple times are set forth in the affidavit and Exhibit A,

1   is that right?

2   **A.**   That's correct.

3   **Q.**   Okay.  Did you make them copies of anything?

4   **A.**   I did.

11:27   5   **Q.**   And what was that?

6   **A.**   So each -- everybody that attends the briefing for the

7   search warrant, they have a copy of the operations plan, which

8   spells out duties, the address, you know, other stuff, radio

9   frequencies, whatever channels we're using.  But attached to

11:27   10   that is a copy of the Search Warrant Exhibit A, and then I have

11   a copy of the affidavit, and everything else in my case file

12   goes with me.

13   **Q.**   So you made the officers that attended the briefing aware

14   that the search warrant was limited to the items identified in

11:27   15   the search warrant and in Attachment A, is that right?

16   **A.**   That's correct.

17   **Q.**   Okay.  So you couldn't -- you didn't have authorization to

18   seize a car, for example.

19   **A.**   That's correct.

11:27   20   **Q.**   And the officers there would've been made aware of that

21   fact.

22   **A.**   Yes.

23   **Q.**   Now, I think you briefly touched upon this earlier this

24   morning, but did you talk about another investigation involving

11:28   25   Mr. Derosier at that search warrant briefing?

85

1   A.   Yes.

2   Q.   Okay.  Can you tell the magistrate judge about that,

3   please?

4   A.   So in my initial contact with Detective Freeman about this

11:28   5   case, she had mentioned this cyber tip issue and that it was

6   Team Lawn.  The name "Team Lawn" struck a chord with Jen, and

7   that's when she -- she was like, "Oh, I have a case where I

8   found exactly what you're looking for."  It was that address

9   verification.  It was closed, done deal.  Never addressed it

11:28   10   again.

11        At the search warrant briefing Jen's supervisor,

12   Detective Sergeant Mike Jennings, was there, and he

13   specifically addressed -- he said, "Now, there's this cyber tip

14   in the -- on the peripherals.  If we find anything, we need

11:29   15   to -- related to anything other than what's related to the

16   crimes spelled out, construction fraud," and he listed them

17   off, "we need to stop and seek to amend the search warrant.

18   That's all we're authorized for, is what's listed there,

19   construction fraud, contract without a license, and violation

11:29   20   of a judicial order."  It was clear, clear as day right there.

21   Q.   So there was discussion of this cyber tip that had some

22   connection to Team Lawn at the search warrant briefing, right?

23   A.   Yes.

24   Q.   Were -- and this cyber tip, were you told that it was

11:29   25   closed?

86

1  **A.**    Yes.

2  **Q.**    Okay.  And do you know when it was closed?

3  **A.**    No, ma'am.  I didn't -- the way I understood it is it was

4  closed when I initially talked to Jen.  I never asked about it.

11:30  5  It wasn't --

6  **Q.**    Did you know any details about that cyber tip?

7  **A.**    No.

8  **Q.**    Did you ever ask any questions of Detective Freeman about

9  that cyber tip?

11:30  10  **A.**    No, ma'am.

11  **Q.**    Did you ever ask any questions about anybody that attended

12  that briefing about that cyber tip?

13  **A.**    No, ma'am.

14  **Q.**    You know it was a cyber tip, and you knew it was closed,

11:30  15  right?

16  **A.**    That's correct.

17  **Q.**    Okay.  And Detective Jennings told the group, "If anybody

18  finds any other evidence, we're to stop the search," is that

19  right?

11:30  20  **A.**    That's correct.

21  **Q.**    Okay.  And is that -- is that something that's typically

22  done in a search warrant briefing?

23  **A.**    Yes.

24  **Q.**    Okay.  Is it unusual for a detective to say, "Hey, if we

11:30  25  find drugs, remember, everyone, we got to stop, get a second

1   search warrant for the drugs"?

2   **A.**   That's very typical.

3   **Q.**   Okay.  So what happened -- well, let me ask you this.  Do

4   you know why the cyber tip was closed?

11:30   5   **A.**   From my understanding, it was closed because it -- they

6   weren't able to develop anything.  I've learned that since.

7   **Q.**   They weren't able to identify a suspect, is that right?

8   **A.**   That's correct.

9   **Q.**   Okay.  That's for certainty, right?

11:31   10   **A.**   Yes.

11   **Q.**   Okay.  And they also believed that one of the suspects had

12   died, is that right?

13   **A.**   So tied with the address was Mr. Coons, and he was killed

14   in February of 2019.

11:31   15   **Q.**   Okay.  And how was he killed, do you remember?

16   **A.**   Yes.

17   **Q.**   How?

18   **A.**   He was -- he was run over by a -- with a Bobcat that Mr.

19   Derosier was operating at the time.

11:31   20   **Q.**   And did anything else significant happen after Mr. Coons

21   died?

22   **A.**   There was a burglary at the residence, and -- in

23   Mr. Coons' residence at XXXXXXXXXXXXXXXXXXXXXX.

24   **Q.**   And that's Mr. Derosier's residence that he shared with

11:32   25   Mr. Coons, is that right?

1   **A.**   That's correct.

2   **Q.**   So after Mr. Coons died, Mr. Derosier reported a burglary

3   of that residence, is that right?

4   **A.**   That's correct.

11:32   5   **Q.**   And according to Mr. Derosier, what was stolen from that

6   residence?

7   **A.**   Computer or computers, something along those lines.

8   **Q.**   Okay.  So after the briefing, the search warrant briefing,

9   what happened next?

11:32   10   **A.**   We departed the P.D. altogether and then made our way to

11   the residence just -- it's not far from the police department,

12   so it took us just a minute or two to get there.

13   **Q.**   Okay.  What time was this?

14   **A.**   Well, we -- we arrived at the residence and initiated the

11:32   15   search warrant at 10:00 a.m.

16   **Q.**   So the briefing was about 9:30 a.m., and then you arrived

17   at the residence at about 10:00 a.m.

18   **A.**   That's correct.

19   **Q.**   Now, did you bring a copy of the warrant and the

11:32   20   supporting affidavit with you when you conducted the search at

21   the residence?

22   **A.**   Yes, ma'am.

23   **Q.**   What did -- did you bring it with you -- how?

24   **A.**   So I have -- I carry all that stuff with me in a Trapper

11:33   25   Keeper thing.  I just have it with me, you know.  It's there.

1          THE COURT:  Paper copies.  Paper?

2          THE WITNESS:  Yes, ma'am, all paper copies.

3          THE COURT:  Thank you.

4   **Q.**   (MS. PUHL CONTINUING)  And what do you store it in?

11:33    5   **A.**   A Trapper Keeper.

6   **Q.**   A Trapper Keeper.  And that Trapper Keeper goes with you

7   to all the search warrants, is that right?

8   **A.**   That's correct.

9   **Q.**   Okay.

11:33   10   **A.**   Or it goes with me any time I go anywhere because my

11   recorder is in there, my note -- my notepad, pens, evidence

12   inventory sheets, all the stuff that you need to conduct an

13   investigation, if you're seizing evidence, or whatever, or

14   talking to people.

11:33   15   **Q.**   And within that Trapper Keeper was Exhibit Number 13,

16   right, including all of the search warrant documents, the

17   entire search warrant packet, right?

18   **A.**   Yes, ma'am.

19   **Q.**   Now, when you arrived at the residence, who, if anyone,

11:34   20   did you find there?

21   **A.**   There were three people, Blake -- Blake Thorson, Julia

22   Anderson, and Christyan Logan.

23   **Q.**   And who were these three people?

24   **A.**   They were all employed by Mr. Derosier in some fashion,

11:34   25   and they lived at the residence as well.

1   Q.   So they all lived with Mr. Derosier at the residence.

2   Tell us -- if you could, please, could you tell the magistrate

3   judge what happened?

4   A.   So we knocked and announced ourselves.  The warrant -- one

11:34   5   of the male residents came into the porch area.  There's like a

6   three-season porch thing, entryway before you get to the main

7   door of the house, and we let him know what was going to

8   happen, we have a search warrant, searching the property.

9          We were put on notice that there's a female upstairs,

11:35  10   Julia, and she might not be dressed fully, so the female

11   detectives went upstairs to make sure she was dressed

12   appropriately, and then everybody congregated.  We told them,

13   "You can stay or you can go.  Free to leave if you want."

14   Spoke with them, you know, briefly initially.

11:35  15          But the goal is to secure the scene, do a cursory

16   search, inspection, make sure nobody is hiding anywhere.  And

17   then you back out, start by taking pictures, you know, outside,

18   move in to the inside.  And then once all those photos are

19   completed, then you begin the search and those duties as

11:36  20   spelled out there on the operations plan.

21   Q.   And at the time that you arrived at the residence, just to

22   be clear, Mr. Derosier wasn't there, is that right?

23   A.   That's correct.

24   Q.   Okay.  And he showed up at some point later, is that

11:36  25   right?

1    **A.**    He did.

2    **Q.**    Okay.  And if you could, please, look at Exhibits 14

3    through 72.

4    **A.**    Through 72?

11:38    5    **Q.**    Yes.

6    **A.**    Okay.

7    **Q.**    Do you recognize those exhibits?

8    **A.**    Yes, ma'am.

9    **Q.**    And what are they?

11:38    10    **A.**    They are some of the photos taken during the execution or

11    following the execution of a search warrant at XXXXXXXXXXXXXXXX

12    XXXXX.

13    **Q.**    They don't include all the photos, right?

14    **A.**    That's correct.

11:38    15    **Q.**    Just a portion of them.

16    **A.**    Yes.

17    **Q.**    Okay.  And do these photos accurately depict the scene as

18    you recall it on the day that you executed the search?

19    **A.**    Yes, ma'am.

11:38    20         MS. PUHL:  Okay.  United States offers Exhibits 14

21    through 72.

22         THE COURT:  Mr. Bellmore?

23         MR. BELLMORE:  No objection, Your Honor.

24         THE COURT:  Exhibits 14 through 72 are received.

11:38    25    **Q.**    (MS. PUHL CONTINUING)  And if you would, Detective Buzzo,

92

1    beginning with Exhibit Number 14, if you could just explain

2    very briefly what we're seeing in these exhibits.

3    A.    14 is the front, front of the house.

4    Q.    So 14, 15, 16, 17 also depict the exterior of the

5    residence, is that right?

6    A.    15, 16, 17, yes.

7    Q.    Okay.  And what is seen -- what do we see in Exhibit 18?

8    A.    Exhibit 18 are two vehicles, a red Chevy pickup and then a

9    white Pontiac possibly, parked in the rear near the house.  I

10   believe it was in the back area of the house.

11   Q.    And are plants also seen in this image?

12   A.    Yes, ma'am.  There's two -- it looks like potted trees

13   there.  They don't look like they're doing too hot.

14   Q.    And why did you take this picture?

15   A.    I didn't.  It was taken by Detective Conley, but there's

16   -- in this photo there's -- the pickup has a wheelbarrow in the

17   back of it, the potted plants, as well as some other things in

18   front of the white car there.  You can see some wood and other

19   items, are all indicative of landscaping business.

20   Q.    Moving to Exhibits 19 through 21.

21   A.    So 19 is a wheelbarrow in the back of that red truck.  20

22   are -- 20 and 21 are pictures of potted plants and shrubbery

23   located in the yard of XXXXXXXXXXXXXXXXXXXXXXX.

24   Q.    All items that you would expect to see from a person who

25   is operating a landscaping business, right?

93

1    A.    That's correct.

2    Q.    Okay.  Moving along to Exhibits 22, 23, 24 and 25.

3    A.    So 22 and 23 are a masonry saw, which you would expect to

4    see somebody that was -- along with the generator and maybe a

11:41   5    chain saw or -- no, that's a backpack blower, but especially

6    the saw would be something that would be used in landscaping

7    brick or some sort of a retaining wall type project,

8    nonetheless, landscaping.

9           The other view, the opposite side of the truck with

11:41   10   the wheelbarrow in the back, another potted plant on the

11   ground.  That was item -- or Exhibit 24.  25 are other tools in

12   the back of that truck, including rakes, and it looks like jugs

13   of chemical of some sort.

14   Q.    How about Exhibit 30?

11:42   15   A.    Exhibit 30 is a commercial lawn mower, something that you

16   wouldn't typically see in somebody's garage for mowing their

17   lawn.  It's a stand-up, self-propelled model, and that was

18   located in the front of the residence.

19   Q.    Exhibit 31?

11:42   20   A.    It's the other side of the other exhibits with the saw,

21   the brick saw, and then you can see that backpack blower in the

22   -- near the lower-left corner of that photo.

23   Q.    And looking at Exhibits 32 and thereafter, what -- these

24   photographs are now taken inside the residence, is that right?

11:43   25   A.    Yes, ma'am.

94

1   **Q.**   Okay.  And is this as you -- is this as you enter the

2   residence?  Is that what we're seeing in Exhibit 32?

3   **A.**   Yes, ma'am.

4   **Q.**   Okay.  And what are we seeing in Exhibit 33?

11:43   5   **A.**   So Exhibit 33 is a closer shot of the white board you see

6   in 32, but on that white board -- on that dry-erase board you

7   see a lot of useful information here.  You see, "Projects

8   2020," along with the names, "Hodnefield, Ruth Ann, Robbin,"

9   other names, "Holmberg."  These are all names and listings of

11:44   10   projects that -- that are essentially on order, it appears,

11   along with dollar values.  That's on the left side.

12      On the right side you can see a listing of accounts

13   receivable.  Robbin is listed there, Roger, RA, along with some

14   dollar amounts, with a final total of $61,000 near the bottom

11:44   15   of that list.

16   **Q.**   So some of these names look familiar to you, is that

17   right?

18   **A.**   Yes.

19   **Q.**   So during your investigation you interviewed some of these

11:44   20   folks, is that right?

21   **A.**   I did.

22   **Q.**   Okay.  And this appears to be sort of an accounting of the

23   defendant's landscaping business, is that right?

24   **A.**   That's right.

11:44   25   **Q.**   Okay.  And 34 is a picture of the same, is that right?

1  **A.**    That's correct.

2  **Q.**    Now looking at Exhibit 35, what do we see there?

3  **A.**    A computer and a screen on the desk.  So basically

4  opposite the room of that white board is -- was a desk where

11:45   5  there was a computer and screens located there.

6  **Q.**    And this computer is on the main floor, is that right?

7  **A.**    That's correct.

8  **Q.**    Okay.  Anything significant about that computer?

9  **A.**    If you go back to what Andrew Fox had stated, he said the

11:45   10  computer on the left was what was used for QuickBooks.

11  **Q.**    Is there a thumb drive that's inserted into the computer?

12  **A.**    Yes, there's a red one right there.

13  **Q.**    Now, if you could, beginning with 37, what are we seeing

14  there?

11:45   15  **A.**    A cell phone laying on top of a subpoena duces tecum, it

16  looks like, before the Attorney General of North Dakota to

17  Nicholas J. Morgan.  It's cut off at Derosier, also known as

18  Nicholas J. Derosier; GPHQ, LLC; Derosier Contracting, XXXX

19  XXXXXXXXXXXXXXXXXX.

11:46   20  **Q.**    Exhibit 39?

21  **A.**    It looks like thumb drives and pens in a little desk caddy

22  that was located on -- near the computer on the main floor.

23  **Q.**    And Exhibits 40 through 48, are -- are these pictures of

24  different financial documents that you and other officers found

11:46   25  at the residence?

96

1   **A.**   Yes.

2   **Q.**   And you took -- you took pictures of them because you

3   believed that they'd be relevant, is that right?

4   **A.**   Yes.

11:47   5   **Q.**   Now, beginning with Exhibit 51, is this the officers now

6   moving upstairs, is that right?

7   **A.**   That's correct.

8   **Q.**   Okay.  And what do we see in Exhibit 52?

9   **A.**   You see the hallway, pointing down the hallway, so your --

11:47   10   your side would be to the stairwell.  I believe there's a

11   bedroom immediately to the left, a bathroom immediately to the

12   right, another bedroom down the hallway to the right, and then

13   what would be the, I guess, main bedroom or master bedroom off

14   to -- down the hallway to the left.

11:47   15   **Q.**   And were all these bedrooms occupied?

16   **A.**   Yes, ma'am.

17   **Q.**   So the defendant occupied one?

18   **A.**   Yes.

19   **Q.**   And Christyan Logan occupied one?

11:48   20   **A.**   Yes.

21   **Q.**   Julia Anderson, is that right?

22   **A.**   Julia Anderson and one of the males were a couple, so they

23   had -- they stayed in one room together.

24   **Q.**   And then Blake Thorson was residing in the bedroom as --

11:48   25   one of the bedrooms as well, is that right?

1    A.    That's correct.

2    Q.    Okay.  And which bedroom did you -- if you've testified to

3    this, I apologize, but which bedroom was Mr. Derosier's?

4    A.    Down and to the left.

11:48   5    Q.    And is Photograph 53 a picture of the defendant's bedroom?

6    A.    Yes, it is.

7    Q.    Okay.  And you see a computer in that picture, is that

8    right?

9    A.    That's correct.

11:48   10   Q.    Okay.  And 54 is a close-up of that computer, is that

11   right?

12   A.    That's correct.

13   Q.    And what do we see in 55, 56, 57 and 58, 59 through 61?

14   A.    These are -- so item -- Exhibit 55 is the safe found in

11:49   15   that bedroom, and then 56 through 61 are all photos of items

16   located within that safe.

17   Q.    And that includes some cell phones and a thumb drive, is

18   that right?

19   A.    That's correct.

11:49   20   Q.    Okay.  And as shown in 59, it included a checkbook that

21   was found in that safe as well, is that right?

22   A.    That's correct.

23   Q.    And credit cards were also included in that safe, right?

24   A.    That's correct.

11:49   25   Q.    And these were credit cards in various names, is that

98

1    right?

2    **A.**   That's correct.

3    **Q.**   Including Team Lawn?

4    **A.**   Yep, Nicholas J. Derosier, Team Lawn, Inc.

11:49    5    **Q.**   And how about Robert Coons?

6    **A.**   And then in Exhibit 61 there's one for Nicholas Derosier,

7    and the other is for Robert J. Coons.

8    **Q.**   Okay.  And this -- these items, again, were found in the

9    safe in Mr. Derosier's bedroom, right?

11:50    10   **A.**   That's correct.

11   **Q.**   Along with other items that had Team Lawn -- their logo

12   found on them, is that right?

13   **A.**   That's correct.

14   **Q.**   Okay.  Now looking at Exhibit 62, 63, 64 and 65, 66 and

11:50    15   67, what is that, or what is seen in those -- what are seen in

16   those images?

17   **A.**   So 62 -- Exhibit 62 is a dresser where diapers were found

18   stacked inside of it, and then 63 through 67 are those diapers.

19   **Q.**   Okay.  And do you know why the officer took images of

11:50    20   diapers at -- at the execution of the search warrant?

21   **A.**   Yes, ma'am.

22   **Q.**   And why is that?

23   **A.**   What I learned is that when officers were talking to the

24   occupants of the home when we made entry, I believe it was

11:51    25   Julia Anderson stated that Derosier had raped XXXXXXXXXX.

1   **Q.**   And how old was that XXXXXX?

2   **A.**   Eight.

3   **Q.**   Okay.  And who specifically did Julia make that claim to?

4   **A.**   I believe it was Special Agent Casetta.

11:51   5   **Q.**   So when the officers are executing the search warrant,

6   they have this in the back of their head, is -- mind, is that

7   right?

8   **A.**   That's right.

9   **Q.**   And that is why those images were taken, is that correct?

11:51   10   **A.**   That's correct.

11   **Q.**   Okay.  Now, did those -- the defendant's roommates say

12   anything else, do you know, or is that all you're aware of?

13   **A.**   I learned about this -- that's all I'm aware of.

14   **Q.**   Okay.

11:52   15   **A.**   I learned about this, about Julia's statement, after -- in

16   fact, I think Mr. Derosier was already there by the time I

17   learned about it.

18   **Q.**   Okay.  Because at some point in time you testified that

19   Mr. Derosier showed up, is that right?

11:52   20   **A.**   That's correct.

21   **Q.**   Okay.  And after he showed up, you interviewed him.

22   You'll be talking about that interview in a few moments, right?

23   **A.**   Yes.

24   **Q.**   Okay.  And there were questions asked about these diapers,

11:52   25   is that right?

100

1  **A.**   Yes.

2  **Q.**   Okay.  And they were asked because of what Julia Anderson

3  said, making this claim about the defendant having raped his

4  eight-year-old XXXXXX, right?

11:52   5  **A.**   That's my understanding, yes.

6  **Q.**   So looking at Exhibit 68 through 72, are all of these

7  photographs taken from inside the residence, specifically the

8  basement?

9  **A.**   Yes.

11:53   10  **Q.**   Okay.  And what do we see specifically in Exhibit 71 and

11  72?

12  **A.**   So 71 and 72, you see some boxes, one of which contains a

13  large number of documents.  And then 72 you can see the names,

14  as well as a year.  You can see Ruth Ann, 2017, Ruth Ann

11:53   15  Halvorson.

16  **Q.**   So these are business documents in physical form, right?

17  **A.**   Yes.

18  **Q.**   Okay.  And did you peruse through these documents?

19  **A.**   I did.

11:53   20  **Q.**   Okay.  And why didn't you take them?

21  **A.**   They -- they seem to predate Mr. Derosier, and it appeared

22  as if they belonged to Mr. Coons, who's now deceased.

23  **Q.**   Because you testified earlier that this business first

24  belonged to Mr. Coons, right?

11:54   25  **A.**   That's right.

1   Q.   And at some point in time Mr. Derosier got involved, is

2   that right?

3   A.   That's right.

4   Q.   Okay.

5           THE COURT:  Ms. Puhl, I think it might be a good time

6   to take a lunch break.

7           MS. PUHL:  Certainly, Your Honor.

8           THE COURT:  Let's plan to reconvene, say, at 1:20.

9   Is that okay?

10          MS. PUHL:  Yes.  Thank you.

11          THE COURT:  All right.  We'll see you then.

12          (A lunch recess was taken from 11:54 a.m. to 1:21

13   p.m., the same day.)

14          THE COURT:  Ms. Puhl, please continue.

15          MS. PUHL:  Thank you, Your Honor.

16   Q.   (MS. PUHL CONTINUING)  Detective Buzzo -- Detective Buzzo,

17   you understand you're still under oath.

18   A.   Yes, ma'am.

19   Q.   And when we broke for lunch you had just finished going

20   through the search warrant photographs, is that right?

21   A.   Yes, ma'am.

22   Q.   Okay.  Directing your attention to Exhibit 75 that's in

23   front of you, do you recognize that exhibit?

24   A.   I do, ma'am.

25   Q.   And what is it?

102

1  **A.**   It's a 65-page transcript of the recorded interview with

2  Nick Derosier -- Nicholas Derosier, taken on the 15th of

3  September, 2020, outside the residence at XXXXXXXXXXXXXXXXX

4  XXXXX.

01:23  5  **Q.**   I'm sorry.  If I could direct your attention to 76, do you

6  recognize that exhibit?  I apologize.

7  **A.**   I do.

8  **Q.**   And what is it?

9  **A.**   Exhibit 76 is the Evidence Inventory and Receipt dated the

01:24  10  15th of September, 2020, which shows the items seized from the

11  residence during the search warrant.

12  **Q.**   Okay.  And you participated, again, in the seizure of some

13  of these, is that right?  You were on scene?

14  **A.**   Yes.

01:24  15  **Q.**   Okay.  And does this inventory accurately reflect what was

16  taken from Mr. Derosier's residence?

17  **A.**   Yes.

18  **Q.**   And does it also accurately reflect what was taken from

19  Mr. Derosier's person?

01:24  20  **A.**   Yes.

21  **Q.**   Okay.  And how many electronic devices were seized from

22  both his residence and his person on September 15, 2020?

23  **A.**   Electronic items?

24  **Q.**   Yes.

01:24  25  **A.**   Fourteen.

1          MS. PUHL:  United States offers Government's

2     Exhibit 76, Your Honor.

3          THE COURT:  Mr. Bellmore?

4          MR. BELLMORE:  No objection, Your Honor.

01:24    5          THE COURT:  Exhibit 76 is received.

6     Q.   (MS. PUHL CONTINUING)  So during the time that this search

7     warrant is underway, Detective Buzzo, you testified that Mr.

8     Derosier appeared on the scene, is that right?

9     A.   That's right.

01:25   10     Q.   Was he alone?

11     A.   No, ma'am, he was not.

12     Q.   Who was he with?

13     A.   With Nicholas Beeche.

14     Q.   And they showed up in one vehicle, is that right?

01:25   15     A.   That's correct.

16     Q.   Okay.  And what happened after he arrived -- they arrived?

17     A.   So when Mr. Derosier and Mr. Beeche arrived, Mr. Derosier

18     was still on the phone -- or was on the phone.  It's my

19     understanding he was talking to the Attorney General's Office

01:25   20     about appearing there for -- I don't know if it was a

21     deposition or something related to the Consumer Protection,

22     Antitrust Division's investigation.  That was immediately upon

23     their arrival.

24          But Nick Beeche was out of the vehicle and talking to

01:26   25     us or engaging at least in small talk conversation-wise.

1    **Q.**    And during this time was anything seized from Mr.

2    Derosier's person?

3    **A.**    No, not at this point.  He's --

4    **Q.**    Okay.

01:26    5    **A.**    He's on his cell phone talking right now at this moment,

6    you know, upon his arrival.

7    **Q.**    And what happens next?

8    **A.**    So he concludes his conversation with the Attorney

9    General's Office.  He's talking about going down to Bismarck,

01:26    10    bringing the senator with or he's driving down with the

11    senator.  And then when he's done with that phone call, we

12    start talking.  I asked him for his phone, and he provided it.

13    **Q.**    Okay.  And that phone was seized, and then ultimately

14    provided to the Bureau of Criminal Investigations, is that

01:26    15    right?

16    **A.**    Yes.

17    **Q.**    And why was that?

18    **A.**    So to be examined, it was locked, and it just wasn't -- we

19    weren't able to get into it.

01:27    20    **Q.**    And it took some time before law enforcement was able to

21    gain access to it, is that right?

22    **A.**    That's correct, ma'am.

23    **Q.**    It was about 11 months, is that right?

24    **A.**    I'm unaware of the length of time.  I know it was a

01:27    25    lengthy process.

1  Q.   Okay.  Directing your attention to Exhibit 73 and 78 that

2  are in front of you -- 75 and --

3       THE COURT:  I think 73 has been received.

4  Q.   (MS. PUHL CONTINUING)  Right.  So 74 and 75, directing

01:27   5  your attention to those two exhibits.

6  A.   Yes, ma'am.

7  Q.   You located them in front of you?

8  A.   I have.

9  Q.   Okay.  Beginning with 74, what is that?

01:28  10  A.   74, as is marked on the CD, is an interview -- is the

11  interview with Mr. Derosier outside that residence on 9/15 of

12  2020.

13  Q.   And is 75 a transcript of that interview?

14  A.   Yes, 75 is that 65-page transcript of the interaction or

01:28  15  interview with Mr. Derosier.

16  Q.   And did you listen to 74 before your testimony today?

17  A.   Yes, ma'am, I have.

18  Q.   And does the recording accurately record the interview as

19  you recall it?

01:28  20  A.   Yes.

21  Q.   And did you also review the transcript during the same

22  time that you listened to the recording?

23  A.   Yes.

24  Q.   And does the transcript accurately reflect what was heard

01:28  25  in the recording?

1  **A.**   Yes.

2         MS. PUHL:  United States offers Exhibits 74 and 75.

3         THE COURT:  Mr. Bellmore?

4         MR. BELLMORE:  Your Honor, I do not have a copy of

01:29   5  75.  To be clear, 74 is the disk.

6         MS. PUHL:  The recording, yep.  Sorry.

7         THE DEFENDANT:  I think there must be some confusion

8  there too.

9         THE COURT:  Well, Mr. Morgan-Derosier, please talk

01:29  10  with your client -- or with your counsel before you address the

11  Court.

12         MR. BELLMORE:  I have no objection to Exhibit 74 and

13  Exhibit 75.  There's no objection.

14         THE COURT:  Exhibits 74 and 75 are received.

01:29  15         MS. PUHL:  The United States requests permission to

16  publish Exhibit Numbers 74 and 75.

17         THE COURT:  Go ahead.

18  **Q.**   (MS. PUHL CONTINUING)  And before we listen to this

19  recording, can you tell us who we're going -- whose voices

01:29  20  we're going to hear on it?

21  **A.**   Yes, ma'am.  So you're going to hear a lot of voices,

22  mine.  You'll hear Nicholas Beeche.  You will hear --

23  **Q.**   So two -- two Nicks, is that right?

24  **A.**   Yes, ma'am, two Nicks.

01:30  25  **Q.**   Nicholas Derosier and Nick -- and Nicholas Beeche, who was

1    an employee of Nicholas Derosier, is that right?

2    A.    That's correct.  You will hear Detective Darin Johnson.

3    You will hear -- did I say myself?  You will hear Special Agent

4    Dan Casetta, Sergeant Rory Suby with the Grand Forks Police

01:30    5    Department, Criminal Investigations Bureau.

6    Q.    And Special Agent Casetta, you will hear his voice about

7    halfway through the interview, is that right?

8    A.    Yeah.  Yes, ma'am.

9    Q.    So he's not present during the entire interview, is that

01:30    10    right?

11    A.    That's -- that's correct.  He comes in well after it

12    starts.

13    Q.    Okay.  Anything else before we listen to it?

14    A.    Name-wise?

01:31    15    Q.    Anything else you want to add about whose voices you'll

16    hear or anything else?

17    A.    You'll hear some barking dogs, some conversation in the

18    background.

19    Q.    Okay.

01:31    20    A.    But that's it.

21            MS. PUHL:  All right.  Thank you.

22            (Government's Exhibit 75 is played in open court.)

23    Q.    (MS. PUHL CONTINUING)  Detective Buzzo, is the remainder

24    of the interview on the CD?

02:08    25    A.    Yes, ma'am, it is.

108

1          MS. PUHL:  Okay.  And the judge does have a copy of

2    the transcript, so we're comfortable ending there, Your Honor.

3          THE COURT:  Mr. Bellmore, any objection to that?

4          MR. BELLMORE:  Your Honor, if the government could

02:09   5    disclose what the timestamp was so we can have that for the

6    record, of when the audio cut off.

7          MS. MEYER:  It appears it's at 33:35.

8    Q.   (MS. PUHL CONTINUING)  Detective Buzzo, how long is this

9    interview in total?

02:09  10    A.   I believe it's an hour and 7 minutes.

11    Q.   Okay.  And as you said, it's on the CD.  We're certainly

12    willing to play the entire CD if --

13          THE COURT:  It was stopped at 33:35?

14          MS. MEYER:  That's what I have, yes.

02:09  15          THE COURT:  It looks to me like it's page 37 of the

16    transcript.  Mr. Bellmore, what's your desire?

17          MR. BELLMORE:  Your Honor, I don't -- I don't believe

18    that needs to be played.  I'm not asking for it to be.  The

19    Court has it.  It's an exhibit, but as for purposes of this

02:10  20    hearing, I'm not asking for the remainder of it to be played.

21          THE COURT:  Okay.

22          MS. PUHL:  I think we can summarize the remainder of

23    it, Your Honor.

24          THE COURT:  Go ahead.

02:10  25    Q.   (MS. PUHL CONTINUING)  Detective Buzzo, you said this

1   interview is approximately one hour, right, a little over one

2   hour, is that right?

3   **A.**   Just over an hour, ma'am.

4   **Q.**   And at any point during this interview did you ask any

5   questions about child pornography?

6   **A.**   I did not.

7   **Q.**   Did you ask any questions about child exploitation?

8   **A.**   No, ma'am.

9   **Q.**   In fact, the focus of the interview was the financial

10   crimes, is that right?

11   **A.**   That is correct.

12   **Q.**   And the defendant acknowledged that he was doing business

13   as a contractor, albeit under a different business name, is

14   that right?

15   **A.**   That's correct.

16   **Q.**   And at the end of the interview did he acknowledge that he

17   had a license to engage in contracting business?

18   **A.**   He never -- he acknowledged that he didn't have one.

19   **Q.**   He didn't -- and you asked him questions about him failing

20   to perform work that he was being paid for, is that right?

21   **A.**   I'm sorry?

22        (A brief discussion was had off the record regarding

23   Ms. Puhl putting on her lapel microphone.)

24   **Q.**   (MS. PUHL CONTINUING)  I asked you about the licensing, is

25   that right?  Is that better?

110

1          THE COURT:  I think that's better, but I think you

2     might want to clarify the questions as to licensing and what --

3          MS. PUHL:  Okay.

4          THE COURT:  -- Mr. Morgan-Derosier may have said

02:11   5     about licensing.

6     Q.   (MS. PUHL CONTINUING)  During the interview the defendant

7     acknowledged that he was working as a contractor, albeit under

8     a different business, right?

9     A.   That is correct.

02:11   10    Q.   And during the interview he acknowledged he was not

11    licensed, is that right?

12    A.   That is right.

13    Q.   And during the interview you asked him questions about

14    failing to perform work that he received payment for, is that

02:11   15    right?

16    A.   That is correct.

17    Q.   And he didn't agree with that, is that right?

18    A.   That's correct.

19    Q.   Okay.  And you asked a whole series about these -- a whole

02:11   20    series of questions about these topics, right?

21    A.   That is correct.

22    Q.   You also -- you also asked him questions about Mr. Coons,

23    right?

24    A.   Yes.

02:12   25    Q.   And is that because you were seeing Coons' signature on

111

1   certain documents after his death?

2   A.   That is correct.

3   Q.   And how did Mr. Coons die again?

4   A.   He -- he was killed when he was run over in a Bobcat on

02:12   5   XXXXXXXXXXXXXXXXXXXXX or in front of XXXXXXXXXXXXXXXXXXXXX.

6   Q.   And when was that?

7   A.   February of 2019.

8   Q.   Okay.  So over a year before this, right?

9   A.   Correct.

02:12   10   Q.   Okay.  And that residence was whose residence?

11   A.   Ray Holmberg.

12   Q.   Okay.  And at some point, as you can hear during this

13   interview, Mr. Casetta joins the conversation, right?

14   A.   Yes.

02:12   15   Q.   And he asked about the diapers, right?

16   A.   Yes.

17   Q.   And then after he asked about those diapers, he left, is

18   that correct, or he's --

19   A.   No, I -- I ended up walking away while he stayed and

02:13   20   talked to Detective Casetta and Special Agent -- or Detective

21   Johnson and Special Agent Casetta stayed there.  It was -- what

22   Special Agent Casetta had addressed, that was the first I heard

23   of it, so I went to find out what -- what was going on.

24   Q.   And what did you learn about why those questions were

02:13   25   asked?

112

1    **A.**   That Julia had made -- made a statement regarding Mr.

2    Derosier raping his eight-year-old XXXXXX.

3    **Q.**   As a police officer, do you feel like you have a duty to

4    ask that question when somebody makes that allegation?

02:13   5    **A.**   Yes.

6    **Q.**   Okay.  And were there any more questions asked about the

7    diapers when the interview goes on for an extra 30 minutes, an

8    additional 30 minutes?

9    **A.**   Not to my knowledge.

02:13   10   **Q.**   Okay.  And did any kids live in that residence?

11   **A.**   No.

12   **Q.**   And Mr. Casetta also asked whether they'd find something

13   on the devices that shouldn't be there or something to that

14   effect, right?

02:14   15   **A.**   That is correct.

16   **Q.**   Did you later learn why Mister -- or Special Agent Casetta

17   asked that question?

18   **A.**   I did.

19   **Q.**   And what was that?

02:14   20   **A.**   That one of the roommates had seen photos, a photo or had

21   seen a file on a thumb drive, but he wasn't very specific about

22   it.  He just said of a -- I'd have to look at Special Agent

23   Casetta's report to -- to get the exact words he used.

24   **Q.**   But something -- something prompted Special Agent Casetta

02:14   25   to ask that question, right?

113

1   **A.**   Correct.

2   **Q.**   Okay.  And this was relative to a thumb drive that was

3   seized from the safe, as you later learned, right?

4   **A.**   Yes.

02:15   5   **Q.**   Okay.  And again, this was information that was

6   volunteered to Special Agent Casetta, right?

7   **A.**   That's my understanding, yes.

8   **Q.**   Because you testified Special Agent Casetta found out

9   about the search warrant about 15 minutes before the briefing,

02:15   10   is that right?

11   **A.**   Correct, ma'am.

12   **Q.**   And to your knowledge, did he know any information about

13   the cyber tip?

14   **A.**   Not to my knowledge.

02:15   15   **Q.**   And during the interview, the defendant admitted that

16   there would be business documents in that safe, isn't that

17   right?

18   **A.**   That's correct.

19   **Q.**   And he admitted that he had business documents in

02:15   20   electronic format throughout his house, didn't he?

21   **A.**   That's correct.

22   **Q.**   And in your experience, is it common for individuals to

23   maintain business documents in electronic format?

24   **A.**   Yes, ma'am, it is.

02:15   25   **Q.**   Now, Detective Buzzo, defendant's reply brief, he writes

114

1   that considering the -- quote on page 9, "considering the

2   totality of the evidence, it is clear officers were looking for

3   child pornography and not business records."  Is that a true

4   statement?

02:16   5   A.   No.

6   Q.   At any time during the execution of this search warrant,

7   did you abandon your search for business records?

8   A.   No.

9   Q.   At any time during the investigation, did you begin

02:16   10   looking for child pornography?

11   A.   No.

12   Q.   Again, your knowledge of the cyber tip was limited to what

13   was said in that briefing, is that right?

14   A.   Correct.

02:16   15   Q.   Which was very little, right?

16   A.   Correct.

17   Q.   And as was heard during the interview, the focus of that

18   interview was for the financial crimes, right?

19   A.   Yes.

02:16   20   Q.   Now, as we discussed previously, we -- there was a typo

21   that was in your search warrant, right?

22   A.   Yes.

23   Q.   Okay.  When did you become aware of that typo?

24   A.   A month or two ago, a phone call from your office

02:17   25   requesting to speak with me.

115

1  **Q.**   Okay.  And we talked about the suppression motion, right?

2  **A.**   That's correct.

3  **Q.**   But that was the first time that you learned about the

4  typo, is that right?

02:17   5  **A.**   That is correct.

6  **Q.**   Okay.  So when you're executing the search warrant, you

7  are operating on the belief that you have a valid search

8  warrant for the residence and the defendant's person, is that

9  right?

02:17   10  **A.**   That is correct.

11  **Q.**   As reflected in the affidavit and in the Exhibit A, right?

12  **A.**   Correct.

13  **Q.**   Now, following the execution of the search warrant and

14  your interview of Mr. Derosier, do you continue to investigate

02:17   15  him for the crimes that are set forth in that affidavit?

16  **A.**   Yes, I do.

17  **Q.**   Okay.  And what did you do, just briefly?

18  **A.**   So I served -- I believe I served at least one search

19  warrant on a bank or subpoenas and continued to review the

02:18   20  documents, collect the evidence, review the documentation that

21  I had received from the banks, working with Detective Freeman,

22  who was reviewing -- so the day of the search warrant, went

23  back and entered the items that we had seized into evidence,

24  and she began processing almost -- later on that day.  I don't

02:18   25  know if it was immediately, but it was soon after.

116

1       I was then notified that she -- she found images of
2   child pornography, had redrafted a search warrant, so there's
3   this whole process.  It took some time.  Detective --
4   Q.   You obtained a second search warrant, right?
5   A.   Yes, related to what she had found, the child pornography.
6   So as far as extracting the data, the financial -- the
7   construction fraud, the violation of judicial order,
8   contracting without a license, all of that, that -- that data
9   from the electronics had to be parsed through through Detective
10  Freeman because -- to create a working copy for me, so that
11  takes time.  When there's information intermingled, you have to
12  go through it.  You don't want to recreate child pornography
13  and have thousands of copies out there --
14  Q.   So you were --
15  A.   -- so it just takes time.
16  Q.   You -- you reviewed the forensic examination of some of
17  the devices as it was relating to these cases -- these crimes
18  under investigation, is that right?
19  A.   That's correct.
20  Q.   And did you ultimately submit an affidavit for charges to
21  the state's attorney?
22  A.   I did.
23  Q.   And do you recall when you did that?
24  A.   I would have to review my report, ma'am.
25  Q.   Okay.  Do you have that report in front of you?

117

1  **A.**   I do.

2  **Q.**   Okay.  And if you could -- would that help you refresh

3  your recollection?

4  **A.**   Yes, it would.

02:20  5  **Q.**   Okay.  And if you could look at it to refresh your

6  recollection and let me know when you're done reviewing it.

7  **A.**   September 28.

8  **Q.**   You're done reviewing it?

9  **A.**   Yes, ma'am.

02:20  10  **Q.**   And does that refresh your recollection?

11  **A.**   It did.

12  **Q.**   And do you now recall when you submitted an affidavit for

13  charges?

14  **A.**   Yes.

02:20  15  **Q.**   When was that?

16  **A.**   September 28, 2020.

17  **Q.**   And do you know if Mr. Derosier was ever charged?

18  **A.**   He was, ma'am.

19  **Q.**   And when was he charged?

02:21  20  **A.**   I believe it was November 4th of 2020.

21  **Q.**   And do you recall what he was charged with in state court?

22  **A.**   Yes, there were two counts of issuing a check without a --

23  or a draft without an account.  One was an A misdemeanor.  One

24  was a C felony, construction fraud, contracting without a

02:21  25  license.

1   **Q.**   Was he also charged with a felony theft of property?

2   **A.**   Yes, theft of property and violation of a judicial order.

3   **Q.**   And, finally, a forgery charge as well?

4   **A.**   Yes, ma'am, a forgery as well, all in Grand Forks District

02:21   5   Court.

6   **Q.**   So some of these were misdemeanors and some were felonies,

7   is that right?

8   **A.**   That's correct.

9   **Q.**   Okay.  And what happened on September 4th of 2020, if you

02:21   10   recall?

11   **A.**   September 4th?

12   **Q.**   I'm sorry.  December 4th, 2020.

13   **A.**   That was my last day at the police department, ma'am.

14   **Q.**   All right.  And -- and then you began working for the Air

02:22   15   Force Base, is that right?

16   **A.**   Yes, ma'am.

17   **Q.**   And did you, nonetheless, continue to follow this case?

18   **A.**   I did, what was publicly available.

19   **Q.**   And what do you recall happened next?

02:22   20   **A.**   So I believe it was June of 2021, I was out of town, but I

21   was watching the preliminary hearing online.

22   **Q.**   Probably cause hearing?

23   **A.**   Probable cause hearing, yes.

24   **Q.**   And following that probable cause hearing, what happened?

02:22   25   **A.**   I believe the hearing was continued, and then eventually

1    the felony charges were dismissed.

2    Q.   Okay.  And who testified at that hearing?

3    A.   At that time Detective Caitlin Stromberg.

4    Q.   And was she familiar with the investigation?

02:22  5    A.   It didn't seem like it, ma'am.

6    Q.   Okay.  And again, that's because you, as the lead

7    investigator in this case, had left, right?

8    A.   Yes.

9    Q.   And did defendant ultimately plead guilty to other counts?

02:23  10   A.   Yes, ma'am, he did.

11   Q.   And what -- what did he plead to?

12   A.   To the misdemeanors, the violation of judicial order, I

13   believe, and I -- I would have to review the docket to be sure.

14   Q.   He only pled to misdemeanor counts, right?

02:23  15   A.   That's correct.

16   Q.   Okay.  And he pled to all the misdemeanor counts, is that

17   right?

18   A.   That's my understanding.

19   Q.   And was that in August of '21?

02:23  20   A.   Yes, ma'am.

21   Q.   And what, if anything, happened after that?

22   A.   The felony charges were refiled in Grand Forks District

23   Court, and they are currently pending.

24   Q.   And what charges are those?

02:23  25   A.   Construction fraud and contracting without a license,

1    ma'am.

2    **Q.**   And that -- was that due to the fact that some of the

3    victims contacted the PT and were upset about those charges

4    having been dismissed?

02:24    5    **A.**   That's correct.

6         MR. BELLMORE:  Your Honor, I would object as

7    foundation or speculation.

8         MS. PUHL:  I'll withdraw the question, Your Honor.

9         THE COURT:  Consider it withdrawn.

02:24    10        MS. PUHL:  Although he can't --

11        THE COURT:  And the response as well.

12        MS. PUHL:  I will -- I will withdraw the question,

13    but I would note that it is hearsay, but the Court can consider

14    hearsay at such a hearing.

02:24    15        MR. BELLMORE:  Your Honor, that wasn't my objection.

16        MS. PUHL:  No further questions, Your Honor.

17        THE COURT:  I will not consider the response in

18    considering the issues.  Mr. Bellmore.

19        MR. BELLMORE:  Your Honor, before I begin, would it

02:24    20    be okay with the Court if I would remain seated so I could

21    speak into the microphone?  We're having --

22        THE COURT:  Yes, and let's just confirm that the

23    court reporter can hear you adequately.

24        MR. BELLMORE:  I'll make sure I'm close but not too

02:25    25    close, and if there's any issues, just let me know.

CROSS-EXAMINATION

BY MR. BELLMORE:

**Q.**   Good afternoon, Detective Buzzo.

**A.**   Good afternoon, sir.

**Q.**   I kind of want to pick up where left off there when we're talking about the state court case involving the fraud charges, okay?

**A.**   Okay.

**Q.**   You mentioned that there was a preliminary hearing that ended up resulting in several counts being dismissed?

**A.**   Yes, sir.

**Q.**   Was that the entire case, all of the charges?

**A.**   No, it was only the felony counts because the preliminary hearing is a -- is a probable cause hearing and it's only -- it's triggered by a felony.  If there's a Class C, B or A or AA felony, the defendant, to my understanding in state court, is awarded or is afforded a probable cause hearing to determine if the case can proceed to an arraignment.

**Q.**   And based on the evidence that was presented, it didn't survive -- the felonies did not survive the preliminary hearing?

**A.**   From my recollection in reviewing the docket, I'm not sure if the state's attorney -- if the state's attorney's office dismissed the charges or if the judge ordered them dismissed because of the lack of probable cause.  I'm not -- I'm not

122

1    familiar with the proceeding but what followed the continuance

2    of that hearing.

3    Q.    Who was the assistant state's attorney that was handling

4    that preliminary hearing?

02:26    5    A.    Ms. Megan Essig, sir.

6    Q.    That's the same assistant state's attorney that carefully

7    reviewed your warrant?

8    A.    That's correct.

9    Q.    All right.  Detective Buzzo, jump back here to the -- to

02:27    10    the beginning.  Your investigation started in about the summer

11    of 2020 into Mr. Morgan-Derosier?

12    A.    December of 2020?

13    Q.    The summer of 2020.

14    A.    Summer.  Yes, sir that would be accurate.

02:27    15    Q.    That's when you had received some calls from people in the

16    community about the business?

17    A.    Well, to be clear, I had spoken with Officer Sampson back

18    in December of '19 about that -- that forged check report.  I

19    mean, that's when -- it was to Team Lawn.  I didn't continue.

02:27    20    I didn't do anything with that case for eight months, so I was

21    aware there was a document filed in December.

22    Q.    But your work on the case really ramped up in the summer

23    of 2020.  Is that fair to say?

24    A.    Yes, sir.

02:28    25    Q.    All right.  And that was into Mr. Morgan-Derosier's

123

1   landscaping business?

2   A.    Into what began with Team Lawn and evolved into Mr.

3   Derosier kind of as -- it was a confirmation of who was

4   involved, who are -- who the players were.

02:28   5   THE COURT:  Detective Buzzo, I think if you were just

6   a touch bit farther from the microphone, we'd have a bit less

7   feedback.

8   THE WITNESS:  I'm sorry.

9   THE COURT:  That's okay.

02:28   10   Q.    (MR. BELLMORE CONTINUING)  Was it Rebecca Peterson who

11   tipped you off to the injunction prohibiting Mr.

12   Morgan-Derosier and his business from operating in the state of

13   North Dakota?

14   A.    Rebecca, she would've been the second -- I'd have to

02:29   15   review my -- my report to what came first, the chicken or the

16   egg, whether I -- you know, I didn't talk to Rebecca until I

17   talked to the Attorney General's Office, so no.  The Attorney

18   General's Office, Investigator Schroeder, was the one that told

19   me about the injunction because then Mister -- Investigator

02:29   20   Schroeder from the Attorney General's Office referred Rebecca

21   Peterson to me.

22   Q.    All right.  And you also spoke to a Ruth Ann Halvorson in

23   Grand Forks?

24   A.    Correct, sir.

02:29   25   Q.    And she was complaining about some landscaping work that

124

1    hadn't been completed on her property?

2    **A.**    Correct.

3    **Q.**    All right.  And so this October 15, 2019, order, you

4    reviewed the court documents in that case?

02:29   5    **A.**    I did, sir.

6    **Q.**    Including the actual order itself?

7    **A.**    Yes.

8    **Q.**    That enjoined Mr. Morgan-Derosier and his company from

9    doing business anywhere in the state of North Dakota?

02:30   10   **A.**    Enjoined?

11   **Q.**    Sir, prohibited him from working in that capacity as a

12   contractor in the state of North Dakota?

13   **A.**    Yes.

14   **Q.**    That order didn't mention anything about revoking a

02:30   15   license, though, did it?

16   **A.**    He was prohibited from doing business in the state was my

17   understanding of that order.

18   **Q.**    But the order mentioned nothing about his business license

19   or Team Lawn's business license?

02:30   20   **A.**    I don't know that -- I don't believe they were licensed at

21   the time.  I don't believe there was any business associated

22   with Mr. Derosier post-injunction that was in good standing

23   with the state.

24   **Q.**    So the lack of license you're saying predated the

02:31   25   injunction?

1   **A.**   My understanding is that they were not in good standing

2   with the state, with the Secretary of State.

3   **Q.**   And how did you verify that?

4   **A.**   There's a public access database and my conversations with

02:31   5   the Attorney General's Office.  Again, that was my

6   understanding of what all -- what the order meant.

7   **Q.**   So the North Dakota Secretary of State licenses

8   businesses, right?

9   **A.**   That's my understanding, yes.

02:31   10   **Q.**   Not district courts?

11   **A.**   Certainly, sir.

12   **Q.**   You mentioned in your direct examination that you had a

13   conversation with a Grand Forks Police Department detective

14   about Mr. Morgan-Derosier?

02:32   15   **A.**   Which one, sir?

16   **Q.**   Well, I'll put a timeframe to it.  In August of 2020, Mr.

17   Morgan-Derosier's name came up at the Grand Forks Police

18   Department by another Grand Forks detective?

19   **A.**   There's several people in my office, yes, sir.

02:32   20   **Q.**   You mentioned another Grand Forks Police Department

21   detective who had a pending investigation against Mr.

22   Morgan-Derosier?

23   **A.**   Are you talking about Detective Freeman?

24   **Q.**   I am.

02:32   25   **A.**   I don't believe it was pending.

126

1  **Q.**   All right.

2  **A.**   I believe it was closed.

3  **Q.**   Did you write a report summarizing your investigation into

4  Mr. Morgan-Derosier and his business?

02:33   5  **A.**   I did.

6  **Q.**   And you had referred to that several times on direct

7  examination, is that correct?

8  **A.**   I have.

9  **Q.**   All right.  Do you have that in front of you still?

02:33   10  **A.**   Right here, sir.

11  **Q.**   I don't know if it's Bates stamped, sir, but it would be

12  page 544, and I would refer you to the last complete paragraph

13  or the second-to-last paragraph that begins with "I spoke."

14  **A.**   Yes.

02:34   15  **Q.**   Do you see that?

16  **A.**   I do.

17  **Q.**   All right.  That reads, "I spoke with another Grand Forks

18  Police Department detective who has an unrelated pending

19  investigation into Derosier."  Is that your writing?

02:34   20  **A.**   Yes, I did type that.

21  **Q.**   That says "pending"?

22  **A.**   That does say "pending."

23  **Q.**   And that's -- the detective was Ms. Freeman?

24  **A.**   Yeah, that's the mail, postmaster station manager report?

02:34   25  Yes, sir, that would've been Detective Freeman.

1  **Q.**  But it doesn't say Ms. Freeman's name in the report.

2  **A.**  Nope.  No, it does not.

3  **Q.**  At least not in that section, correct?

4  **A.**  Not in that paragraph, sir.

02:34  5  **Q.**  And you mentioned on direct examination that her office

6  was near yours at the police department?

7  **A.**  Yes, sir.

8  **Q.**  How long have you known Ms. Freeman?

9  **A.**  Since she started with the police department, sir.  I can

02:35  10  speculate a year.

11  **Q.**  Several years, fair to say?

12  **A.**  Yes, sir.

13  **Q.**  Okay.  She investigates child pornography cases, right?

14  **A.**  She investigates a lot of different cases, sir.

02:35  15  **Q.**  She investigates child pornography cases, right?

16  **A.**  Are you -- just specifically child pornography?

17  **Q.**  I didn't -- I didn't ask specifically.  I asked if she

18  investigates child pornography cases.

19  **A.**  Yes, sir.

02:35  20  **Q.**  Okay.  And, in fact, her investigation that was pending,

21  that's -- as referenced in your report, that involved child

22  pornography.

23  **A.**  My understanding, I -- reading this -- I don't know why I

24  wrote that.  My understanding when I walked out of Jen's office

02:36  25  is that this cyber tip tied to Team Lawn, that when I mentioned

1   Team Lawn, the -- it was like a light bulb clicked on, and

2   she's like, "I had this thing, this cyber tip."  My

3   understanding is that that -- the investigation into the cyber

4   tip involving Team Lawn was closed.

02:36   5   **Q.**   What's a cyber tip?

6   **A.**   National Center for Missing and Exploited Children

7   referral to law enforcement for child pornography.

8   **Q.**   So for child pornography.

9   **A.**   Yes.

02:36   10   **Q.**   All right.  And that tip fizzled.

11   **A.**   Fizzled?

12   **Q.**   It didn't go anywhere, did it?

13   **A.**   I -- not to my knowledge.

14   **Q.**   You just said it was closed.

02:36   15   **A.**   Correct.

16   **Q.**   All right.  So that means what, that -- was Mr. Derosier

17   arrested for that cyber tip?

18   **A.**   No.

19   **Q.**   Was he charged?

02:37   20   **A.**   Not to my knowledge.

21   **Q.**   Was he convicted?

22   **A.**   My understanding is no, nothing came of it regarding Mr.

23   Derosier.

24   **Q.**   All right.  And your testimony is that you don't know much

02:37   25   about the cyber tip, itself.

1   A.   Correct, sir.

2   Q.   Except you'd already known who Mr. Morgan-Derosier was?

3   A.   Excuse me?

4   Q.   You already knew who Mr. Morgan-Derosier was, right?  You

5   recognized that name in the cyber tip.

02:37

6        MS. PUHL:  Objection, Your Honor.  Mr. Derosier's

7   name is not in the cyber tip.  It's misstating the evidence,

8   but -- and it hasn't been admitted, nonetheless.

9        THE COURT:  That objection is sustained.

02:37

10  Q.   (MR. BELLMORE CONTINUING)  Detective Buzzo, Mr.

11  Morgan-Derosier's name came up in a conversation about the

12  cyber tip.

13  A.   I believe it was because -- now, not in discussion about

14  the cyber tip, itself.  I never reviewed any -- anything from

02:38

15  NCMEC, any cyber tip.  That's not -- quite honestly, I try and

16  stay away from those cases.  However, I believe -- I'd have to

17  review the document from the postmaster, but I believe Mr.

18  Derosier's name is on there, along with Nicholas Beeche and

19  maybe somebody else, but --

02:38

20  Q.   We'll get to the post office document, but I'm just trying

21  to sort out how you're claiming you don't know anything about

22  this investigation, but you -- you talked about a Robert,

23  Robert Coons.  You know what that -- who that name is, right?

24  You recognize that name?

02:38

25  A.   I do.

130

1   Q.   All right.  And that was also a name that was associated
2   with the cyber tip that Ms. Freeman was working on, right?
3   A.   Sir, I don't know.  I didn't review the cyber tip.  I
4   didn't -- I didn't -- how I associated Mr. Derosier to
02:39   5   Mr. Coons was from his death investigation when Mr. Coons was
6   run over by Mr. Derosier.  That's how I connected those two
7   together.  When -- when the address came up I -- it was off of
8   that -- the confirmation was off of that postmaster paperwork
9   that Jen, Detective Freeman, provided.
02:39   10   Q.   When did the cyber tip -- when was that closed?
11   A.   I have no idea, sir.
12   Q.   Okay.  So because that topic comes up and Ms. Freeman
13   knows the name, Mr. Morgan-Derosier, she provides you with a
14   updated address that she has.  Is that your recollection?
02:39   15   A.   She provided me with a postmaster address verification
16   form, a copy of it.
17   Q.   The actual verification?
18   A.   The document from the postmaster.
19           MR. BELLMORE:  All right.  Your Honor, may I
02:40   20   approach?
21           THE COURT:  You may.
22   Q.   (MR. BELLMORE CONTINUING)  Detective Buzzo, I have handed
23   you what's been marked Defendant's Exhibit 18.  Do you
24   recognize that document?
02:40   25   A.   Yes, sir, I do.

131

1  Q.   All right.  I was -- well, in your words, what -- what do

2  you take this document to be?

3  A.   It's the -- it's a police department form, but it's the

4  postmaster address verification form.

02:41   5  Q.   And as far as that request process, this appears to be a

6  -- the request side of it, not the -- not the response.  Is

7  that fair to say?

8  A.   No, this would be the response.

9  Q.   This is the response.  All right.  And you see a date on

02:41   10  there that says July 14, 2020?

11  A.   Correct.

12  Q.   Your report includes a date of July 29, 2020.

13  A.   My report?

14  Q.   Yes, your report when we went over that paragraph where

02:41   15  you were talking to the unnamed Grand Forks Police Department

16  detective.  It discusses information from the United States

17  Postal Service from July 29, 2020.

18  A.   What -- what date did you say?

19  Q.   July 29, 2020, for your report that was dated August 25,

02:42   20  2020.

21  A.   My report is dated August 25th.

22  Q.   Yeah.  Maybe I can clarify, Detective Buzzo.  If you take

23  a look at what's been marked as Defendant's Exhibit 18 --

24      MR. BELLMORE:  Well, Your Honor, at this time I

02:42   25  believe Mister -- Detective Buzzo has identified the document.

132

1    I'm going to move to be offered to have that admitted into

2    evidence.

3              THE COURT:  Exhibit 18?

4              MR. BELLMORE:  Yes, Your Honor.

02:42   5       THE COURT:  Ms. Puhl?

6              MS. PUHL:  No objection, Your Honor.

7              THE COURT:  Exhibit 18 -- Defense Exhibit 18 is

8    received.

9    Q.    (MR. BELLMORE CONTINUING)  All right.  Detective Buzzo, to

02:43   10   move this along, the top-left corner of Defendant's Exhibit 18,

11   do you see the letters J-U-L?

12   A.    Oh, the fax stamp, is that what you're asking, at the top,

13   the very top?

14   Q.    Yes, sir.

02:43   15   A.    Yes.  I thought you were talking about the date on the

16   form.

17   Q.    Right, and let's be clear.  The date on the form says

18   July 14, 2020, correct?

19   A.    Correct.

02:43   20   Q.    It appears as though there's a fax date that says July 29,

21   2020.

22   A.    Correct.

23   Q.    And then your report references July 29, 2020.

24   A.    Yes.

02:43   25   Q.    Okay.  All right.  So in this report, this was not you

1    requesting this address change or this address information.

2    **A.**   No, sir.

3    **Q.**   It was Detective Freeman.

4    **A.**   Yes.

02:43   5    **Q.**   And this was July of 2020.

6    **A.**   The request is dated July 14th, 2020.

7    **Q.**   So Detective Freeman was looking into Mr.

8    Morgan-Derosier's address July of 2020, it appears.

9    **A.**   Yes, sir.

02:44   10   **Q.**   And that's just a few weeks before your involvement with

11   the construction fraud side of things ramped up, as we

12   mentioned before.

13   **A.**   It's a fair statement.

14   **Q.**   And you can't -- you don't know for sure because it wasn't

02:44   15   your investigation, but I want to confirm that you don't know

16   when this cyber tip investigation was closed.

17   **A.**   No, sir, I don't.

18   **Q.**   Once you had information about the injunction and some of

19   the customer complaints, you went out to visit some of these

02:44   20   condos, some of these work sites?

21   **A.**   On High -- High Plains Court?

22   **Q.**   Yes, sir.

23   **A.**   Yes, sir.

24   **Q.**   All right.  You went out there at least two times?

02:45   25   **A.**   At least, sir, yes.

134

1   Q.   And I think your testimony was the second time you came

2   across a couple of workers who were working in the -- the lawns

3   of these job sites?

4   A.   Yes, sir.

02:45   5   Q.   Was it -- was it two or three?

6   A.   There were three initially.

7   Q.   I want to talk about two of them, Mr. Blake Thorson and

8   Mr. Christyan Logan, okay?

9   A.   Sure.

02:45   10   Q.   You interviewed both of them?

11   A.   Yes.

12   Q.   And that was on the scene?

13   A.   Yes.

14   Q.   They told you that they were both employees of Mr.

02:45   15   Morgan-Derosier?

16   A.   Yes, they did.

17   Q.   And Mr. Logan showed you a pay stub.

18   A.   Yes, he did.

19   Q.   But that was -- that was a photograph of a piece of paper

02:46   20   that he had somebody send to you during the interview.

21   A.   It was a photograph of his pay stub, yes, that was sent to

22   him that he sent to me as I was speaking with him.  I believe

23   it was Julia who had text -- used Snapchat, and then as he got

24   the message, he screen-shotted it and texted it to me.

02:46   25   Q.   That would be Julia Anderson?

1   A.   Yes, sir.

2   Q.   That pay stub -- the information you had on that pay stub,

3   you believe that to be created by QuickBooks?

4   A.   Yes, sir.

02:46   5   Q.   QuickBooks is accounting software?

6   A.   Yes, sir.

7   Q.   After the two interviews with the -- well, let's -- I'm

8   sorry.  When you were talking to Blake Thorson, you were

9   talking about your investigation into the Team Lawn business,

02:47   10   the landscaping business itself, whether it was operational.

11   A.   There were three of them there, but, yes.

12   Q.   And that was -- that was the topic of conversation.

13   A.   Of the business, the work he's doing, the work he's done,

14   how he's getting paid, stuff like that.

02:47   15   Q.   You recorded that interview?

16   A.   I believe I did.  I'd have to double-check to be sure.

17   Q.   Did he -- Mr. Thorson, did he offer any information about

18   child pornography to you?

19   A.   I don't believe so.

02:47   20   Q.   Did you ask?

21   A.   No.

22   Q.   All right.  For Mr. Logan, Christyan Logan, you kept the

23   conversation about the Team Lawn and the landscaping business?

24   A.   Yes, sir.

02:48   25   Q.   He didn't offer any information about child pornography?

1  A.   Not to my knowledge, sir.

2  Q.   And you didn't ask any questions about child pornography.

3  A.   No.

4  Q.   Later on you spoke to another employee, Andrew Fox?

02:48  5  A.   Yes.

6  Q.   He had told you that he had worked for Mr. Morgan-Derosier

7  until October 31st of 2019?

8  A.   I'd have to double-check to be sure on the date, but there

9  was a termination date where he no longer worked for him.

02:48  10  Q.   Did you speak to Mr. Fox first, or did you learn of his

11  civil suit first?

12  A.   That, I'm not sure of.  I don't know if I was provided

13  Mr. Fox's name before I discovered it on the civil side of the

14  ND Courts' web page.

02:49  15  Q.   But eventually you found that lawsuit?

16  A.   Yes, sir, I did.

17  Q.   And you read through some of the pleadings?

18  A.   I don't know that there was a pleading.

19  Q.   You read through the --

02:49  20  A.   I think it was dismissed.

21  Q.   You read through the court documents?

22  A.   Yes.

23  Q.   There was a check that was filed?

24  A.   Yes.

02:49  25  Q.   And that was from the United Valley Bank.

1   **A.**   That's correct.

2   **Q.**   All right.  So based on the information you had gathered

3   that there was an -- there was an injunction prohibiting Mr.

4   Morgan-Derosier from working and the evidence you had that

02:50   5   there was this operation, you submitted a warrant for bank

6   records at the United Valley Bank?

7   **A.**   Yes, sir.

8   **Q.**   Through the court, right?

9   **A.**   Yes.  Well, I'm sorry.  I'm confused now.  I got a search

02:50   10   warrant, served it on the bank, yes.

11   **Q.**   Did you write the search warrant yourself?

12   **A.**   Yes.

13   **Q.**   Did you write the affidavit yourself?

14   **A.**   I did.

02:50   15       MR. BELLMORE:  May I approach, Your Honor?

16       THE COURT:  You may.

17   **Q.**   (MR. BELLMORE CONTINUING)  Detective Buzzo, I've handed

18   you what's been marked Defendant's Exhibit 17.  Do you

19   recognize that document?

02:51   20   **A.**   Yes.

21   **Q.**   What is it?

22   **A.**   It's a search warrant for United Valley Bank.

23   **Q.**   Does it also contain a affidavit?

24   **A.**   Yes, it did.

02:51   25       MR. BELLMORE:  Your Honor, I would offer Defendant's

1    Exhibit 17.

2              THE COURT:  Ms. Puhl?

3              MS. PUHL:  No objection, Your Honor.

4              THE COURT:  Defense Exhibit 17 is received.

02:51    5    Q.   (MR. BELLMORE CONTINUING)  Detective Buzzo, did this --

6    the warrant, did this go through that same automated court

7    warrant system we discussed this morning?

8    A.   Yes, it did.

9    Q.   And with this warrant you were trying to get all of the

02:52   10    bank's records related to the account associated with the

11   checks for Mr. Fox.  Is that -- is that fair to say?

12   A.   Yes.

13   Q.   And you put a limit on the timeframe of the records you

14   were requesting, is that true?

02:52   15   A.   Where is -- in the affidavit, yes.

16   Q.   That would be from October 1st of 2019 to September 10th

17   of 2020.

18   A.   That's correct.

19   Q.   And again, the injunction order was October 15th of 2019.

02:53   20   A.   Yes, 10/15 of '19.

21   Q.   So not exactly, but that corresponds with that injunction,

22   that October 2019 timeframe.

23   A.   It -- it says 10/1 of 2019, yes.

24   Q.   So you weren't looking for anything from before October

02:53   25   of 2019.

139

1    A.   Related to this search warrant and affidavit, no.

2    Q.   And this was -- this warrant was dated September 10th of

3    2020, is that correct?

4    A.   Yes, it was.

02:53   5    Q.   And when did you execute that warrant?

6    A.   I believe it was that day.

7    Q.   Could it have been September 14th?

8    A.   For United Valley Bank?  I received a response from them

9    on September 14th, I believe.

02:54   10   Q.   Okay.  And you -- and you gave them the warrant on

11   September 10th.

12   A.   This warrant was served, yes, sir, on the 10th.

13   Q.   You received -- well, you made -- you left the -- you left

14   the warrant with the bank and then had them comply with it.  Is

02:54   15   that fair to say?

16   A.   Yes, sir.

17   Q.   And they complied with it by the 14th of September

18   of 2020.

19   A.   Correct.

02:54   20   Q.   That's the same day that you applied for another warrant.

21   A.   Yes, sir.

22   Q.   In this case.

23   A.   Yes.

24   Q.   That was with the -- that was filed or requested with the

02:54   25   district court for Grand Forks County.

1   **A.**   Correct.

2   **Q.**   Detective Buzzo, the warrant that you applied for on

3   September 14, 2020, that was for the residence on Fifth Avenue

4   in Grand Forks?

02:55   5   **A.**   XXXXXXXXXXXXXXXXXXXXXXXX in Grand Forks, sir.

6   **Q.**   And you testified on direct examination initially that you

7   had -- you wrote the warrant.

8   **A.**   Correct.

9   **Q.**   But then you later clarified that actually went through a

02:56   10   computer-automated system?

11   **A.**   What are you -- the warrant, the search warrant, the face

12   of it --

13   **Q.**   Yes, sir.

14   **A.**   -- or are we talking the packet and all the other plethora

02:56   15   of information?  So I just don't want to confuse here.  The

16   warrant is drafted by the system, like the search warrant, that

17   four-corner document.  The search warrant is drafted by --

18   well, it's created by the system.  The affidavit and the other

19   attachments and exhibits are all either attached or created by

02:57   20   myself.

21   **Q.**   So that we're talking about three separate components to

22   this warrant packet.  Is that fair to say?

23   **A.**   To which one?

24   **Q.**   The warrant from September 14th of 2020.

02:57   25   **A.**   So with that you would have your -- the search warrant,

141

1    itself, that's created using the data that's inputted into the

2    system, and then you would have your affidavit of probable

3    cause.  Well, let me back up.  On -- have Attachment A.  You

4    would have your affidavit of probable cause and then any

02:57    5    exhibits from -- referring the reader of the affidavit to --

6    attached to the affidavit.

7    Q.   Well, here we have a automated search warrant, right, to

8    begin?

9    A.   Any warrant?  Yes.  Is that what --

02:58    10    Q.   I'm asking about the warrant on September 14th of 2020.

11    There's three components of that, that -- fair to say?

12    A.   Well, three components as I just stated?  I mean, what --

13    I mean, I described the components of it.

14    Q.   So there's --

02:58    15    A.   I didn't count -- I'm sorry.  The warrant, the attachment,

16    the affidavit, and the exhibits, that's four.

17    Q.   Yes.  So there is an Exhibit A.

18    A.   So the warrant, the exhibit, the affidavit -- or

19    attachment to the search warrant, search warrant, and then the

02:59    20    exhibits regarding the -- that are attached to the search

21    warrant -- or to the affidavit, rather.

22    Q.   So on the first page of the packet, the search warrant,

23    can you find that for me?

24    A.   Thirteen?

02:59    25    Q.   Yes, 13, sir.

142

1   **A.**   Okay.

2   **Q.**   Can you tell me where in the automated search warrant

3   there's a reference to an affidavit?

4   **A.**   There is no reference to an affidavit.

03:00   5   **Q.**   There's a reference to an Exhibit A.  Do you see that?

6   **A.**   Yes, I do.

7   **Q.**   Do you see any reference to any other exhibits besides

8   Exhibit A?

9   **A.**   No, I do not.

03:00   10   **Q.**   In reference to Exhibit A, that's talking about the types

11   of property to be searched.  Is that your understanding?

12   **A.**   It's a description of items to be searched for and seized.

13   **Q.**   And those items to be seized are listed in Exhibit A?

14   **A.**   Not only what items are to be searched for and seized, but

03:01   15   how as well.

16   **Q.**   Exhibit A is titled "Description of Items to be Searched

17   for and Seized"?

18   **A.**   Yes.

19   **Q.**   Was this an automated form?

03:01   20   **A.**   No, it was not.

21   **Q.**   You wrote this?

22   **A.**   Yes.

23   **Q.**   You wrote this in connection with the construction fraud

24   investigation that you were undergoing?

03:01   25   **A.**   Yes.

1   **Q.**   The investigation into Mr. Morgan-Derosier?

2   **A.**   Yes.

3   **Q.**   And his companies?

4   **A.**   Yes.

03:01   5   **Q.**   I'll turn your attention to Exhibit A, which is marked at

6   Bates 706.  Let me know if you have that.

7   **A.**   I have it in front of me, sir.

8   **Q.**   I'm going to direct your attention, sir, to the third

9   paragraph.  Do you see that?

03:02   10   **A.**   Yes.

11   **Q.**   Could you read that, please?

12   **A.**   "Information, correspondence, records, documents or other

13   materials pertaining to the possession, receipt or distribution

14   of visual depictions of projects, job sites, communications,

03:02   15   account data, timesheet information, customer information,

16   address and accounts that were transmitted or received using

17   the digital media, including, but not limited to, electronic

18   mail, chat logs and electronic messages for (sic) any other

19   forms of transmission."

03:03   20   **Q.**   Do you see that you included the words "possession,

21   receipt, distribution and visual depictions"?

22   **A.**   Yes, I did.

23   **Q.**   Those are child pornography terms.

24   **A.**   Excuse me?

03:03   25   **Q.**   Those are child pornography terms.  Would you agree?

1          MS. PUHL:  I'm going to object, Your Honor.

2          THE COURT:  The basis of the objection?

3          MS. PUHL:  They're child pornography terms,

4   possession, distribution and receipt?  I expected that this

03:03   5   refers to lots of different crimes, Your Honor.

6          THE COURT:  As it's phrased, Mr. Bellmore, I will

7   sustain that objection, but you may want to rephrase it.

8          MR. BELLMORE:  Your Honor, the question is whether or

9   not those terms are associated with child pornography, so --

03:03   10          THE COURT:  Do you know -- Detective Buzzo, do you

11   know whether the four terms that are highlighted are commonly

12   associated with child pornography cases?

13          THE WITNESS:  No, Your Honor, I don't have enough

14   experience in investigating that type of crime.

03:04   15          THE COURT:  Thank you.

16   **Q.**   (MR. BELLMORE CONTINUING)  Detective Buzzo, can you tell

17   us more about what visual depictions you were hoping to obtain

18   through this warrant, as indicated in Exhibit A?

19   **A.**   Photos of projects that were underway or completed.

03:04   20   **Q.**   And what information did you have about distributing

21   visual depictions while you filed this warrant and requested

22   this warrant and executed this warrant?

23   **A.**   I would have to review specifically related to that.

24   **Q.**   But based on your investigation, this is the type of

03:05   25   information that you were hoping to obtain, correct?

1   **A.**   That's correct.

2   **Q.**   That's why you wrote it down?

3   **A.**   Yes.

4   **Q.**   In the attachment?

03:05   5   **A.**   Correct.

6   **Q.**   All right.  Detective Buzzo, let's go to the affidavit.

7   Most of the first several paragraphs deal with summaries of

8   your investigation, correct?

9   **A.**   Correct.

03:06   10   **Q.**   At some point in the affidavit you mentioned that you had

11   learned that Mr. Morgan-Derosier, through his business, uses

12   QuickBooks, is that right?

13   **A.**   That's correct.

14   **Q.**   Your affidavit does not make any mention of any sort of

03:06   15   QuickBooks-related file names.

16   **A.**   I'm sorry?

17   **Q.**   You're not asking for specific QuickBooks file names in

18   this affidavit.

19   **A.**   Specific QuickBooks file names?  You're -- like a CSV

03:07   20   file, or what -- what --

21   **Q.**   Yes.

22   **A.**   No, sir.

23   **Q.**   Okay.  In fact, there's nothing in the affidavit that

24   limits the type of files that you can search for.

03:07   25   **A.**   Is that a question, sir?

146

1  Q.   Yeah, it was a question, and if you need me to repeat it

2  or rephrase it, I can do so.

3  A.   There's nothing limiting -- what was the --

4  Q.   You're asking, sir, for the ability to search through

03:07  5  digital files, correct?

6  A.   That's correct.

7  Q.   All right.  You knew that Mr. Morgan-Derosier was using

8  QuickBooks.

9  A.   He was using QuickBooks, yes.

03:08  10  Q.   So the answer is yes?

11  A.   Yes, he was using QuickBooks.

12  Q.   All right.  You had information that Mr. Morgan-Derosier

13  was -- that he had a website, correct?

14  A.   Yes, he did have a website.

03:08  15  Q.   And that information is contained within the affidavit.

16  A.   Can you steer me to the paragraph?

17  Q.   Well, this is your affidavit, sir, right?  You wrote this

18  affidavit?

19  A.   I did.

03:08  20  Q.   Okay.  Have you read it?

21  A.   I have several times.

22  Q.   Paragraph 15, sir.

23  A.   Yes, it is in paragraph 15.

24  Q.   And in paragraph 16 you reference a phone number for Team

03:09  25  Lawn.

1   **A.**   Correct.

2   **Q.**   Go back to paragraph 12, which runs on from pages 6 to 7,

3   and in that paragraph you mention QuickBooks software, is that

4   correct?

03:10   5   **A.**   Yes.

6   **Q.**   Those are the only specific mentions of electronic media

7   or devices --

8   **A.**   I'm sorry?

9   **Q.**   The references we just discussed, QuickBooks, a website

03:10   10   and a phone number, that's it as far as references to specific

11   information you had about Mr. Morgan-Derosier's business use of

12   technology.

13   **A.**   In the affidavit?

14   **Q.**   Yes.

03:10   15   **A.**   I do state in paragraph 21 that I believed Derosier uses

16   computers and other electronic communication devices to conduct

17   business related -- related to Team Lawn, Inc., and/or Team

18   Lawn and Landscape; and Vaughn Construction, Inc.; Derosier

19   Outdoors or Derosier Companies and Associates and/or GPHQ, LLC,

03:11   20   also known as Garden and Patio Headquarters.

21   **Q.**   Sir, there's a court reporter taking it down, so if you

22   could read that a little slower, that would probably be

23   helpful.

24   **A.**   My apologies.

03:12   25   **Q.**   You were referencing paragraph 22, is that right?

1    **A.**    21, sir.

2    **Q.**    I'm sorry?

3    **A.**    Paragraph 21 --

4    **Q.**    All right.

03:12  5    **A.**    -- on page 11.

6    **Q.**    Yeah, you say you believe Mr. Morgan-Derosier uses

7    electronic devices, right?

8    **A.**    That's correct.

9    **Q.**    But when I'm referencing his website, his phone number and

03:12  10    his use of QuickBooks, those are the facts that you -- you knew

11    at the time you wrote this affidavit, correct?

12    **A.**    So you mentioned paragraph 12.  In paragraph 11 it talks

13    about Andrew Fox, page 6.  The bottom -- the last sentence of

14    paragraph 11, "Andrew stated he knows Derosier uses QuickBooks

03:13  15    software and described the office within his residence, XXXX

16    XXXXXXXXXXXXXXXXXXX, where he uses computers to print checks and

17    do bookkeeping work."

18    **Q.**    But you weren't asking to search for just a computer or

19    just a phone or just a website.

03:13  20    **A.**    To go back to the previous question, sir, in paragraph 8

21    it also references Christyan Logan offered to obtain -- it

22    talks about that, the photo of the pay stub.  And specifically,

23    "While we were talking to the three, I asked about accounting

24    software and was advised that Derosier uses QuickBooks on his

03:14  25    home computer at XXXXXXXXXXXXXXXXXXXXXXX.  I was told the

1    computer has a double screen and was used -- and it was where

2    he used the accounting software."  And it talks about the

3    QuickBooks template from the payroll side of the program.

4    **Q.**   So that's -- that's a desktop computer?  Is that your

5    understanding of what you wrote there, what you meant?

6    **A.**   I don't know that I was able to glean that information

7    out, whether it was a desktop or a laptop.

8    **Q.**   The double screen didn't tip it off for you?

9    **A.**   I have two work laptops, and each one of them has multiple

10   screens, sir.

11   **Q.**   That's a workstation?

12   **A.**   Yes, sir.

13   **Q.**   Okay.  Paragraph 19, Detective Buzzo, you mention

14   searching computer system for evidence of crimes.  Do you see

15   that?

16   **A.**   Within paragraph 19 or the whole paragraph?

17   **Q.**   How about the first sentence?  You wrote, "Your affiant

18   advises searching the computer system for the evidence of

19   crimes may require a range of date analysis techniques."  Is

20   that what you wrote?

21   **A.**   Yes, sir.

22   **Q.**   And that's -- and that's true?

23   **A.**   Yes, sir.

24   **Q.**   And that's based on your knowledge?

25   **A.**   That is based on my knowledge --

1    **Q.**   Okay.

2    **A.**   -- and minimal training.

3    **Q.**   Well, what is -- what is -- what is the data analysis

4    techniques that would go into something like this?

03:16   5    **A.**   So there's a wide range of software out there that can

6    parse out information based on the type of issues.  So for

7    financial crimes you can -- you can take an image device and

8    load the data into certain types of software where you can then

9    parse out and build financial documents to show where -- where

03:16   10   money goes.

11           I personally never used that type of software, but

12   it's available through other federal agencies, as well as some

13   state financial crimes task forces, matter of which we have in

14   the area, financial crimes task force-wise.  There's -- you can

03:17   15   physically go through, visually inspect, search by file name,

16   by type.  That's the extent of my knowledge, sir.

17   **Q.**   But nothing in your affidavit or warrant requires that,

18   any sort of parsing or limiting to file types.

19   **A.**   Excuse me?

03:17   20   **Q.**   Nothing -- what you've requested in the search warrant is

21   limited to file types.

22   **A.**   Correct.

23   **Q.**   Okay.  How -- you said that there -- you believe, based on

24   your experience, that there is forensic examinations that can

03:18   25   be targeted towards business records?

151

1   A.   So if you identify -- like if a bank provides you a data

2   dump of -- instead of providing 10,000 pages of account

3   summaries and statements, check deposits, check withdrawals,

4   copies of checks, ACH transfers, essentially money coming in

03:18   5   and money going out of an account, the bank can provide you

6   with some type of data in a file, and you load it into the

7   soft -- this financial crimes software, and you can parse out

8   and get -- you can follow money.  It gives you a visual

9   depiction.

03:19   10          Again, I've seen the software once in training, and

11   I've never used it.  I know it's available.  I know there's

12   other software out there.  It just depends on the type of data

13   that you have, how you got it, and what -- what the type of

14   case is.

03:19   15   Q.   And is that why you wrote that into your affidavit, that

16   being a possibility of how this evidence, when seized, could be

17   searched?

18   A.   Yes.

19   Q.   But locally in Grand Forks -- there wasn't an ability to

03:19   20   do that locally.

21   A.   Not at the Grand Forks Police Department.

22   Q.   So is it fair to say that this -- that was an option in

23   this search warrant on how to analyze the evidence once you

24   seized it?

03:20   25   A.   Yes.

1   Q.   I think you mentioned too that sometimes it's difficult to

2   know what type of search on the data can be done and what can't

3   be done?  Is that a fair summary of this paragraph we're

4   talking about?

03:20   5   A.   Yes, sir.

6   Q.   So this would give an officer, whether they're trained in

7   forensic searches, flexibility on how they want to proceed?

8   A.   Not so much flexibility, but the ability to correctly and

9   accurately analyze the data.  If that's flexibility, then I'd

03:20   10  say yes.

11  Q.   And we'll get to the search, but you seized electronic

12  devices as a result of this warrant.

13  A.   There's a few other items than electronic devices, though.

14  Q.   But, yes, you seized electronic devices at the residence

03:21   15  on Fifth Avenue?

16  A.   Yes, sir.

17  Q.   And you said there was a couple other items.

18  A.   That's correct.

19  Q.   That were not electronic devices?

03:21   20  A.   Correct.

21  Q.   That was a marker board?

22  A.   A marker board, yes, sir.

23  Q.   And there was the paper documents?

24  A.   A password -- I'd have to look at the inventory sheet for

03:21   25  how it's titled.

1   Q.   We'll get into some of the search things here.  I would

2   like to go in order, but since that came up, you believe that

3   that search warrant allowed you to take a marker board out of

4   Mr. Morgan-Derosier's house?

03:22   5   A.   Yes.

6   Q.   Okay.

7           THE COURT:  When you talk about a "marker board," are

8   you talking about what I think you earlier referred to as a

9   white board?

03:22   10          THE WITNESS:  Yes, ma'am.

11          THE COURT:  Thank you.

12          MR. BELLMORE:  Your Honor, I believe marker board is

13   the terminology that's used in the exhibit, but --

14          THE COURT:  Yes.  Thank you.

03:22   15          MR. BELLMORE:  -- thank you for clarifying.

16          THE COURT:  Mr. Bellmore, whenever it's convenient,

17   let's take a break.

18          MR. BELLMORE:  I'm ready now.

19          THE COURT:  Okay.  Let's reconvene at 3:40.

03:22   20          (A recess was taken from 3:22 p.m. to 3:40 p.m., the

21   same day.)

22          THE COURT:  Go ahead, Mr. Bellmore.

23   Q.   (MR. BELLMORE CONTINUING)  Detective Buzzo, we were

24   talking about the September 14th search warrant and affidavit,

03:41   25   right?

1    A.   That is correct, sir.

2    Q.   That warrant didn't have a time limit on the types of

3    evidence that could be seized.

4    A.   It had a ten-day -- to search within ten days after

03:41    5    receiving this warrant.

6    Q.   But as far as the actual evidence itself, those records

7    are not limited by time.

8    A.   Time of collection?

9    Q.   No, date of the documents.

03:42    10    A.   I'm not following.

11    Q.   Okay.  So we had spent some time talking about the United

12    Valley Bank warrant, correct?

13    A.   Oh, a date range.

14    Q.   Sure.  Yes.

03:42    15    A.   Sorry.

16    Q.   Okay.  So the United Valley Bank warrant had a date range

17    on it, correct?

18    A.   Yes.

19    Q.   That was October 1st of 2019, right?

03:42    20    A.   Yes.

21    Q.   Up until September 10, 2020.

22    A.   Yes, it was September 10th.

23    Q.   September 10th was the date of the warrant, itself, so, in

24    other words --

03:42    25    A.   Yes.

1   **Q.**    -- United Valley Bank went from -- all records from

2   present day, back to October 1st of 2019.  Is that a fair way

3   to say that?

4   **A.**    Yes.

03:43     5   **Q.**    Now, with that in mind and we turn to the house search

6   warrant from September 14, 2020, that didn't have a date range

7   for the evidence.

8   **A.**    Correct.

9   **Q.**    The date range was unlimited.

03:43   10   **A.**    It did not have a date range.

11   **Q.**    So it could go -- because it didn't have a date range on

12   it, the types of documents could be from or dated before

13   October 15, 2019.

14   **A.**    Correct.

03:43   15   **Q.**    And again, the 2015 -- excuse me, the October 15, 2019,

16   date, right?

17   **A.**    Correct.

18   **Q.**    And that date, October 15, 2019, is the date of the

19   district court injunction.

03:43   20   **A.**    That's, yes, the injunction.

21   **Q.**    So if -- the September 14 warrant, is that -- is that

22   approved the same day that you submitted it?

23        THE COURT:  I'm sorry.  You cut out a bit,

24   Mr. Bellmore.

03:44   25   **Q.**    (MR. BELLMORE CONTINUING)  Detective Buzzo, the -- did the

1   judge sign the September 14th warrant the same day that you

2   applied for it?

3   **A.**   That, I'm not sure of, sir.  I could review my report just

4   to see if I'd mentioned it in there, when it was submitted and

03:44   5   when it was approved, but I -- I'm not sure.

6   **Q.**   Well, you -- you executed the warrant on September 15,

7   2020, correct?

8   **A.**   Correct.

9   **Q.**   And I think your testimony on direct examination was that

03:45   10   you had -- that this search warrant was executed the following

11   day?

12   **A.**   Well, the day following the issuance.  The warrant was

13   issued on the 14th of September, 2020.  It says on the warrant

14   2:58 p.m.  I don't know if it was submitted on the 13th and it

03:45   15   sat in the queue for a day, or I'm just not -- I'm not sure,

16   sir.

17   **Q.**   And just quickly, you had mentioned that a assistant

18   state's attorney reviewed the paperwork you submitted for the

19   warrant?

03:45   20   **A.**   Yes.

21   **Q.**   That was before you submitted it, though, correct?

22   **A.**   That is correct.

23   **Q.**   The policy is that you have to have that run by a

24   prosecutor before you apply for the warrant.

03:45   25   **A.**   The affidavit and -- and that, yes, all the documents

1   associated.

2   **Q.**   There's no policy that you have to have that reviewed by

3   an assistant state's attorney after the Court issues it.

4   **A.**   No, sir, not to my knowledge.

03:46   5   **Q.**   So when we talked about the search warrant being page 1,

6   the computer-generated document, there was no review by the

7   state's attorney's office of that court-generated document, the

8   warrant.

9   **A.**   Of the -- of the warrant, page 1?

03:46   10   **Q.**   Yes, sir.

11   **A.**   No, not -- well, I will -- I shouldn't say no.  I don't

12   know.  I don't have sufficient knowledge to know what they see

13   on their end.  I've never seen what they see, just like the

14   judges.  I don't know what the judges see when I submit

03:46   15   something.

16   **Q.**   Well, I'm referring to the state's attorney that is to be

17   reviewing that.  They see the affidavit and the exhibits?  Is

18   that fair to say?  Is that the extent of what they review?

19   **A.**   I don't -- again, sir, I'm assuming they see everything.

03:47   20   I don't know what they see on their end.

21   **Q.**   I want to make sure that it's -- understand that I don't

22   want to stay on this point for too long, but the state's

23   attorney's office reviews what you submit through that internet

24   system?

03:47   25   **A.**   It could be either through there or by e-mail or we -- in

1   our office they review the affidavit.  There's a variety of

2   ways.  You don't have to submit -- the state's attorneys don't

3   have to review the system, the portal itself.

4          It happens at 3 o'clock in the morning where they're

5   in our office because something bad happened.  We jam out the

6   warrants and everything else, the exhibits and the attachments.

7   They review it all, and then we submit it through the system up

8   to the point where we can click the button that the state's

9   attorney has reviewed it because they're literally in our

10  office.  I mean, there's a variety of ways here.

11  **Q.**   But the state's attorney's office is not a part of that

12  check and button system on the website.

13  **A.**   They -- they are.  We check it, that they've reviewed it.

14  **Q.**   Right.  That's -- that's what that is, is just that you

15  are verifying, you are -- you are saying that you have had a

16  conversation or communication with the state's attorney's

17  office.  And the way that's confirmed is just by you checking

18  the box?

19  **A.**   In the system, yes.

20  **Q.**   When you have to have that reviewed by a state's attorney,

21  are you submitting the information that you intend to include

22  in the form?

23  **A.**   Yes.

24  **Q.**   In addition to accompanying documents that you will have

25  them review?

159

1   **A.**   Yes, sir.

2   **Q.**   Okay.  So we're at 2:58 p.m. on September 14th.  You

3   started making arrangements once you have the warrant to

4   conduct the actual search?

03:49   5   **A.**   Correct.

6   **Q.**   And it's -- you arrive at the Fifth Avenue address at

7   about 10:00 a.m.?

8   **A.**   Yes, sir.

9   **Q.**   You have the risk assessment warrant meeting at about

03:49   10   9:30?

11   **A.**   Around there, yes, sir.

12   **Q.**   I'm not too familiar with where the police department is

13   in Grand Forks, but that's not too far away from -- the

14   department is not located too far away from where this warrant

03:50   15   was executed at on Fifth Avenue?

16   **A.**   That's correct, sir.

17   **Q.**   So there was enough time to have that risk assessment

18   meeting and make it to the residence within about a half-hour's

19   time?

03:50   20   **A.**   Yes, sir.

21   **Q.**   You said that typically you are calling all of the

22   detectives in the department to join in on the assessment

23   meeting and help out with the execution of a warrant?

24   **A.**   Yeah, any -- anybody that is going to be conducting the

03:50   25   search warrant should be at that meeting.

1   **Q.**   I think you testified on direct, all hands on deck.

2   **A.**   That is correct.

3   **Q.**   Does that mean as many people as you can get to get to a

4   search site?

03:50  5   **A.**   Well, yes and no.  I mean, there's more to it.  The risk

6   -- the level of risk is taken into account.  We -- at the time

7   we had -- I think we had 92 officers at the P.D. and probably

8   didn't need 92 officers to search that house, so it's -- it's

9   what's -- what's required according to, I guess, the risk that

03:51  10  we perceive.

11  **Q.**   A search that is deemed higher risk is going to require

12  more officers?

13  **A.**   That's correct, as well as equipment.

14  **Q.**   As far as detectives in the Grand Forks Police Department,

03:51  15  ballpark, about 12?  Would that seem right?

16  **A.**   Twelve is about right.  I couldn't tell you currently, but

17  at that time there was 12.

18  **Q.**   You mentioned Sergeant Jennings was present?

19  **A.**   He was.  He was at the meeting.

03:52  20  **Q.**   Would he be considered like in a supervisor role?

21  **A.**   He is.

22  **Q.**   Thank you.  I have reference to an organizational chart

23  here.  I just -- I'm not sure I fully follow it, so Sergeant

24  Jennings would be a supervising investigator?

03:52  25  **A.**   Yes, sir.  There are effectively three supervisors in the

1   Criminal Investigations Bureau.  There's a lieutenant and then

2   two sergeants.  At that time -- well, there still currently is

3   Detective Sergeant Rory Suby, who was on scene - you heard his

4   voice - and then Detective Sergeant Mike Jennings, who handles

03:52   5   the other side of the house.

6   **Q.**   Was he at the search site on Fifth Avenue?

7   **A.**   I don't remember see -- seeing him there.  Because

8   Detective Sergeant Suby was there, I don't think that Sergeant

9   Jennings was there.  I don't recall seeing him there.

03:53   10   **Q.**   He did not submit a written report?

11   **A.**   From my review, no, sir.

12   **Q.**   Well, how many detectives from the Grand Forks Police

13   Department were planning to be at the search site?

14   **A.**   I need a second to think about this here.  I would -- I

03:54   15   think possibly eight.

16   **Q.**   And you called Special Agent Casetta.

17   **A.**   Yes, I did.

18   **Q.**   So eight plus one more was necessary for the search.

19   **A.**   Well, I would've hoped we could get more.

03:54   20   **Q.**   You said you worked with Special Agent Casetta together at

21   the Grand Forks Police Department a few years back?

22   **A.**   Yes, sir.

23   **Q.**   So you knew him well?

24   **A.**   I did.

03:55   25   **Q.**   But back in 2020, he was working for a federal agency?

1  **A.**    Yes, sir.

2  **Q.**    Homeland Security Investigations?

3  **A.**    Correct.

4  **Q.**    That's an agency that investigates child pornography?

03:55   5  **A.**    Amongst other things, but that is one thing they do

6  investigate.

7  **Q.**    You mentioned too that there'll be coordination between

8  different agencies.  These search warrants, that happens,

9  right?

03:55   10  **A.**    Yes, sir.

11  **Q.**    Sometimes there are task forces that are made up of

12  multiple agencies?

13  **A.**    Yes.

14  **Q.**    And they work together to execute search warrants?

03:55   15  **A.**    Yes.

16  **Q.**    Among other law enforcement tasks?

17  **A.**    Yes.

18  **Q.**    And on direct examination I think you were discussing kind

19  of why Special Agent Casetta was there.  You mentioned he's --

03:56   20  he was there perhaps should other issues pop up?

21  **A.**    Yes.

22  **Q.**    And during the meeting before the search at the police

23  department, while you were at the police department, you

24  mentioned that you had provided everyone involved with a copy

03:56   25  of the search warrant?

163

1   **A.**    Yes, a copy of the operations plan, and to that is stapled

2    a copy of the search warrant and then the attachment to it or

3    any attachments that would be there.

4   **Q.**    So the risk assessment and the warrant packet was all

03:56    5    stapled together.

6   **A.**    The operations plan, the search warrant itself, and then

7    the attachment -- Attachment A is all stapled together, and

8    everybody gets a copy.

9   **Q.**    They're handed a copy, or they can pick one up if they

03:57    10    want?

11   **A.**    You know, I'm not sure how -- I'm not -- I'm not sure how

12    it played out here.  I guess sometimes both.

13   **Q.**    When you arrived to Fifth Avenue, was it you who knocked

14    on the door?

03:57    15   **A.**    Yes.

16   **Q.**    And talking about XXXXXXXXXXXXXXXXXXXXXX in Grand Forks,

17    that's the address?

18   **A.**    That's correct, sir.

19   **Q.**    There's a -- within a residential neighborhood?

03:58    20   **A.**    It is, sir.

21   **Q.**    And that is a house?

22   **A.**    It is a house.

23   **Q.**    You identified three people who were inside the residence

24    when you knocked on the door?

03:58    25   **A.**    Yes, sir.

1  **Q.**   Mr. Morgan-Derosier was not there at the time?

2  **A.**   That is correct.

3  **Q.**   Did you do a walk-through through the residence once you

4  were able to enter through the front door?

03:58  5  **A.**   Eventually I did briefly, and then my focus shifted to

6  other things.

7  **Q.**   We listened to an audio conversation between you and Mr.

8  Morgan-Derosier?

9  **A.**   Yes, sir.

03:58  10  **Q.**   When he eventually showed up to the -- to the house?

11  **A.**   Yes, sir.

12  **Q.**   That was outside?

13  **A.**   That was outside, sir.

14  **Q.**   We could hear several dogs barking in the background?

03:59  15  **A.**   Yes, sir.

16  **Q.**   While you were outside, before Mr. Morgan-Derosier

17  arrived, do you have a chance to speak with any of the

18  occupants of the house?

19  **A.**   I didn't other than briefly -- very briefly.  Right off

03:59  20  the bat the two males that were there were like, hey, one of

21  the girlfriends, Julie Anderson, was upstairs, and they didn't

22  believe she was dressed, so we wanted to make sure -- get some

23  female detectives up there just make sure she's appropriately

24  dressed before anybody gets upstairs.

03:59  25  **Q.**   You had already interviewed Mr. Logan earlier in your

165

1    investigation?

2    **A.**   Both males that were there I had spoken with.

3    **Q.**   All right.  The other male would be Blake Thorson?

4    **A.**   Yes.

03:59    5    **Q.**   But you didn't question them on the scene about your

6    business investigation?

7    **A.**   No, not to my recollection.  They had questions of whether

8    or not they had to stay, and that's when we had this

9    conversation.  And then by that time Julia was walking down the

04:00    10    steps, and I addressed all three of them.  You're free to go.

11    You don't have to stay.  We're not detaining you.  You can

12    leave.  If you want to stay, you can stay.  And they had a bit

13    of a conversation about what they were going to do, but I let

14    them discuss things, but --

04:00    15    **Q.**   Where did that encounter take place with the occupants?

16    Was that upstairs or on the main floor?

17    **A.**   Main floor and then out into the -- to the yard area of

18    the house, the steps.

19    **Q.**   So we have several photographs, but the floor plan of the

04:01    20    house, the main floor would have the kitchen?

21    **A.**   Yes.

22    **Q.**   And then there was a space where there was a desk?

23    **A.**   From -- so, yes.  Going into -- from the main door there's

24    a -- you look directly to where that white board was at, the

04:01    25    marker board.  Off to the left -- off to the left would be the

1    stairwell that goes up.  If you continue down through the

2    doorway and towards that marker board, the area opens up into

3    what I would classify as a living room area.  That's where

4    those desks were.

04:01    5         I don't remember there being like traditional living

6    room furniture in there.  There was a kitchen table.  Well, the

7    kitchen is then behind there, you know, to the north through a

8    small entryway or an opened-up entryway, rather, and there's a

9    table and then the kitchen on the far-north side of the

04:02    10    residence.

11    Q.   Upstairs there's bedrooms?

12    A.   Yes, sir.

13    Q.   There's a bathroom?

14    A.   Yes, sir.

04:02    15    Q.   On the main floor, is there a bathroom?

16    A.   You know, sir, I don't remember there being a main floor

17    bathroom.

18    Q.   Did you do -- after you had addressed the occupants, did

19    you do any sort of walk-through of the -- of the residence?

04:02    20    A.   Eventually I did.

21    Q.   And this was all right away, of course?

22    A.   Kind of broken up into different -- there were -- we had

23    at least one detective out trying to find Mr. Derosier, dealing

24    with the occupants.

04:03    25         In the middle of all this somebody found an explosive

167

1   device or what they thought was an explosive device, so we had

2   to clear out, call -- call the bomb expert -- experts.  They

3   had to come and evaluate it.  Determined it was -- it was a

4   firework or a mortar round, and then, you know, so there's --

04:03   5   there's all this stuff going on.

6          So my time was broken up in all of this trying to

7   coordinate with the detective that -- or detectives, if there

8   were more than one.  I know Darin Johnson was at least the one.

9   If there were more, I'm not sure, but figuring out where

04:04   10  Derosier is at, because at one point him and Beeche were on the

11  move.  Were they coming back to the residence?  Were they going

12  somewhere else?  I mean, there's all these things going on, so

13  it was broken up.

14  Q.   The fireworks scare, did that happen, would you say,

04:04   15  towards the middle of the search or towards the beginning?

16  A.   I'd -- I'd say it was towards the beginning.  I don't

17  think Mr. Derosier was there yet.

18  Q.   Were you outside when Mr. Morgan-Derosier arrived?

19  A.   Yes.

04:04   20  Q.   What rooms -- before that, what rooms did you search

21  through?

22  A.   So I walked through the main floor.  I walked through the

23  upstairs, the whole upstairs, and then eventually down to the

24  basement.

04:05   25  Q.   And there's several file cabinets down in the basement?

168

1    A.    There are.

2    Q.    I'm going to jump back.  I apologize.  The occupants,

3    Mr. Logan, Mr. Thorson, Ms. Anderson, did they opt to leave the

4    house while the search was taking place?

04:05   5    A.    Yes, sir.

6    Q.    Was that immediately after you told them they could?

7    A.    Again, they were discussing what they were going to do.

8    At one point somebody wanted to stay, others wanted to go.  I

9    couldn't tell you how long it was before -- I don't think they

04:06   10   ever really left the property other than hanging out near the

11   front yard.  They -- I think they were wrangling a dog at one

12   point too that was an issue, so --

13   Q.    Are you aware at one point Mr. Logan and Ms. Anderson

14   spoke to Special Agent Casetta?

04:06   15   A.    I became aware of that, yes.

16   Q.    Not at the time.  Not at the scene.

17   A.    Well, when Special Agent Casetta approached while I was

18   speaking with Mr. Derosier and asked some questions, that --

19   that's when -- that's the first I heard of what he had said,

04:07   20   and so that's when I left the group there and went to find out

21   what's going on, because they had been in the house or near.  I

22   don't know where they spoke to them, but I was dealing with

23   other things.

24   Q.    When you were outside and Mr. Morgan-Derosier showed up,

04:07   25   the other officers were inside.  They were still searching.

1  A.   Yes.

2  Q.   And the total time that you had spoke with Mr.

3  Morgan-Derosier was, what, about an hour?

4  A.   About that, hourish.

04:08   5  Q.   It was -- and then you recorded it, and we listened to

6  that earlier, right?

7  A.   Yep.

8  Q.   I won't go through every -- every step of the way there,

9  but you -- you spoke to him about your investigation.

04:08   10  A.   Yes.

11  Q.   About your business investigation.

12  A.   Correct.

13  Q.   And eventually during that conversation Special Agent

14  Casetta comes out?

04:08   15  A.   Yes.

16  Q.   Well, you did tell Mr. Morgan-Derosier that you were there

17  for a reason and what that reason was.

18  A.   Yes.

19  Q.   To search that residence, right?

04:09   20  A.   Correct.

21  Q.   And that that was based on a warrant, right?

22  A.   Correct.

23  Q.   And, of course, naturally, Mr. Morgan-Derosier asked,

24  "Well, what's the warrant for," right?

04:09   25  A.   Correct.

170

1   Q.   And you said you were looking for evidence of a crime?

2   You were looking for evidence of a crime?

3   A.   Yeah.  Whether I listed them off or not or generalized it,

4   I'm not -- I don't recall.

04:09   5   Q.   We listened to the audio just maybe a few hours ago,

6   right?

7   A.   Correct, sir.  It'd be on there.

8   Q.   You mentioned that it was contracting without a license?

9   Does that sound like something you recall saying?

04:10   10   A.   Yes.  Yes, sir, I -- that would be --

11   Q.   And construction fraud?

12   A.   Yes.

13   Q.   Violation of a judicial order?

14   A.   Yes, sir.  I'm sorry.  Can I look at the transcript here,

04:10   15   or --

16   Q.   Yes, sir.

17   A.   I'm sorry?

18   Q.   Yes, sir.

19          THE COURT:  I think it's on page 3 of the transcript.

04:10   20          THE WITNESS:  Pardon, ma'am?

21          THE COURT:  Page 3.

22          THE WITNESS:  Yes, sir, contracting without a

23   license, construction fraud, violation of judicial order,

24   amongst other things.

04:10   25   Q.   (MR. BELLMORE CONTINUING)  I'm sorry.  You said "amongst

1    other things"?

2    **A.**   Correct.

3    **Q.**   Eventually Special Agent Casetta joins the conversation?

4    **A.**   Yes, sir.

5    **Q.**   Where does he come from, what direction?  Where was he at?

6    **A.**   I'm not sure.  I'm assuming he came from the house.

7    **Q.**   Page 30 for reference on the transcript, again, Exhibit --

8    Government's Exhibit 75, you were present when Special Agent

9    Casetta said that he was finding interesting stuff in there

10   after talking to his roommates?

11   **A.**   Yes.

12   **Q.**   The word "his" there, did you take that to mean Mr.

13   Morgan-Derosier?

14   **A.**   Yes, sir.

15   **Q.**   Special Agent Casetta said that the roommates were saying

16   some interesting things about Mr. Morgan-Derosier?

17   **A.**   Finding some interesting stuff.  Oh, are you referring

18   about halfway down, "They said some interesting stuff about

19   you"?

20   **Q.**   Yes.  Do you recall hearing that?

21   **A.**   Yes.

22   **Q.**   And then that Special Agent Casetta told Mr.

23   Morgan-Derosier that he found some interesting stuff.

24   **A.**   Yes.

25   **Q.**   And he was referring to diapers?

1  **A.**   That was my understanding, sir.

2  **Q.**   And this was a search warrant to gather electronic devices

3  for business records, right?

4  **A.**   Business records and electronic devices related to those

5  crimes.

6  **Q.**   If I could have you go to page 35 just for reference, a

7  little later on in the conversation, Special Agent Casetta and

8  you and Mr. Derosier are talking about the warrant.

9  **A.**   I don't know that I'm here right now.

10  **Q.**   Okay.  The document refers to letters Q and A throughout

11  the transcript.  Do you see that?

12  **A.**   Yes, there's multiple Qs.  They're numerical order, Q2, 3

13  if there's multiple people asking questions.  That's how the

14  transcriptionist divides people up.

15  **Q.**   And you are not Q2.

16  **A.**   I am Q, it appears, just Q.

17  **Q.**   And Mr. Morgan-Derosier would be A2.

18  **A.**   Yes.

19  **Q.**   Because he was not the first person to provide an answer?

20  Is that how that works?

21  **A.**   Yes, sir.

22  **Q.**   Okay.  So -- but this was your recording device?

23  **A.**   Yes.

24  **Q.**   And you have listened to the entire audio file?

25  **A.**   I have.

1   **Q.**   And so at this point you don't believe that you were a

2   part of the conversation?

3   **A.**   No, sir, I don't -- I don't believe I was.  I come back in

4   much later.

04:15   5   **Q.**   That's fine, Detective Buzzo, but I want to make sure

6   that -- I want to ask you a question about part of the

7   conversation on page 35.

8   **A.**   Okay.

9   **Q.**   But just to clarify, that you are -- that what we have

04:15   10   been going through in this transcript has been accurately

11   transcribed with respect to what's actually contained in the

12   audio file?

13   **A.**   Yes, relatively accurate.

14   **Q.**   And we see towards the middle of the page, again, page 35,

04:16   15   Special Agent Casetta says, "I believe it's a state warrant"?

16   **A.**   Yes.

17   **Q.**   Later, "It gives access to the residence"?

18   **A.**   Yes.

19   **Q.**   And then later, "I didn't get a chance to review the

04:16   20   warrant."

21   **A.**   Correct.

22   **Q.**   And prior to that Special Agent Casetta was inside the

23   residence?

24   **A.**   Yes, he was at some point.

04:16   25   **Q.**   Because he referenced going through one of the bedrooms,

1   right?

2   **A.**   I'm sorry?

3   **Q.**   Before he said he didn't review the warrant, he had

4   mentioned already searching one of the bedrooms.

04:16   5   **A.**   Correct.

6   **Q.**   And, Detective Buzzo, during direct examination the

7   government asked you several questions about the types of

8   questions you were asking Mr. Morgan-Derosier.  Do you recall

9   giving answers to that?

04:17   10   **A.**   Specifically?

11   **Q.**   That you were investigating -- that you were asking

12   questions related to your business investigation.

13   **A.**   Yes.

14   **Q.**   And you were at that time gathering more information about

04:17   15   your business investigation.

16   **A.**   Correct.

17   **Q.**   And it's probably fair to say that you got more

18   information talking to Mr. Morgan-Derosier that furthered your

19   business investigation.

04:17   20   **A.**   Correct.

21   **Q.**   And the government indicated that your investigation into

22   the business offenses went beyond the search warrant -- excuse

23   me, went beyond the search, the execution of the search

24   warrant.  You worked on this after September 14th.

04:18   25   **A.**   I'm -- I'm sorry, sir.  I'm confused.  I drafted the

1   search warrant, and it was executed on the 15th.  I drafted a

2   search warrant.  It was signed on the 14th.  We didn't --

3   **Q.**   Right.  Thank you for clarifying.  I was meaning the 15th.

4   Is that -- and is it okay if I rephrase my question?

04:18   5   **A.**   Certainly, sir.

6   **Q.**   When you were -- you were working on your investigation

7   and interviewing Mr. Morgan-Derosier.

8   **A.**   Yes.

9   **Q.**   And you kept working on that investigation after the 15th

04:18   10   of September.

11   **A.**   Yes, sir.

12   **Q.**   Okay.  But when you were speaking with Mr. Morgan-Derosier

13   on September 15th, you already had the warrant, right?

14   **A.**   Yes, sir.

04:19   15   **Q.**   When you were at his -- at his residence, you already

16   obtained a warrant.

17   **A.**   Yes.

18   **Q.**   That was based on the affidavit that you had submitted?

19   **A.**   Correct.

04:19   20   **Q.**   That you swore was true and accurate, correct?

21   **A.**   Correct.

22   **Q.**   And that your probable cause to search that house was

23   based on the information within that affidavit.

24   **A.**   Correct.

04:19   25   **Q.**   You seized one piece of evidence.  You personally seized

1    one piece of evidence from the search.

2    A.   Sounds about right, sir.

3    Q.   That was Mr. Morgan-Derosier's phone.

4    A.   Yes, the phone, and then I handed it to Detective Johnson,

04:19    5    who -- because I was talking to Mr. Derosier.

6    Q.   Did you do anything with the phone before you handed it

7    off?

8    A.   No, sir.

9    Q.   And I missed it.  I apologize.  Who did you hand it off

04:20   10    to?

11    A.   Detective Johnson.  His badge number is 608, and that's

12    what's reflected on the evidence log.

13    Q.   The inventory receipt form that was completed in this case

14    is -- that's what you're referring to?

04:20   15    A.   Yes, sir.

16    Q.   Okay.  And so 608 does not refer to yourself?

17    A.   No, my badge number is 638 -- or my badge number was 638.

18    Q.   It's a little hard to see.  It looks like it was written

19    over, but to be clear, that would be Item Number 5, a black

04:20   20    cell phone, Android?

21    A.   What exhibit, sir?

22        THE COURT:  Perhaps Exhibit 76.

23        THE WITNESS:  Yes, sir, Item Number 5.

24    Q.   (MR. BELLMORE CONTINUING)  That does not -- that does not

04:21   25    refer to being found by you?

177

1  **A.**   It was -- I can only assume that it was brought to

2  Detective Freeman because she was the one that was managing

3  evidence by -- 608 is Darin Johnson.  Darin Johnson was

4  standing with me when I was speaking with Mr. Derosier

04:21  5  initially, so when -- when I asked Mr. Derosier for his phone,

6  he handed it to me, and I turned and handed it to Detective

7  Johnson, who had been -- had it logged in as evidence.

8  **Q.**   Did you observe the workstation in the living room?

9  **A.**   Yes.

04:22  10  **Q.**   And there were a number of documents scattered throughout

11  those desks?

12  **A.**   Yes, sir.

13  **Q.**   You didn't seize any of those documents, correct?

14  **A.**   No, sir.

04:22  15  **Q.**   And from the desk there was a thumb drive that was seized,

16  one, and that would be Item Number 3?

17  **A.**   Desk, living -- yes, sir.

18  **Q.**   There were -- there were two thumb drives on the desk?

19  **A.**   Thumb drives?

04:23  20  **Q.**   Detective Buzzo, there's only -- there's only one thumb

21  drive from the living room desk on the inventory sheet in --

22  **A.**   Number 3, is that what you're referring to?

23  **Q.**   Yes, sir.  I'm just asking you -- I'm just -- there was

24  more than one thumb drive that was in that desk area.

04:23  25  **A.**   I'm sorry.  I'm confused.  Number 3 is a thumb drive from

178

1   the desk living room.  Item 1 also has a 16-gigabyte external

2   drive with that Dell computer --

3   **Q.**   Okay.

4   **A.**   -- from the desk living room area.

04:24   5   **Q.**   So those are both included as -- as one item?

6   **A.**   Yes.  I'm sorry.  Referring to Number 1, correct.

7   **Q.**   And that is the thumb drive that was attached to -- the

8   drive that was attached to the desktop computer?

9   **A.**   So Item Number 1 is a -- is the desktop computer, and it

04:24   10  has the external -- the thumb -- that red thumb drive in it.

11  Those were not separated.  They were kept as one, from my

12  understanding.

13  **Q.**   Did you go down into the basement?

14  **A.**   I did.

04:25   15  **Q.**   And there were file cabinets down there?

16  **A.**   There were.

17  **Q.**   And file boxes?

18  **A.**   At least one file box, but there were multiple file

19  cabinets.

04:25   20  **Q.**   There was a hard drive that was seized from the basement,

21  correct?

22  **A.**   Yes, sir.

23  **Q.**   But that was located in the laundry basket?

24  **A.**   I'm not sure, sir.  It says basement.  I would have to

04:25   25  review the photos to figure out where it was actually at.  I

1    didn't seize it.

2    **Q.**   And you left the business records in the basement because

3    you thought they were -- you thought they were too old?

4    **A.**   I did.  So the items in the box I went through.  My

5    instructions to the search -- searchers and specifically

6    Detective Conley, who was taking the pictures, is if we can get

7    a clear picture -- if we can get a picture of it, as far as

8    documentation goes, that's fine.  I don't -- I don't know what

9    he ended up actually taking photos of.

10   **Q.**   But they weren't seized.

11   **A.**   Correct.

12   **Q.**   Same with the paperwork on the desktop, the table, the

13   desks -- the top of the desks.  Excuse me.  There was a number

14   of documents.  You did not seize any of those.

15   **A.**   We did not seize them.  Photos were taken of those

16   specifically.

17   **Q.**   Individually?

18   **A.**   My understanding.  I know I've seen multiple photos.

19   **Q.**   So there should be -- there should be an inventory of

20   photos or photo log photographing separately each document that

21   was found at the residence?

22   **A.**   I don't know that there'd be a photo log, but there'd be

23   -- if the documents were relevant, Detective Conley should've

24   taken photos of them.

25   **Q.**   So you -- you were only looking to document or seize

1   relevant documents?

2   **A.**   Well, documents related to those crimes that were listed

3   on the warrant or on the -- relevant to the case.

4   **Q.**   And what was the -- what was the criteria for relevance?

04:28   5   **A.**   If the detective believed that it was -- it fit the

6   warrant, then we would seize it.  I know I had a conversation

7   with Detective Conley about taking pictures of photos, taking

8   pictures of documents individually.  What happened there was

9   really left up to his discretion.

04:29   10   **Q.**   Was that a conversation that took place on scene, or was

11   that back in front of everybody at the risk assessment

12   pre-execution meeting at the police station?

13   **A.**   No, that was there on scene.

14   **Q.**   So the detectives, they were spread out across the house,

04:29   15   and they're searching a particular area?  Are they working in

16   teams?  What was happening as far as the actual going through

17   the different rooms searching for business records?

18   **A.**   I know when we initially started searching as a --

19   everybody, each person took a different area, just kind of

04:29   20   fanned out and began their search.

21   **Q.**   So it was up to them, each detective, on what they

22   determined was relevant based on the warrant information you

23   had provided to them?

24   **A.**   Correct.

04:30   25   **Q.**   And they didn't run by every document with you.

181

1  **A.**  No.

2  **Q.**  You spent a good amount of time outside talking to Mr.

3  Morgan-Derosier and attending to other things, correct?

4  **A.**  That's correct.

04:30  5  **Q.**  You trust their judgment call on that?

6  **A.**  Absolutely.

7  **Q.**  You didn't have any issues with the warrant?  That -- that

8  was okay?  When you got that warrant, that the warrant let you

9  kind of pick and choose what was important to your case?

04:30  10  **A.**  Not necessarily.  You say "pick and choose."  It's -- if

11  we can take photos, specifically documents -- if we seized

12  every single piece of items that were listed business

13  documents -- if we seized every business document or I seized

14  every business document from -- that I've ever searched for,

04:31  15  we'd have millions of pieces of evidence and -- everywhere.

16  **Q.**  It was just impractical to do that.

17  **A.**  For large quantities it can be impractical.

18  **Q.**  And again, as far as the types of devices, and after that,

19  what types of media files, there was no limit to what you could

04:32  20  look for.

21  **A.**  As far as types?  I mean, look for what?

22  **Q.**  Evidence.

23  **A.**  Correct.

24  **Q.**  Did you notice that there was some photographs of objects

04:32  25  that were taken at the scene?

1   **A.**   Of objects?

2   **Q.**   Objects.

3   **A.**   Specifically?

4   **Q.**   Did you see a photograph or photographs of diapers?

04:32   5   **A.**   Yes.

6   **Q.**   Did you see a photograph of a class ring?

7   **A.**   I can't say I recall a class ring, but is it in one of the

8   exhibits, sir?

9   **Q.**   No, sir.  Just one -- one moment.

04:33   10   **A.**   Okay.

11          MR. BELLMORE:  Your Honor, may I approach?

12          THE COURT:  Please do.

13   **Q.**   (MR. BELLMORE CONTINUING)  Detective Buzzo, I have handed

14   you what has been marked Defendant's Exhibits 19, 20 and 21.

04:35   15   Do you have those in front of you?

16   **A.**   I do, sir.

17   **Q.**   Do you recognize those photographs?

18   **A.**   I don't, but I'd have to review the -- all the photos

19   taken to --

04:35   20   **Q.**   They're not photos that you took personally?

21   **A.**   No, sir.

22   **Q.**   And I suppose you never looked at before, or you don't

23   recall?

24   **A.**   I don't recall looking at them.  It doesn't mean I didn't.

04:35   25   I -- I don't remember these specifically.

1          MR. BELLMORE:  That's fine.  Thank you.

2          Your Honor, if I may approach, I'll retrieve those

3     exhibits.  I will wait to offer those through a different

4     witness.

04:36   5          THE COURT:  Certainly.

6          THE WITNESS:  And that was related to Exhibits 19 and

7     20.

8          MS. PUHL:  Your Honor, I don't -- just to speed

9     things along, I don't object to introducing these exhibits.

04:36  10     They were -- they were photographs that were taken at the

11     scene.

12          THE COURT:  So, Mr. Bellmore, are you now offering

13     them?

14          MR. BELLMORE:  Yes, Your Honor.

04:36  15          THE COURT:  We'll receive Exhibits 19, 20 and 21.

16     Q.   (MR. BELLMORE CONTINUING)  Detective Buzzo, you do

17     recognize Exhibit 21?

18     A.   Yes, sir, I've seen this before.

19     Q.   All right.  There are two documents contained within this

04:36  20     photograph?

21     A.   Yes.

22     Q.   One is a document related to a driver's license?

23     A.   Correct.

24     Q.   The other one is a birth certificate?

04:37  25     A.   Correct.

1  Q.   For Mr. Morgan-Derosier?

2  A.   That is correct.

3  Q.   Those were documents relevant to your business

4  investigation?

04:37    5  A.   Certainly the birth certificate is.

6  Q.   When you were outside talking to Mr. Morgan-Derosier, he

7  asked you or another agent about the warrant itself?

8  A.   I think it was me.  He may have asked others.  I think he

9  did ask -- or talked about the warrant with others too, but I

04:38   10  do -- I did have a conversation with him.

11  Q.   You told him that you would -- somebody would leave a

12  warrant for him inside?

13  A.   I did not tell him that.  That was Detective Suby, I

14  believe, Detective Sergeant Suby.  Yeah, that wasn't me, I

04:38   15  don't believe.

16  Q.   Did you leave the warrant at the residence?

17  A.   Yes.

18  Q.   Where did you leave it?

19  A.   I'd have to review the photos, but I'm -- I think it was

04:38   20  left on the kitchen table.  I'm not positive, the location.

21  Q.   Did you -- were those photographed?

22  A.   It should've been.

23  Q.   Did you leave a copy of the inventory?

24  A.   Yes.

04:40   25       MR. BELLMORE:  May I approach, Your Honor?

1              THE COURT:  You may.

2    Q.   (MR. BELLMORE CONTINUING)  Detective Buzzo, I've handed

3    you what's been marked Defendant's Exhibits 22, 23 and 24.  Do

4    you have those before you?

04:41    5    A.   I do.

6    Q.   Do you recognize Exhibit 22?

7    A.   Yes, sir, I do.

8    Q.   What is that?

9    A.   That is the search warrant and the copies of the

04:41   10    inventory.

11    Q.   Exhibit 23, do you recognize that?

12    A.   Yes, sir.

13    Q.   What is it?

14    A.   That's a copy of the search warrant and inventories.

04:41   15    Q.   Where's the search warrant?

16    A.   To the left.

17    Q.   And the inventory is to the right?

18    A.   Yes.

19    Q.   And those are yellow pages?

04:41   20    A.   Yep.

21    Q.   And there's some paperwork underneath those documents?

22    A.   Correct.

23    Q.   And it's maybe hard to see, but there is a number of

24    papers that are below the inventory and the warrant?  Do you

04:42   25    see that?

1    **A.**    I do.

2    **Q.**    And there's some wording on there.  Do you see that?

3    **A.**    On the papers below the search warrant and inventory?

4    **Q.**    Yes.

04:42    5    **A.**    Yes.

6    **Q.**    It reads, "North Dakota by N.D.C.C., Chapter 51-15."

7    **A.**    Correct.

8    **Q.**    Defendant's Exhibit 24, that is a number of photographs.

9    Do you recognize those?

04:42    10    **A.**    I do.

11    **Q.**    Those were documents that were on the desk in the living

12    room of the residence you searched?

13    **A.**    Yes, they were.

14    **Q.**    The first page, the first image on Number 24, can you see

04:43    15    what that is?

16    **A.**    It says it's a "Subpoena Duces Tecum and Subpoena to

17    Appear."  This printout is a little fuzzy.  "Nicholas Beeche,

18    Nicholas J. Morgan-Derosier, a/k/a Nicholas J. Derosier; GPHQ,

19    LLC; and Derosier Contracting, Respondents," I think, "To:

04:43    20    Nicholas J. Morgan-Derosier."  It's a subpoena from the

21    Attorney General.

22    **Q.**    That's not a document you brought to the residence?

23    **A.**    No, sir, it is not.

24    **Q.**    Does that look like -- because there's -- it looks like

04:44    25    it's wet at the top?  Can you -- is that what it looks like?

04:44

1   **A.**   Yes, sir.  There were a variety of wet documents on this.

2   This is the computer desk kind of right next to the kitchen

3   area, so yes.

4   **Q.**   Detective Buzzo, we're going to try to get the first image

04:44

5   of page 1, Defendant's Exhibit 24, up on the screen.  But I

6   want to direct your attention, whether on the screen or on the

7   actual exhibit in front of you, towards the text at the bottom

8   of that document.  Can you read it from the -- the physical

9   photograph?

04:44

10  **A.**   I can't see the bottom of it.

11  **Q.**   I mean, is the -- is the language -- is the -- are the

12  letters just too blurry?  Can you see on the screen?  Is it --

13  if it's helpful?

14  **A.**   Can you back it up a little bit?  Okay.  I can make it

04:45

15  out.

16  **Q.**   Okay.  You can see it?

17  **A.**   Specifically where?

18  **Q.**   Well, let's go with the -- the very last line towards the

19  right.  Do you see the letters "N.D.C.C."?

04:45

20  **A.**   Yes.

21  **Q.**   And then it looks like there's "ch 51-15"?

22  **A.**   I could see that over there.

23  **Q.**   All right.  As we talked about earlier, that's the same

24  language that is at the bottom of that stack of papers where

04:46

25  you laid the warrant and the inventory?

188

1    **A.**    Yes.

2    **Q.**    All right.  Do you know if that's the exact document that

3    was below the -- what you left as the warrant?

4    **A.**    That, I don't know, sir, but that's where the warrant was

04:46    5    left.  And I remember seeing that there was a cell phone on top

6    of that, I believe.  We have a photo of that.

7    **Q.**    That was seized?

8    **A.**    The cell phone was, yes.

9    **Q.**    Okay.  I want to go to 23 briefly and direct your

04:46    10    attention to the left side here.  That -- that was the warrant

11    that you left?

12    MS. PUHL:  Your Honor, I'm going to object.  I think

13    this has been asked and answered.  I'm not sure where the

14    defendant is going with this.  I don't see the point.

04:47    15    THE COURT:  Well, I will overrule that objection, but

16    please move along if you can, Mr. Bellmore.

17    **Q.**    (MR. BELLMORE CONTINUING)  Detective Buzzo, on the left

18    there, which you had already testified was the warrant that you

19    left, how many -- how many pages do you see?

04:47    20    **A.**    There's a stack there.  I can't count the stack.  I mean,

21    there's multiple.  There's doubled-up pages, plus the subpoena

22    from the AG's Office.

23    **Q.**    Well, let's exclude the subpoena.  That's what you're --

24    you're recognizing as the set of documents at the bottom?

04:48    25    **A.**    Yes.

1   Q.    And we can see -- on the top, we can see that's the

2   warrant.  That's the computer-generated warrant we talked

3   about, correct?

4   A.    Correct.

04:48   5   Q.    And there's two pages underneath it.

6   A.    Yes.

7   Q.    All right.  You mentioned after the --

8         MR. BELLMORE:  Excuse me.  Your Honor, I'm going to

9   move to admit Exhibits 22 through 24.

04:48   10        THE COURT:  Any objection?

11        MS. PUHL:  No objection, Your Honor.

12        THE COURT:  Defendant's Exhibits 22, 23 and 24 are

13   received.

14   Q.    (MR. BELLMORE CONTINUING)  Detective Buzzo, do you recall

04:49   15   after the search warrant was executed, that you applied for

16   another bank warrant in this case?

17   A.    Yes, sir, I do.

18   Q.    For Gate City Bank?

19   A.    Yes, sir.

04:49   20   Q.    And you were looking for similar information that you had

21   requested and received from United Valley Bank?

22   A.    Similar as in banking documents, yes, sir.

23   Q.    You were looking for banking documents?

24   A.    Account statements --

04:49   25   Q.    And --

190

1  **A.**   -- records of deposits and withdrawals, those types of
2  items.
3  **Q.**   You put a date range on that warrant as well?
4  **A.**   I most likely did, yes.
5            MR. BELLMORE:  May I have one moment, Your Honor?
6            THE COURT:  Sure.
7            MR. BELLMORE:  I have no further questions, Your
8  Honor.
9            THE COURT:  Ms. Puhl, how much redirect might you
10  have in mind?
11            MS. PUHL:  Your Honor, I'd like to think I could get
12  it done in 20 to 30 minutes.
13            THE COURT:  Yeah, I promised that we'd be done by
14  5:00, so I think we need to adjourn for today.  What time would
15  you like to start in the morning?
16            MS. PUHL:  I guess our preference would be 9 o'clock,
17  Your Honor.
18            THE COURT:  Mr. Bellmore?
19            MR. BELLMORE:  That's fine, Your Honor.
20            THE COURT:  All right.  Let's plan to be back here at
21  9 o'clock tomorrow morning, and I'm sure the clerk will want to
22  sort through the exhibits.
23            MS. PUHL:  Your Honor, I --
24            THE COURT:  Some of them are originals.  Some of them
25  are copies.  Go ahead, Ms. Puhl.

1          MS. PUHL:  My colleague has informed me that Exhibit

2    Number 76 has not been introduced, so if we could go ahead and

3    introduce Exhibit Number 76.

4          THE COURT:  That's the transcript or the CD?

04:51    5          MS. PUHL:  The evidence inventory sheet, Your Honor.

6    I failed to move to introduce it into evidence.

7          THE COURT:  Mr. Bellmore, any objection to receipt of

8    the inventory?

9          MR. BELLMORE:  No objection, Your Honor.

04:51   10          THE COURT:  Then Exhibit 76 is received.

11          Anything else we should take care of today, Ms. Puhl?

12          MS. PUHL:  Nothing further, Your Honor.  Thank you.

13          THE COURT:  Mr. Bellmore, anything else?

14          MR. BELLMORE:  Well, Your Honor, for scheduling

04:52   15    purposes, I'd informed the Court I do have a afternoon hearing

16    in front of Judge Welte.  I guess maybe I was a little

17    ambitious that we would have things much further along than we

18    wound up today, but I don't know what -- if the Court is

19    intending on trying to go the full day.  I just wanted to bring

04:52   20    it to the Court's attention.

21          THE COURT:  I have all day tomorrow available.  What

22    time is your hearing, Mr. Bellmore?

23          MR. BELLMORE:  2:30, Your Honor.

24          THE COURT:  Okay.

04:52   25          MR. BELLMORE:  2:30, Your Honor.

192

1          THE COURT:  Well, if we're still going at 2:30, then
2     we'll need to deal with that then.  Ms. Puhl?
3          MS. PUHL:  Your Honor, if we could just --
4     housekeeping matter, we have folks that are due to be out of
04:53   5     town Friday, so is it the Court's intent to take a break at
6     2:30 if we're not done?  I would -- it would be my preference
7     that Mr. Bellmore ask a colleague to cover that hearing.
8     That's certainly what we do when we're in this situation.
9          THE COURT:  Is that possible, Mr. Bellmore?  What
04:53   10    type of hearing is it?
11         MR. BELLMORE:  It's a sentencing hearing, Your Honor,
12    and that's -- from the defense perspective, it's -- it's not
13    the same as having a substitute assistant United States
14    attorney cover it.  So I don't think that -- that my client
04:53   15    would feel particularly comfortable going through a sentencing
16    with somebody new, but we will do what we can.  And maybe we
17    can update the Court first thing in the morning about what
18    option that we have.
19         THE COURT:  And as I said, I don't have anything else
04:54   20    on the schedule, so we can certainly shorten up a lunch break.
21    And if you want to start before 9:00, we can start before 9:00.
22         MS. PUHL:  We can -- it would be my preference to
23    start at 8:30.  Again, the Court instructed us that this was
24    two days, so we cleared our calendars for two days, including
04:54   25    all the witnesses who are from out of town, so I think that

1    would be preferable.

2              THE COURT:  Mr. Bellmore, can we start at 8:30

3    tomorrow?

4              MR. BELLMORE:  Yes, Your Honor.

04:54    5         THE COURT:  Okay.  Let's plan to start at 8:30.  I

6    think the two days was based on what we heard from counsel,

7    but, you know, if we don't finish, then we'll figure out what

8    we do from there.

9              Thank you, all.  We'll see you in the morning.

04:54   10         (A recess was taken from 4:54 p.m., Wednesday, May 3,

11   2023, to 8:30 a.m., Thursday, May 4, 2023.)

12                   - - - - - - - - - -

13

14

15

16

17

18

19

20

21

22

23

24

25